# EXHIBIT A

## AMENDMENT NUMBER ONE
## TO LOAN AND SECURITY AGREEMENT

This Amendment Number One to Loan and Security Agreement (this "Amendment") is entered into as of September 2, 2004, by and among, on the one hand, the lenders identified on the signature pages hereof (such lenders, together with their respective successors and permitted assigns, are referred to hereinafter each individually as a "Lender" and collectively as the "Lenders") and **ORCHARD DRIVE, LLC**, a Delaware limited liability company, as the arranger and administrative agent for the Lenders ("Agent"), and, on the other hand, **OCEANS CASINO CRUISES, INC.**, a Delaware corporation ("OCC"), **VESSEL CASINOS, INC.**, a Delaware corporation ("VCI"), and **VENTURES SOUTH CAROLINA, L.L.C.**, a Florida limited liability company ("VSC") (OCC, VCI and VSC are each a "Borrower" and collectively, jointly and severally the "Borrowers"), in light of the following:

A.  Borrowers, Agent and Lenders have previously entered into that certain Loan and Security Agreement, dated as of April 8, 2004 (the "Loan Agreement").

B.  Borrowers have requested that Lenders (a) increase the total Revolver Commitment from $3,000,000 to $3,900,000, (b) make an additional term loan to Borrowers in the principal amount of $2,750,000, (c) consent to the sale of the Vessels listed on Schedule S attached hereto (the "Secondary Vessels"), and (d) (i) defer the Borrowers' obligations to pay the interest due on June 1, 2004, with respect to the Advances and Term Loans outstanding during the month of May, 2004, allow such interest to be added to the outstanding principal balance of the Obligations on the terms and conditions set forth herein, and waive the Event of Default arising from the failure to pay such interest on June 1, 2004, (ii) consent to a modification of the mandatory prepayment requirement under Section 2.4(c)(ii) of the Loan Agreement with respect to the proceeds received by the Borrowers from the sale of the Secondary Vessels in accordance with the terms set forth herein, (iii) consent to the indemnity to be provided by OCC to Robert Weisberg as described herein notwithstanding the provisions of Section 7.13 of the Loan Agreement or any other provision of the Loan Agreement that would prohibit or restrict such indemnity and (iv) grant an extension of time for the Borrowers to comply with certain conditions subsequent set forth in Section 3.2 of the Loan Agreement in the manner provided on Exhibit 8 hereto.

C.  Lenders have agreed to Borrowers' requests subject to the terms and conditions contained in this Amendment.

NOW, THEREFORE, Borrowers and Lenders, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby agree as follows:

1.  **Definitions.**  All initially capitalized terms used in this Amendment and defined in the Loan Agreement shall have the meanings given to them in the Loan Agreement unless otherwise specifically defined herein.

2.   **Amendments.**

(a) Schedule C-1 is hereby amended and restated in its entirety by replacing it with the Schedule C-1 attached to this Amendment.

(b) The definitions of "Commitment," "Maximum Revolver Amount," "Revolver Commitment," "Term Loan" and "Term Loans" in Section 1.1 are hereby amended and restated as follows:

"Commitment" means, with respect to each Lender, its Revolver Commitment, its Term Loan A Commitment, its Term Loan B Commitment, its Term Loan C Commitment, its Term Loan D Commitment or its Total Commitment, as the context requires, and, with respect to all Lenders, their Revolver Commitments, their Term Loan A Commitments, their Term Loan B Commitments, their Term Loan C Commitments, their Term Loan D Commitment or their Total Commitments, as the context requires, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 or in the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder in accordance with the provisions of Section 14.1.

"Maximum Revolver Amount" means, as of the date that the conditions set forth in Sections 11 and 12(a) have been met, $3,900,000; provided, however, that commencing on April 1, 2005, and continuing on the first day of each calendar month thereafter, up to and including December 31, 2005, the Maximum Revolver Amount shall be reduced by $100,000 each month and, as of December 31, 2005 and at all times thereafter, the Maximum Revolver Amount shall equal $3,000,000.

"Revolver Commitment" means, with respect to each Lender, its Revolver Commitment, and, with respect to all Lenders, their Revolver Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 or in the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder in accordance with the provisions of Section 14.1; provided, however, that commencing on April 1, 2005, and continuing on the first day of each calendar month thereafter, up to and including December 31, 2005, the aggregate Revolver Commitments of all Lenders shall be reduced by $100,000 each month and, as of December 31, 2005 and at all times thereafter, the aggregate amount of the Revolver Commitments shall equal $3,000,000.

"Term Loan" means Term Loan A, Term Loan B, Term Loan C or Term Loan D and "Term Loans" means, collectively, Term Loan A, Term Loan B, Term Loan C and Term Loan D.

(c) The definition of "Pro Rata Share" is amended by deleting clause (e) in its entirety and replacing it with a new clause (e) and by adding a new clause (f) as follows:

(e)     with respect to a Lender's obligation to make Term Loan D and receive payments of interest, fees, and principal with respect thereto, (i) prior to the making of Term Loan D, the percentage obtained by dividing (x) such Lender's applicable Term Loan D Commitment, by (y) the aggregate amount of all Lenders' applicable Term Loan D Commitments, and (ii) from and after the making of Term Loan D, the percentage obtained by dividing (x) such Lender's portion of the Term Loan D Amount by (y) the Term Loan D Amount,

(f)     with respect to all other matters as to a particular Lender (including the indemnification obligations arising under Section 16.7), the percentage obtained by dividing (i) such Lender's Revolver Commitment, plus such Lender's portion of the Term Loan A Amount, plus such Lender's portion of the Term Loan B Amount, plus such Lender's portion of the Term Loan C Amount plus such Lenders' portion of the Term Loan D amount, by (ii) the aggregate amount of Revolver Commitments of all Lenders, plus the Term Loan A Amount, plus the Term Loan B Amount, plus the Term Loan C Amount, plus the Term Loan D Amount.

(d) New definitions of Amendment Number One, Amendment Number One Closing Date, Amendment Number One Funding Date, Expansion Budget, PIK Interest, Secondary Vessels, Term Loan D, Term Loan D Amount, Term Loan D Commitment are added to Section 1.1 of the Loan Agreement as follows:

"Amendment Number One" means Amendment Number One to Loan and Security Agreement, dated as of September 2, 2004, among Borrowers, Lenders and Agent.

"Amendment Number One Closing Date" means September 2, 2004.

"Amendment Number One Funding Date" means the date on which all of the conditions precedent set forth in Section 12 of Amendment Number One have been fulfilled or waived by the Agent.

"Expansion Budget" means the budget of capital expenditures, lease obligations and working capital expenses related to the expansion and continued maintenance of the Borrowers' business operations resulting from the acquisition of two additional ports located in the State of Florida and attached hereto as Exhibit B-1.

"PIK Interest" means interest due on June 1, 2004, with respect to the Advances and Term Loans outstanding during the month of May, 2004, which interest has been capitalized, and the payment of which in cash on June 1, 2004 has been deferred to the earlier of (i) October 31, 2004 or

(ii) the Amendment Number One Funding Date, in accordance with the terms of Section 3 of Amendment Number One.

"Secondary Vessels" means the Vessels listed on Schedule S to Amendment Number One.

"Term Loan D" has the meaning set forth in Section 2.2(e).

"Term Loan D Amount" means (a) on the Amendment Number One Funding Date, $2,750,000 and (b) on any date of determination after the Amendment Number One Funding Date, the outstanding principal balance of Term Loan D.

"Term Loan D Commitment" means, with respect to each Lender, its Term Loan D Commitment, and, with respect to all Lenders, their Term Loan D Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 or in the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder in accordance with the provisions of Section 14.1.

(e) A new subsection (e) is added to Section 2.2 as follows:

(e)     **Term Loan D.**   Subject to the terms and conditions of this Agreement, on the Amendment Number One Funding Date, each Lender with a Term Loan D Commitment agrees (severally, not jointly or jointly and severally) to make term loans (collectively, "Term Loan D") to Borrowers in an amount equal to such Lender's Pro Rata Share of the Term Loan D Amount. The outstanding unpaid principal balance and all accrued and unpaid interest under Term Loan D shall be due and payable on the earlier of (y) August 1, 2006, and (z) the date of termination of this Agreement, whether by its terms, by prepayment, or by acceleration. All amounts outstanding under Term Loan D shall constitute Obligations. Borrowers shall prepay Term Loan D at such times and in such amounts as may be required under Section 2.4(c) and under Amendment Number One. Borrowers may make voluntary prepayments of principal with respect to Term Loan D from time to time so long as: (i) Borrowers provide Agent not less than 3 Business Days prior written notice of such prepayment, and (ii) the amount of any prepayment is in a minimum amount of $100,000 and integral multiples thereof, or the remaining principal balance of Term Loan D, if less. In connection with each voluntary prepayment, Borrowers shall concurrently pay to Agent for the benefit of the Term Loan D Lenders a prepayment fee in an amount equal to the Applicable Prepayment Premium on the amount prepaid. Amounts repaid under Term Loan D may not be reborrowed.

(f) Subpart (i) of Section 2.4(b) is amended and restated in its entirety by replacing it with the following:

(i)      Except as otherwise provided with respect to Defaulting Lenders and except as otherwise provided in the Loan Documents (including agreements between Agent and individual Lenders), aggregate principal and interest payments shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the Obligations to which such payments relate held by each Lender) and payments of fees and expenses (other than fees or expenses that are for Agent's separate account, after giving effect to any agreements between Agent and individual Lenders) shall be apportioned ratably among the Lenders having a Pro Rata Share of the type of Commitment or Obligation to which a particular fee relates. Except as otherwise specifically provided in paragraph (b)(iii) below or Section 2.4(d), all payments shall be remitted to Agent and all such payments, and all proceeds of Collateral received by Agent, shall be applied as follows:

A.      first, to pay any Lender Group Expenses then due to Agent under the Loan Documents, until paid in full,

B.      second, to pay any Lender Group Expenses then due to the Lenders under the Loan Documents, on a ratable basis, until paid in full,

C.      third, to pay any fees then due to Agent by Borrowers and not any amount owing to Agent by a Defaulting Lender (for its separate account, after giving effect to any agreements between Agent and the individual Lenders) under the Loan Documents, until paid in full,

D.      fourth, to pay any fees then due by Borrowers to any or all of the Lenders (after giving effect to any agreements between Agent and individual Lenders) under the Loan Documents, on a ratable basis, until paid in full, provided that, if an Event of Default has occurred and is continuing, the priority of the payment of any fee payable to any Lender in respect of Term Loan B, Term Loan C and Term Loan D shall, unless the Required Lenders agree in their sole discretion to forgo deferring such payment, be deferred to item "eighteenth", "nineteenth" and twentieth below, respectively,

E.      fifth, to pay interest due in respect of all Agent Advances, until paid in full,

F.      sixth, to pay interest due in respect of the Advances (other than Agent Advances), until paid in full,

G.      seventh, ratably to pay interest due in respect of Term Loan A until paid in full,

H.    eighth, so long as no Event of Default has occurred and is continuing or, if an Event of Default has occurred and is continuing and the Required Lenders agree in their sole discretion, ratably to pay interest due in respect of Term Loan B, until paid in full (if an Event of Default has occurred and is continuing and the Required Lenders have not agreed to allow the payment of interest due in respect of Term Loan B, the priority of the payment of interest on Term Loan B shall be deferred to item "twenty-first" below),

I.    ninth, as no Event of Default has occurred and is continuing or, if an Event of Default has occurred and is continuing and the Required Lenders agree in their sole discretion, ratably to pay interest due in respect of Term Loan C, until paid in full (if an Event of Default has occurred and is continuing and the Required Lenders have not agreed to allow the payment of interest due in respect of Term Loan C, the priority of the payment of interest on Term Loan C shall be deferred to item "twenty-second" below),

J.    tenth, as no Event of Default has occurred and is continuing or, if an Event of Default has occurred and is continuing and the Required Lenders agree in their sole discretion, ratably to pay interest due in respect of Term Loan D, until paid in full (if an Event of Default has occurred and is continuing and the Required Lenders have not agreed to allow the payment of interest due in respect of Term Loan D, the priority of the payment of interest on Term Loan C shall be deferred to item "twenty-third" below),

K.    eleventh, to pay the principal of all Agent Advances until paid in full,

L.    twelfth, so long as no Event of Default has occurred and is continuing or, if an Event of Default has occurred and is continuing and the Required Lenders agree in their sole discretion, ratably to pay all principal amounts then due and payable (other than as a result of an acceleration thereof) with respect to Term Loan A until paid in full (if an Event of Default has occurred and is continuing and the Required Lenders have not agreed to allow the payment of principal due in respect of Term Loan A, the priority of the payment of principal then due with respect to Term Loan A shall be deferred to item "seventeenth" below),

M.    thirteenth, so long as no Event of Default has occurred and is continuing or, if an Event of Default has occurred and is continuing and the Required Lenders agree in their sole discretion, ratably to pay all principal amounts then due and payable (other than as a result of an acceleration thereof) with respect to Term Loan B, until paid in full (if an Event of Default has occurred and is continuing and the Required Lenders have not agreed to allow the payment of principal due in respect of Term

Loan B, the priority of the payment of principal then due with respect to Term Loan B shall be deferred to item "twenty-four" below),

N.      fourteenth, so long as no Event of Default has occurred and is continuing or, if an Event of Default has occurred and is continuing and the Required Lenders agree in their sole discretion, ratably to pay all principal amounts then due and payable (other than as a result of an acceleration thereof) with respect to Term Loan C, until paid in full (if an Event of Default has occurred and is continuing and the Required Lenders have not agreed to allow the payment of principal due in respect of Term Loan C, the priority of the payment of principal then due with respect to Term Loan C shall be deferred to item "twenty-five" below),

O.      fifteenth, so long as no Event of Default has occurred and is continuing or, if an Event of Default has occurred and is continuing and the Required Lenders agree in their sole discretion, ratably to pay all principal amounts then due and payable (other than as a result of an acceleration thereof) with respect to Term Loan D, until paid in full (if an Event of Default has occurred and is continuing and the Required Lenders have not agreed to allow the payment of principal due in respect of Term Loan D, the priority of the payment of principal then due with respect to Term Loan D shall be deferred to item "twenty-six" below)

P.      sixteenth, to pay the principal of all Advances (other than Agent Advances) until paid in full,

Q.      seventeenth, if an Event of Default has occurred and is continuing, to pay the outstanding principal balance of Term Loan A (in the inverse order of the maturity of the installments due thereunder), until Term Loan A is paid in full,

R.      eighteenth, if an Event of Default has occurred and is continuing, to pay fees due in respect of Term Loan B, until paid in full,

S.      nineteenth, if an Event of Default has occurred and is continuing, to pay fees due in respect of Term Loan C, until paid in full,

T.      twentieth, if an Event of Default has occurred and is continuing, to pay fees due in respect of Term Loan D, until paid in full,

U.      twenty-first, if an Event of Default has occurred and is continuing, to pay interest due in respect of Term Loan B, until paid in full,

V.      twenty-second, if an Event of Default has occurred and is continuing, to pay interest due in respect of Term Loan C, until paid in full,

W.   twenty-third, if an Event of Default has occurred and is continuing, to pay interest due in respect of Term Loan D, until paid in full,

X.   twenty-four, if an Event of Default has occurred and is continuing, to pay the outstanding principal balance of Term Loan B (in the inverse order of maturity of the installments due thereunder), until Term Loan B is paid in full,

Y.   twenty-five, if an Event of Default has occurred and is continuing, to pay the outstanding principal balance of Term Loan C (in the inverse order of maturity of the installments due thereunder), until Term Loan C is paid in full,

Z.   twenty-six, if an Event of Default has occurred and is continuing, to pay the outstanding principal balance of Term Loan D, until Term Loan D is paid in full,

AA.   twenty-seven, if an Event of Default has occurred and is continuing, to pay the Applicable Prepayment Premium then due and payable until paid in full.

BB.   twenty-eight, to pay any other Obligations until paid in full, and

CC.   twenty-nine, to Borrowers (to be remitted by wire transfer to the Designated Account) or such other Person entitled thereto under applicable law.

(g) Clause (iv) of Section 2.5(a) is renumbered to (v) and a new clause (iv) is added to Section 2.5(a) as follows:

(iv) if the relevant Obligation is Term Loan D, at a fixed rate equal to twenty percent (20%), per annum,

(h) A new clause (i) is added to Section 6.3 as follows:

(i) by the 15th and last day of each calendar month beginning September 30, 2004, (or if such date is not a Business Day, on the first Business Day thereafter), a progress report summarizing the capital expenditures, lease obligations and working capital expenses incurred by Borrowers during the immediately preceding portion of such calendar month not previously reported to Lenders together with a summary of such expenditures incurred to date in connection with the items set forth on the Expansion Budget and a comparison of the actual amounts incurred by Borrowers to the amounts set forth in the Expansion Budget.

(i) Section 2.2(d) is hereby amended and restated in its entirety as follows:

(d)     **Regularly Scheduled Payments of Term Loan A, Term Loan B and Term Loan C.** Borrowers shall make scheduled principal payments on Term Loan A, Term Loan B and Term Loan C in the following aggregate amounts, at the following times and applied in the following manner:  (i) $100,000 each month, on the first day of each month during the eight (8) month period beginning on May 1, 2004 and ending on December 31, 2004; (ii) $167,000, each month, on the first day of each month during the twelve (12) month period beginning on January 1, 2005 and ending on December 31, 2005; and (iii) $216,000 each month, on the first day of each month during the twelve (12) month period beginning on January 1, 2006 and ending on December 31, 2006.  Each scheduled principal payment shall be applied, first, to the installments of principal on Term Loan A until paid in full, second, to the installments of principal on Term Loan B until paid in full, and third, to the installments of principal on Term Loan C until paid in full.

3.     **Modification of Section 7.18(a)(i) (Minimum TTM EBITDA Measurement) until March 31, 2005.**  With respect to Section 7.18(a)(i), Lenders hereby agree that Borrowers shall be deemed to be in compliance with that Section as of September 30, 2004, and December 31, 2004, if Borrowers have not less than the following required amount of TTM EBITDA as of such dates:

| Required Amount | Measurement Date |
| --- | --- |
| $8,722,293 | 9/30/04 |
| $8,827,237 | 12/31/04 |
| $11,473,252 | 3/31/05 |
| $13,645,151 | 6/30/05 |
| $15,450,384 | 9/30/05 |
| $15,557,427 | 12/31/05 |

4.     **Deferral of June 1, 2004 Interest Payment and Waiver of Event of Default.**  Lenders hereby defer the obligation of the Borrowers to pay in cash on June 1, 2004, the interest that is otherwise, but for this Amendment, due and payable to Agent on behalf of the Lenders on June 1, 2004, and agree that such interest shall be capitalized as PIK Interest and added to the outstanding principal balance of the Obligations, subject to the following conditions:

(a) PIK Interest shall bear interest at the same rate as the Advances and Term Loans, as applicable, from June 1, 2004, until paid in full.

(b) PIK Interest, as well as any interest thereon, shall be paid in full upon the earlier of (i) the Amendment Number One Funding Date or (ii) October 31, 2004.

The Lenders hereby waive the Event of Default that has occurred due to the Borrowers failure to pay the interest that was due on June 1, 2004, pursuant to the terms of the Loan Agreement.

5.   **Limited Waiver of Prohibition of Sale of Secondary Vessels under of Sections 7.4 and Modification of Mandatory Prepayment Requirements With Respect to Proceeds from Sale of Secondary Vessels.**  Notwithstanding the provisions of Section 7.4 of the Loan Agreement to the contrary, Lenders consent to the sale or charter (so long as the charter includes a purchase option that would qualify as a permitted sale under this Section) of the Secondary Vessels subject to the terms and conditions hereof, and notwithstanding the provisions of Section 2.4(c)(ii) of the Loan Agreement to the contrary, all proceeds from the sale or charter of the Secondary Vessels shall be first used to make mandatory prepayments of Term Loan D until repaid in full and shall thereafter be applied in accordance Section 2.4(c)(ii). The foregoing consents by the Lenders are subject to the following conditions: (i) the sale (including a sale under a purchase option contained in a charter permitted under this Section) or charter of any of the Secondary Vessels shall be at a price not less than the fair market value of each such Secondary Vessel, (ii) no Secondary Vessel shall be sold or chartered to a Competitor or potential Competitor of a Borrower and the purchaser or charterer, as applicable, shall covenant to Borrowers (with the Lenders being an intended third party beneficiary of such covenant) that the purchaser or charterer, as applicable, shall not sell, charter, lease, license or otherwise transfer any Secondary Vessel to a Competitor or potential Competitor of a Borrower, (iii) each such sale or charter shall be on terms that are fair and reasonable and satisfactory to the Lenders, in their Permitted Discretion, and (iv) the cash proceeds of each such sale payable upon the execution of definitive sale documentation with respect to any such Secondary Vessel, shall be in an amount not less than 50% of the purchase price for such Secondary Vessel. For purposes of this Section 5, "Competitor" shall mean any Person who, at the time of the sale or charter of any Secondary Vessel, operates or intends to operate in any market where the Borrowers currently operate or could reasonably be expected to operate in the future.

6.   **Limited Waiver of Section 7.13 of the Loan Agreement With Respect to Weisberg Indemnity.**  The Lenders hereby agree to waive the Borrowers' compliance with Section 7.13 of the Loan Agreement and any other provision of the Loan Agreement that would restrict the ability of OCC to enter into that certain Indemnification, made by OCC in favor of Robert Weisberg (a true and correct copy of which is attached hereto as Exhibit 6 and is referred to herein as the "Indemnity"), in connection with the execution of the lease between RE Palm Beach Partners and VSC relating to the property at Little River, South Carolina, the terms of such Indemnity to be satisfactory to the Agent and Lenders in their Permitted Discretion.

7.   **Exclusion of Term Loan D from Calculation of Financial Covenants.**  Lenders hereby agree to exclude the interest obligations in connection with Term Loan D and the outstanding principal balance of Term Loan D from the calculation of the Fixed Charge Coverage Ratio, Interest Coverage Ratio and the Leverage Ratio.

**8.     Limited Waiver of Section 3.2 With Respect to Conditions Subsequent.** The Lenders hereby agree to amend certain of the conditions subsequent set forth in Section 3.2 of the Loan Agreement as set forth in Exhibit 8 attached hereto.

**9.     Waiver to VSC.** The parties hereto hereby acknowledge that VSC is subject to a Chapter 11 proceeding and that no bankruptcy court approval has been obtained in respect of the execution or delivery by VSC of any of the Loan Documents (including this Amendment), and that no Loan Documents are effective obligations of, or enforceable against, VSC, and that VSC is not a "Borrower" or "Obligor" under or for any purpose of any Loan Document until such time as such Chapter 11 proceeding is dismissed or bankruptcy court approval of VSC's execution and delivery of the Loan Documents has been obtained.  The Lenders hereby waive ab initio any representation and warranty relating to VSC contained in any Loan Document as an inducement to the Lenders to enter into the Loan Documents, and waive any consequence of any inaccuracy thereof insofar as it relates to VSC, and hereby waive ab initio any Default or Event of Default that may otherwise exist or have existed as a result of (i) any inaccuracy of such representations and warranties insofar as they relate to VSC, (ii) VSC not being a party to, or bound by, the Loan Documents, or failing to comply with any purported obligations of VSC under the Loan Documents, or the failure to deliver any documents by or on behalf of, or relating to, VSC or the satisfaction of any other closing condition or condition subsequent relating to VSC, or (iii) the insolvency of, or any insolvency proceeding relating to, VSC.  Upon the dismissal of VSC's Chapter 11 proceeding or the issuance of an order of the bankruptcy court approving VSC becoming a borrower under the Loan Agreement, then from and after that date VSC shall be deemed a "Borrower" and "Obligor" subject to all of the terms, covenants, conditions, representation and warranties contained in the Loan Agreement and Loan Documents.

**10.     Effectiveness of Waivers; No Defaults.** Each amendment and waiver set forth herein shall be effective from and after the Amendment Number One Closing Date notwithstanding the date that is determined to be the Amendment Number One Funding Date. Subject to the limitations set forth in Section 9 above, (i) each Borrower (other than VSC) hereby affirms to the Lender Group that all of such Borrower's representations and warranties set forth in the Loan Agreement, as amended hereby, are true, complete and accurate in all material respects as of the date hereof and (ii) after giving effect to the amendments and waivers set forth herein, each Borrower hereby affirms to the Lender Group that no Event of Default has occurred and is continuing as of the date hereof.

**11.     Conditions Precedent to Amendment Number One Closing Date.** The effectiveness of the waivers and amendments set forth herein are is expressly conditioned upon the following:

(a) Receipt by Agent of certified copies of the resolutions of each respective Borrower's board of directors, or sole member, as applicable, authorizing the execution and delivery of this Amendment and the other documents contemplated hereby, and authorizing the transactions contemplated hereunder and thereunder, and authorizing specific officers of such Borrower to execute the same on behalf of the Borrower in each case certified by the Secretary or other acceptable officer of such Borrower as of the date hereof; and

(b) Receipt by Agent of an executed copy of this Amendment.

12.   **Conditions Precedent To Amendment Number One Funding Date.**

(a) The increase in the total Revolver Commitment and the funding of the Term Loan D are expressly conditioned upon the receipt by Agent of (i) an origination fee of $18,000 for the ratable benefit of the Lenders with a Revolver Commitment, and (ii) an origination fee of $27,500 for the ratable benefit of the Lenders with a Term Loan D Commitment; and

(b) The funding of the Term Loan D is further expressly conditioned upon receipt by Agent of executed amendments to the Preferred Ship Mortgages and any other instruments, agreements or documents in order to insure that all of the Obligations (including the Obligations arising as a result of the increase in the Maximum Revolver Amount and the Obligations arising in connection with Term Loan D) are secured by the Agent's Lien on all of the Collateral, together with evidence satisfactory to Agent that such Agent's Liens on the Collateral are of a first priority and senior to all other Liens on the Collateral held by any Person.

13.   **Amendment Fee.**   In consideration of the Lenders entering into this Amendment, the Borrowers have agreed to pay an amendment fee to the Agent for the ratable benefit of the Lenders in the amount of $430,808 (the "Amendment Fee"). The Amendment Fee shall be capitalized and added to the outstanding principal balance outstanding under Term Loan B, shall accrue interest and be paid or prepaid in accordance with the terms applicable to Term Loan B, and shall be an Obligation under the Agreement.

14.   **Costs and Expenses.**   Borrowers shall pay to Agent all of Agent's out-of-pocket costs and expenses (including, without limitation, the reasonable fees and expenses of its counsel, which counsel may include any local counsel deemed necessary, search fees, filing and recording fees, documentation fees, appraisal fees, travel expenses, and other fees) arising in connection with the preparation, execution, and delivery of this Amendment and all related documents.

15.   **Limited Effect.**   In the event of a conflict between the terms and provisions of this Amendment and the terms and provisions of the Loan Agreement, the terms and provisions of this Amendment shall govern. In all other respects, the Loan Agreement, as amended and supplemented hereby, shall remain in full force and effect. All references to the Loan Agreement in any other documents, instrument, agreement or writing shall hereafter be deemed to refer to the Loan Agreement as amended hereto.

16.   **CHOICE OF LAW.  THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES.**

17. .   **Counterparts; Effectiveness.**   This Amendment may be executed in any number of counterparts and by different parties on separate counterparts, including by facsimile signature, each of which when so executed and delivered shall be deemed to be an original. All

such counterparts, taken together, shall constitute but one and the same Amendment. This Amendment shall become effective upon the execution of a counterpart of this Amendment by each of the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first set forth above.

**OCEANS CASINO CRUISES, INC.,**
a Delaware corporation

By: _____
Title: Chairman & CEO

**VESSEL CASINOS, INC.,**
a Delaware corporation

By: _____
Title: Chairman & CEO

**VENTURES SOUTH CAROLINA, L.L.C.,**
a Florida limited liability company

By: Oceans Casino Cruises, Inc., its sole member

By: _____
Title: Managing Member

S-1
Amendment Number One to Loan and Security Agreement

**ORCHARD DRIVE, LLC,**
a Delaware limited liability company, as Agent and
as a Lender

By: _____
Title: CFO

**SKYLAB ROAD LLC,**
a Delaware limited liability company, as a Lender

By:
Title:

      CONSTANTINE DAKOLIAS
      CHIEF CREDIT OFFICER

S-3
Amendment Number One to Loan and Security Agreement

## Schedule S

### Secondary Vessels

Suncruz II
Suncruz IV
Suncruz X
Suncruz XI

LA 162999v9

**Schedule C-1**
**Commitments**

| | | | | | | |
|---|---|---|---|---|---|---|
| Orchard Drive, LLC | $3,900,000 | $3,500,000 | $13,948,453.61 | $2,500,000 | $1,375,000 | $25,223,453.61 |
| Skylab Road LLC | $0 | $3,500,000 | $13,948,453.61 | $2,500,000 | $1,375,000 | $21,323,453.61 |
| All Lenders | $3,900,000 | $7,000,000 | $27,896,907.22 | $5,000,000 | $2,750,000 | $46,546,907.22 |

Schedule C-1

## Exhibit 8

| Section of Credit Agreement | Condition Subsequent | Borrowers' Obligation as of Amendment Number One Closing Date |
|---|---|---|
| 3.2(c) | Executed copies of the credit card notifications as set forth in Section 5.27 of the Loan Agreement, in form and substance satisfactory to Agent | Borrowers shall deliver the credit card notification agreements to the Agent and Lenders within 30 days following the Amendment Number One Closing Date. |
| 3.2(d)(i) | Cash Management Agreements | Borrowers shall deliver the Cash Management Agreements to the Agent and Lenders within 30 days following the Amendment Number One Closing Date. |
| 3.2(d)(ii) | Control Agreements of Borrowers | Borrowers shall deliver the Control Agreements to the Agent and Lenders within 30 days following the Amendment Number One Closing Date. |
| 3.2(d)(iii) | Collateral assignment of key man life insurance policy of Weisberg, Naos and Karan | Borrowers (a) shall cause the key man life insurance conditions set forth in Section 6.8 of the Agreement to be met within 90 days of the Amendment Number One Closing Date with respect to the policies described in clauses (ii) and (iii) of such Section, and (b) shall use their best efforts to cause the key man life insurance conditions set forth in Section 6.8 of the Agreement to be met within 90 days of the Amendment Number One Closing Date with respect to the policies described in clause (i) of such Section.  Lenders waive any conditions subsequent described in clause (iv) of such Section with respect to obtaining key man life insurance for  any other members of Borrowers' senior management. |
| 3.2(d)(iv) | Collateral Access Agreements | Upon the request of Agent, Borrowers shall deliver all of the executed Collateral Access |

| | | Agreements to Agent within 30 days following receipt of Agent's request. |
|---|---|---|
| 3.2(d)(v) | Collateral Assignment of Leases | Borrowers shall use their best efforts to provide the Agent and Lenders with executed copies of the Collateral Assignment of Leases. |
| 3.2(e) | Conditions Subsequent in items A(2) and D(2) of the Dale Letter | Borrowers shall use their best efforts to ensure that (a) a recognized financial institution acceptable to Lenders is designated as institutional trustee of Oceans Trust and (b) the REPBP Trust (as defined in the Dale Letter) has been properly formed with a trustee designated that is satisfactory to the Lenders |
| 3.2(f) | Final closing balance sheet respecting the Borrowers, reviewed by Navigant Consulting, reflecting all purchase price adjustments arising out of the transaction. | Borrowers shall use their best efforts to deliver the final closing date balance sheet, reviewed by Navigant Consulting, to the Agent and Lenders by October 31, 2004. |

# LOAN AND SECURITY AGREEMENT

by and among

OCEANS CASINO CRUISES, INC.,
VESSEL CASINOS, INC.
and
VENTURES SOUTH CAROLINA, L.L.C.
as Borrowers,

THE LENDERS THAT ARE SIGNATORIES HERETO
as the Lenders,
and
ORCHARD DRIVE, LLC
as the Arranger and Administrative Agent

Dated as of April 8, 2004

## TABLE OF CONTENTS

Page

1. DEFINITIONS AND CONSTRUCTION.........................................................................1
   1.1 Definitions.................................................................................................1
   1.2 Accounting Terms....................................................................................24
   1.3 Code.........................................................................................................24
   1.4 Construction.............................................................................................24
   1.5 Schedules and Exhibits............................................................................25

2. LOAN AND TERMS OF PAYMENT........................................................................25
   2.1 Revolver Advances...................................................................................25
   2.2 Term Loans..............................................................................................26
   2.3 Borrowing Procedures and Settlements....................................................27
   2.4 Payments..................................................................................................32
   2.5 Interest Rates, Payments, and Calculations............................................36
   2.6 Cash Management.....................................................................................38
   2.7 Crediting Payments; Float Charge...........................................................39
   2.8 Designated Account..................................................................................40
   2.9 Maintenance of Loan Account; Statements of Obligations......................40
   2.10 Fees.........................................................................................................41
   2.11 Intentionally Omitted..............................................................................41
   2.12 Intentionally Omitted..............................................................................41
   2.13 Capital Requirements..............................................................................41
   2.14 Securitization..........................................................................................42
   2.15 Registered Notes......................................................................................43
   2.16 Joint and Several Liability of Borrowers.................................................43

3. CONDITIONS; TERM OF AGREEMENT..................................................................45
   3.1 Conditions Precedent to the Initial Extension of Credit...........................45
   3.2 Conditions Subsequent to the Initial Extension of Credit........................49
   3.3 Conditions Precedent to all Extensions of Credit....................................51
   3.4 Term.........................................................................................................51
   3.5 Effect of Termination...............................................................................51
   3.6 Early Termination by Borrower................................................................51

4. CREATION OF SECURITY INTEREST....................................................................52
   4.1 Grant of Security Interest.........................................................................52
   4.2 Negotiable Collateral...............................................................................52
   4.3 Collection of Accounts, General Intangibles, and Negotiable Collateral..........52
   4.4 Filing of Financing Statements; Commercial Tort Claims; Delivery of
       Additional Documentation Required......................................................53
   4.5 Power of Attorney....................................................................................54
   4.6 Right to Inspect; Retain Consultants.......................................................54
   4.7 Control Agreements.................................................................................55

5.    REPRESENTATIONS AND WARRANTIES..................................................55
      5.1   No Encumbrances.............................................................................55
      5.2   [Intentionally Omitted]......................................................................55
      5.3   [Intentionally Omitted]......................................................................55
      5.4   Equipment........................................................................................55
      5.5   Location of Inventory and Equipment...............................................55
      5.6   Equipment Records...........................................................................56
      5.7   State of Incorporation; Location of Chief Executive Office; FEIN;
            Organizational ID Number; Commercial Tort Claims.......................56
      5.8   Due Organization and Qualification; Subsidiaries............................56
      5.9   Due Authorization; No Conflict........................................................57
      5.10  Litigation.........................................................................................58
      5.11  GAAP; No Material Adverse Change...............................................58
      5.12  Fraudulent Transfer..........................................................................58
      5.13  Employee Benefits............................................................................58
      5.14  Environmental Condition..................................................................58
      5.15  Brokerage Fees.................................................................................59
      5.16  Intellectual Property.........................................................................59
      5.17  Leases..............................................................................................59
      5.18  Deposit Accounts and Securities Accounts.......................................59
      5.19  Complete Disclosure........................................................................59
      5.20  Indebtedness.....................................................................................60
      5.21  Material Contracts............................................................................60
      5.22  Intellectual Property of Subsidiaries.................................................60
      5.23  No Violation of Law.........................................................................60
      5.24  No Default........................................................................................60
      5.25  Taxes................................................................................................61
      5.26  Solvency...........................................................................................61
      5.27  Credit Card Processors.....................................................................61
      5.28  Admiralty Representations................................................................61

6.    AFFIRMATIVE COVENANTS.....................................................................62
      6.1   Accounting System............................................................................62
      6.2   Collateral Reporting..........................................................................62
      6.3   Financial Statements, Reports, Certificates.......................................63
      6.4   Guarantor Reports.............................................................................65
      6.5   Returns.............................................................................................65
      6.6   Maintenance of Properties, Licenses and Permits.............................65
      6.7   Taxes................................................................................................66
      6.8   Insurance..........................................................................................66
      6.9   Location of Inventory and Equipment...............................................67
      6.10  Compliance with Laws.....................................................................67
      6.11  Leases..............................................................................................68
      6.12  Existence and Operation...................................................................68
      6.13  Environmental..................................................................................68
      6.14  Disclosure Updates..........................................................................69
      6.15  Formation of Subsidiaries.................................................................69

ii

|  | 6.16 | Security Specialist | 69 |
|  | 6.17 | Admiralty Covenants | 69 |
|  | 6.18 | Inspections and Appraisals | 70 |
| 7. | | NEGATIVE COVENANTS | 70 |
|  | 7.1 | Indebtedness | 70 |
|  | 7.2 | Liens | 71 |
|  | 7.3 | Restrictions on Fundamental Changes | 71 |
|  | 7.4 | Disposal of Assets | 72 |
|  | 7.5 | Change Name | 72 |
|  | 7.6 | Nature of Business | 72 |
|  | 7.7 | Prepayments and Amendments | 72 |
|  | 7.8 | Change of Control | 72 |
|  | 7.9 | Consignments | 73 |
|  | 7.10 | Distributions | 73 |
|  | 7.11 | Accounting Methods | 73 |
|  | 7.12 | Investments | 73 |
|  | 7.13 | Transactions with Affiliates | 73 |
|  | 7.14 | Suspension | 74 |
|  | 7.15 | Compensation | 74 |
|  | 7.16 | Use of Proceeds | 74 |
|  | 7.17 | Inventory and Equipment with Bailees | 74 |
|  | 7.18 | Financial Covenants | 75 |
|  | 7.19 | Margin Stock | 77 |
|  | 7.20 | Stock Issuances | 77 |
|  | 7.21 | Employment and Consulting Agreements | 77 |
|  | 7.22 | Maritime Industry Standards | 78 |
|  | 7.23 | Transactions with Convicted Felons, To Borrowers' knowledge | 78 |
| 8. | | EVENTS OF DEFAULT | 78 |
| 9. | | THE LENDER GROUP'S RIGHTS AND REMEDIES | 82 |
|  | 9.1 | Rights and Remedies | 82 |
|  | 9.2 | Remedies Cumulative | 84 |
| 10. | | TAXES AND EXPENSES | 84 |
| 11. | | WAIVERS; INDEMNIFICATION | 84 |
|  | 11.1 | Demand; Protest; etc | 84 |
|  | 11.2 | The Lender Group's Liability for Borrowers Collateral | 84 |
|  | 11.3 | Indemnification | 85 |
| 12. | | NOTICES | 85 |
| 13. | | CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER | 86 |
| 14. | | ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS | 87 |
|  | 14.1 | Assignments and Participations | 87 |

**EXHIBITS AND SCHEDULES**


| | |
|---|---|
| Exhibit A-1 | Form of Assignment and Acceptance |
| Exhibit C-1 | Closing Date Business Plan Projections |
| Exhibit C-2 | Form of Compliance Certificate |
| | |
| Schedule A-1 | Agent's Account |
| Schedule C-1 | Commitments |
| Schedule D-1 | Designated Account |
| Schedule O-1 | Obligor Documents |
| Schedule P-1 | Permitted Investments |
| Schedule P-2 | Permitted Liens |
| Schedule P-3 | Preferred Ship Mortgages |
| Schedule V-1 | Vessels |
| Schedule 2.6(a) | Cash Management Banks |
| Schedule 3.2(c) | Locations Requiring Collateral Access Agreements |
| Schedule 5.5 | Locations of Inventory and Equipment |
| Schedule 5.7(a) | States of Organization |
| Schedule 5.7(b) | Chief Executive Offices |
| Schedule 5.7(c) | FEINs and Organizational Identification Numbers |
| Schedule 5.7(d) | Commercial Tort Claims |
| Schedule 5.8(b) | Capitalization of Each Obligor |
| Schedule 5.8(c) | Capitalization of Each Borrower's Subsidiaries |
| Schedule 5.8(d) | Options, Warrants and Calls Related to each Obligor's Subsidiaries |
| Schedule 5.10 | Litigation |
| Schedule 5.14 | Environmental Matters |
| Schedule 5.16 | Intellectual Property |
| Schedule 5.18 | Deposit Accounts and Securities Accounts |
| Schedule 5.20 | Permitted Indebtedness |
| Schedule 5.27 | Credit Card Processors |
| Schedule 7.17 | Bailees and Warehousemen |

products, (c) all obligations of such Person under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations for the deferred purchase price of assets (other than accrued expenses and trade debt incurred in the ordinary course of such Person's business and repayable in accordance with customary trade practices), and (f) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of the types described in clauses (a) through (e) above of any other Person; provided, however, that Indebtedness which is limited or is non-recourse to such Person or for which recourse is limited to an identified asset shall be valued at the lesser of (A) the limited amount of such obligations and (B) the fair market value of such asset. For purposes of this definition, the principal amount of Indebtedness under any interest rate swap or other similar financial product at any time shall be equal to the amount payable as a result of the termination of such interest rate swap or other similar financial product at such time.

"Indemnified Liabilities" has the meaning set forth in Section 11.3.

"Indemnified Person" has the meaning set forth in Section 11.3.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state, federal, or foreign bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, winding up, liquidation, or other similar relief.

"Installment Payment" means an installment payment in connection with a Term Loan.

"Intellectual Property" means all patents, patent applications, trademarks, trademark applications, tradenames, tradedress, copyrights, copyright registrations, technology, know-how and processes used in or necessary for the conduct of the business of any Person as currently conducted that are material to the condition (financial or otherwise), business, or operations of such Person.

"Intellectual Property Security Agreement" means an intellectual property security agreement executed and delivered by a Borrower and Agent, the form and substance of which is reasonably satisfactory to Lenders.

"Intercompany Advances" means loans or advances or the repayment of loans or advances from a Borrower or one of its Subsidiaries to another Borrower or one of its Subsidiaries.

"Intercompany Subordination Agreement" means a subordination agreement executed and delivered by each Borrower and each of their Subsidiaries and Agent, the form and substance of which is reasonably satisfactory to the Lenders.

"Interest Coverage Ratio" means, as of the date of determination, the ratio of (a) Borrowers' TTM EBITDA as of such date, to (b) Borrowers' total cash component of Interest

Expense for the twelve month period ending on such date (during the first twelve months following the Closing Date the total cash component of Interest Expense shall be annualized for the balance of such twelve month period).

"Interest Expense" means, for any period, the aggregate of the interest expense of Borrowers and their Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP.

"Inventory" means inventory (as that term is defined in the Code).

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, or capital contributions (excluding (a) commission, travel, and similar advances to officers and employees of such Person made in the ordinary course of business, and (b) *bona fide* Accounts arising in the ordinary course of business consistent with past practice), purchases or other acquisitions for consideration of Indebtedness, Stock, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person); provided, however, the term "Investment" shall not include (i) advances and prepayments to suppliers for goods and services in the ordinary course of business, (ii) Stock or other securities acquired in connection with the satisfaction or enforcement of Indebtedness or claims due or owing to such Person (in bankruptcy of customers or suppliers or otherwise outside the ordinary course of business) or as security for any such Indebtedness or claims, and (iii) deposits to secure performance of leases. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"Investment Property" means investment property (as that term is defined in the Code), and any and all supporting obligations in respect thereof.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

"JAB" means JAB America, Inc., a Florida corporation.

"Leases" has the meaning set forth in Section 3.1(u).

"Lender" and "Lenders" have the respective meanings set forth in the preamble to this Agreement, and shall include any other Person made a party to this Agreement in accordance with the provisions of Section 14.1.

"Lender Group" means, individually and collectively, each of the Lenders and Agent.

"Lender Group Expenses" means all (a) costs or expenses (including taxes, and insurance premiums) required to be paid by an Obligor under any of the Loan Documents that are paid or incurred by the Lender Group in accordance with the terms of this Agreement and the other Loan Documents, (b) except as separately described in clause (f), clause (h), or clause (i) below, out-of-pocket fees or charges paid or incurred by Agent in connection with the Lender Group's transactions with the Obligors or any of their Subsidiaries, including, fees or charges for

photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, and appraisals (including periodic Collateral appraisals or business valuations to the extent of the fees and charges (and up to the amount of any limitation) contained in this Agreement), (c) costs and expenses incurred by Agent in the disbursement of funds to Borrowers or to other members of the Lender Group (by wire transfer or otherwise), (d) charges paid or incurred by Agent resulting from the dishonor of checks, (e) reasonable costs and expenses paid or incurred by Agent and any Lender to correct any default or enforce any provision of the Loan Documents, or in gaining possession of, maintaining, handling, preserving, protecting, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, in each case so long as they are paid or incurred by Agent or a Lender in accordance with the terms of this Agreement and the other Loan Documents, (f) audit fees and expenses of Agent related to audit examinations of the Books to the extent of the fees and charges (and up to the amount of any limitation) contained in this Agreement, (g) reasonable costs and expenses of third party claims or any other suit paid or incurred by the Lender Group in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or the Lender Group's relationship with the Obligors or any of their Subsidiaries, (h) Agent's and each Lender's reasonable out-of-pocket costs and expenses (including reasonable out-of-pocket attorneys fees) incurred in advising, structuring, drafting, reviewing, administering, syndicating, or amending the Loan Documents, (i) Agent's and each Lender's reasonable out-of-pocket costs and expenses (including reasonable out-of-pocket attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including reasonable out-of-pocket attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding concerning an Obligor or a Subsidiary of such Obligor or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking any Remedial Action concerning the Collateral, and (j) costs and expenses incurred by Agent to retain a due diligence investigative specialist firm to commence or recommence background checks on any new or existing officers or directors of Borrowers or any other member of Borrowers' senior management or any other Person that Agent determines necessary to Borrowers' business in Agent's Permitted Discretion; provided, however, that in no event shall an Obligor and its Subsidiaries be responsible for any portion of costs, fees or expenses of (y) the Agent that a court of competent jurisdiction finally determines to have resulted from the willful misconduct, bad faith or gross negligence of Agent or any of its Lender-Related Persons, and (z) any Lender that a court of competent jurisdiction finally determines to have resulted from the willful misconduct, bad faith or gross negligence of such Lender or any of its Lender-Related Persons.

"Lender-Related Person" means, with respect to any Lender, such Lender, together with such Lender's Affiliates, officers, directors, employees, and agents.

"Leverage Ratio" means, as of the date of determination, the ratio of (a) the outstanding Indebtedness (including the Obligations) of Borrowers and their Subsidiaries as of such date, determined in accordance with GAAP, to (b) Borrowers' TTM EBITDA as of the date of determination.

"Liabilities" has the meaning set forth in Section 2.14.

"Lien" means any interest in an asset securing an obligation owed to, or a claim by, any Person other than the owner of the asset, irrespective of whether (a) such interest is based on the common law, statute, or contract, (b) such interest is recorded or perfected, and (c) such interest is contingent upon the occurrence of some future event or events or the existence of some future circumstance or circumstances. Without limiting the generality of the foregoing, the term "Lien" includes the lien or security interest arising from a mortgage, deed of trust, encumbrance, preferred ship mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, security agreement, conditional sale or trust receipt, or from a lease, consignment, or bailment for security purposes and also includes reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting Real Property.

"Loan Account" has the meaning set forth in Section 2.9.

"Loan Documents" means this Agreement, the Obligor Documents, Flow of Funds Agreement, the Management Shareholder Employment Agreements, the Success Fee Letter, any note or notes executed by a Borrower in connection with this Agreement and payable to a member of the Lender Group, and any other agreement entered into, now or in the future, by an Obligor, any of its Subsidiaries, and the Lender Group in connection with this Agreement.

"Management Shareholder Employment Agreements" means those certain Employment and Non-Compete Agreements and Consulting and Non-Compete Agreements, to be executed by each of Robert Weisberg, Spiro Naos, Greg Karan, Joseph Crivello, David Marks, and William Fisher, each in form and substance satisfactory to Lenders and their counsel.

"Management Shareholders" means the following Persons: Oceans Trust, Robert Weisberg, Spiro Naos, Greg Karan, Joseph Crivello, David Marks, and William Fisher.

"Margin Stock" means "margin stock" as such term is defined in Regulation T, U or X of the Federal Reserve Board.

"Material Adverse Change" means (a) a material adverse change in the financial condition, operations, prospects, assets or business of any of the Obligors, either individually or taken as a whole, (b) a material impairment of any Obligor's ability to perform its obligations under the Loan Documents to which it is a party or of the Lender Group's ability to enforce the Obligations or realize upon the Collateral, or (c) a material impairment of the enforceability or priority of the Agent's Liens with respect to the Collateral as a result of an action or failure to act on the part of any Obligor.

"Maturity Date" has the meaning set forth in Section 3.4.

"Maximum Revolver Amount" means $3,000,000.

"Negotiable Collateral" means letters of credit, letter of credit rights, instruments, promissory notes, drafts, documents, and chattel paper (including electronic chattel paper and tangible chattel paper), and any and all supporting obligations in respect thereof.

"Net Cash Proceeds" means, with respect to any sale or disposition by any Person or any Subsidiary thereof of property or assets, the amount of Collections received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Person or such Subsidiary, in connection therewith after deducting therefrom only (i) the amount of any Indebtedness secured by any Permitted Lien on any asset (other than (A) Indebtedness owing to Agent or any Lender under this Agreement or the other Loan Documents and (B) Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection with such disposition, (ii) reasonable expenses related thereto incurred by such Person or such Subsidiary in connection therewith, and (iii) taxes paid or payable to any taxing authorities by such Person or such Subsidiary in connection therewith, in each case to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid or payable to a Person that is not an Affiliate and are properly attributable to such transaction.

"Net Income" means, with respect to any Person for any period, the net income (loss) of such Person and its Subsidiaries for such period, determined on a consolidated basis and in accordance with GAAP, but excluding from the determination of Net Income (without duplication) (a) any non-cash extraordinary or non-recurring gains or non-cash gains from dispositions, (b) interest that is paid-in-kind, and (c) interest income.

"Obligations" means all loans (including the Term Loans), Advances, Agent Advances, debts, principal, interest (including any interest that, but for the commencement of an Insolvency Proceeding, would have accrued), premiums, liabilities (including all amounts charged to Borrowers' Loan Account pursuant hereto), obligations (including indemnification obligations), fees (including the fees provided for in the Fee Letter), charges, costs, Lender Group Expenses (including any fees or expenses that, but for the commencement of an Insolvency Proceeding, would have accrued), guaranties, covenants, and duties of any kind and description owing by Obligors to the Lender Group pursuant to or evidenced by the Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all Lender Group Expenses that Borrowers are required to pay or reimburse the Loan Documents, by law, or otherwise. Any reference in this Agreement or in the Loan Documents to the Obligations shall include all extensions, modifications, renewals, or alterations thereof, both prior and subsequent to any Insolvency Proceeding.

"Obligor" means any Person who is a Borrower or Guarantor.

"Obligor Documents" means the documents, security agreements (including the Surfside Princess LLC Security Agreement), guaranties (including the Guaranty), pledge agreements (including the Pledge Agreements), subordination agreements (including the Intercompany Subordination Agreement and the Surfside Princess LLC Subordination Agreement), collateral assignments, preferred ship mortgages (including the Preferred Ship Mortgages), and any other agreements set forth on Schedule O-1, the form and substance of each of which is reasonably acceptable to Lenders.

"Obsolete Intellectual Property" means any Intellectual Property of a Person that, in such Person's reasonable determination (a) is no longer used in products or services sold or

marketed by such Person or its Subsidiaries, (b) is not generating any material amount of revenues of such Person or its Subsidiaries, or (c) does not have a material fair market value.

"Oceans Trust" means Oceans Trust u/t/a March 30, 2004 by and between Frank P. Crivello, as Grantor, and David M. Marks, as Trustee.

"Orchard" means Orchard Drive, LLC, a Delaware limited liability company.

"Originating Lender" has the meaning set forth in Section 14.1(e).

"Participant" has the meaning set forth in Section 14.1(e).

"Participant Register" has the meaning set forth in Section 2.15(ii).

"Permitted Discretion" means a determination made with honesty in fact and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Dispositions" means (a) sales or other dispositions of Equipment that, in the reasonable business judgment of the Person making the sale or other disposition, is substantially worn, damaged, surplus, or obsolete in the ordinary course of business, (b) sales of Inventory to buyers in the ordinary course of business, (c) the use or transfer of money or Cash Equivalents in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents, (d) dispositions permitted under Section 7.3(b), (e) the granting of Permitted Liens, (f) so long as no Event of Default has occurred and is continuing, up to $200,000 per year in the aggregate of dispositions of Equipment that are made for fair market value so long as the amount of the Net Cash Proceeds of such disposition are applied to the Obligations in the manner set forth in Section 2.4(d), (g) Permitted Intercompany Advances; (h) so long as no Event of Default has occurred and is continuing, dispositions of assets not otherwise permitted in clauses (a) through (g) so long as made at fair market value and the aggregate amount of all such dispositions since the Closing Date would not exceed $200,000, and (i) the abandonment, sale, or other disposition by any Obligor of any of their Obsolete Intellectual Property.

"Permitted Holder" means each of the Management Shareholders.

"Permitted Intercompany Advance" means Intercompany Advances (a) made by any Borrower to another Borrower so long as they are subject to the Intercompany Subordination Agreement, and (b) made by an Obligor that is not a Borrower to a Borrower so long as they are subject to the Intercompany Subordination Agreement.

"Permitted Investments" means (a) Investments in Cash Equivalents, (b) Investments in negotiable instruments for collection, (c) advances made in connection with purchases of goods or services in the ordinary course of business, (d) deposits permitted under Section 7.2, (e) Investments owned on the Closing Date and set forth on Schedule P-1, (f) Investments in the form of loans and advances that could otherwise be made as a distribution permitted under Section 7.10, (g) Investments consisting of endorsements of instruments or items of payment for deposit to the account of an Obligor or which are transmitted or turned over to Agent, and (h) Permitted Intercompany Advances. The outstanding amount of any Investment

on any date of determination shall be calculated after giving effect to all cash returns of principal or capital thereon, cash dividends or other cash returns thereon received by the applicable Person making such Investment.

"Permitted Liens" means (a) Liens held by Agent, (b) Liens for unpaid taxes, assessments, or other governmental charges or levies that either (i) are not yet delinquent, or (ii) do not constitute an Event of Default hereunder and are the subject of Permitted Protests, (c) Liens set forth on Schedule P-2, (d) the interests of lessors under operating leases, (e) purchase money Liens or the interests of lessors under Capital Leases to the extent that such Liens or interests secure Permitted Purchase Money Indebtedness and so long as such Lien attaches only to the asset purchased or acquired and the proceeds thereof, (f) Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers, incurred in the ordinary course of business and not in connection with the borrowing of money, and which Liens either (i) are for sums not yet delinquent, or (ii) are the subject of Permitted Protests, (g) Liens arising from deposits made in connection with obtaining worker's compensation or other unemployment insurance, (h) Liens or deposits to secure performance of bids, tenders, or leases incurred in the ordinary course of business and not in connection with the borrowing of money, (i) Liens granted as security for surety or appeal bonds in connection with obtaining such bonds in the ordinary course of business, (j) Liens resulting from any judgment or award that is not an Event of Default hereunder, (k) with respect to any Real Property, covenants and restrictions of record, minor title defects, easements, rights of way, zoning restrictions, and other similar encumbrances or charges that do not materially interfere with or impair the use or operation thereof, (l) rights of setoff or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business, (m) deposits in an aggregate amount not to exceed $200,000 given in the ordinary course of business of the Person providing such deposit; provided, however, that deposits permitted under other clauses hereof shall not be subject to this clause (m), and (n) any interest or title of a licensor, lessor or sublicensor or sublessor under any lease or license permitted by this Agreement.

"Permitted Protest" means the right of a Borrower or any of its Subsidiaries to protest any Lien (other than any Lien that secures the Obligations), taxes, or rental payment, provided that (a) a reserve with respect to such obligation is established on the Books of the applicable Person in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Borrower or its Subsidiary, as applicable, in good faith, and (c) Agent is satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of the Agent's Liens.

"Permitted Purchase Money Indebtedness" means, as of any date of determination, Purchase Money Indebtedness incurred after the Closing Date by Borrowers and their Subsidiaries in an aggregate principal amount outstanding at any one time not in excess of $1,000,000.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Pledge Agreements" means those security agreement-stock pledges and membership interest pledge agreements executed and delivered by (i) each Permitted Holder in favor of Agent, in form and substance satisfactory to Agent, in its Permitted Discretion, with respect to all outstanding Stock of OCC other than the outstanding Stock held by the Lenders, (ii) OCC in favor of Agent, in form and substance satisfactory to Agent, in its Permitted Discretion, with respect to all outstanding Stock of VCI, and (iii) OCC in favor of Agent, in form and substance satisfactory to Agent, in its Permitted Discretion with respect to all outstanding Stock of VSC.

"Preferred Ship Mortgages" means each of the First Preferred Ship Mortgages and the Second Preferred Ship Mortgage listed on Schedule P-3.

"Proceeding" means the Chapter 11 cases of the SunCruz, JAB and VSC pending before the Bankruptcy Court as case number 01-24661-BLK-PGH, 01-24662-BKJ-PGH and 03-29123.

"Projections" means Borrowers' and their Subsidiaries' forecasted (a) balance sheets, (b) profit and loss statements, and (c) cash flow statements, all prepared on a basis consistent with Borrowers' historical financial statements, together with appropriate supporting details and a statement of underlying assumptions.

"Pro Rata Share" means:

(a)    with respect to a Lender's obligation to make Advances and receive payments of principal, interest, fees, costs, and expenses with respect thereto, (i) prior to the Revolver Commitments being terminated or reduced to zero, the percentage obtained by dividing (y) such Lender's Revolver Commitment, by (z) the aggregate Revolver Commitments of all Lenders, and (ii) from and after the time that the Revolver Commitment have been terminated or reduced to zero, the percentage obtained by dividing (y) the aggregate outstanding principal amount of such Lender's Advances by (z) the aggregate outstanding principal amount of all Advances,

(b)    with respect to a Lender's obligation to make Term Loan A and receive payments of interest, fees, and principal with respect thereto, (i) prior to the making of Term Loan A, the percentage obtained by dividing (x) such Lender's applicable Term Loan A Commitment, by (y) the aggregate amount of all Lenders' applicable Term Loan A Commitments, and (ii) from and after the making of Term Loan A, the percentage obtained by dividing (x) such Lender's portion of the Term Loan A Amount by (y) the Term Loan A Amount,

(c)    with respect to a Lender's obligation to make Term Loan B and receive payments of interest, fees, and principal with respect thereto, (i) prior to the making of Term Loan B, the percentage obtained by dividing (x) such Lender's applicable Term Loan B Commitment, by (y) the aggregate amount of all Lenders' applicable Term Loan B Commitments, and (ii) from and after the making of Term Loan B, the percentage obtained by dividing (x) such Lender's portion of the Term Loan B Amount by (y) the Term Loan B Amount, and

LA 133549v12                    19

(d)   with respect to a Lender's obligation to make Term Loan C and receive payments of interest, fees, and principal with respect thereto, (i) prior to the making of Term Loan C, the percentage obtained by dividing (x) such Lender's applicable Term Loan C Commitment, by (y) the aggregate amount of all Lenders' applicable Term Loan C Commitments, and (ii) from and after the making of Term Loan C, the percentage obtained by dividing (x) such Lender's portion of the Term Loan C Amount by (y) the Term Loan C Amount.

(e)   with respect to all other matters as to a particular Lender (including the indemnification obligations arising under Section 16.7), the percentage obtained by dividing (i) such Lender's Revolver Commitment, plus such Lender's portion of the Term Loan A Amount, plus such Lender's portion of the Term Loan B Amount, plus such Lender's portion of the Term Loan C Amount, by (ii) the aggregate amount of Revolver Commitments of all Lenders, plus Term Loan A Amount, plus the Term Loan B Amount, plus the Term Loan C Amount.

"Purchase Money Indebtedness" means Indebtedness (other than the Obligations, but including Capitalized Lease Obligations), incurred at the time of, or within 20 days after, the acquisition of any fixed assets for the purpose of financing all or any part of the acquisition cost thereof.

"Qualified Cash" means, as of any date of determination, the amount of unrestricted cash and Cash Equivalents of an Obligor that is in Deposit Accounts or in Securities Accounts, or any combination thereof, and which such Deposit Account or Securities Account is the subject of a Control Agreement and is maintained by a branch office of the bank or securities intermediary located within the United States.

"Rating Agencies" has the meaning set forth in Section 2.14.

"Real Property" means any estates or interests in real property now owned or hereafter acquired by any Obligor or any of its Subsidiaries and the improvements thereto.

"Record" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

"Registered Loan" has the meaning set forth in Section 2.15.

"Registered Note" has the meaning set forth in Section 2.15.

"Related Fund" means a fund, money market account, investment account or other account managed by a Lender or an Affiliate of such Lender or its investment manager.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the environment, (c) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (d) conduct any other actions authorized by 42 USC § 9601.

"Replacement Lender" has the meaning set forth in Section 15.2(a).

"Report" has the meaning set forth in Section 16.17.

"Required Lenders" means, at any time, Lenders whose Pro Rata Shares aggregate 51% or more as determined pursuant to clause (d) of the definition of "Pro Rata Share".

"Revolver Commitment" means, with respect to each Lender, its Revolver Commitment, and, with respect to all Lenders, their Revolver Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 or in the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder in accordance with the provisions of Section 14.1.

"SEC" means the United States Securities and Exchange Commission and any successor thereto.

"Securities Account" means a securities account (as that term is defined in the Code).

"Securitization" has the meaning set forth in Section 2.14.

"Securitization Parties" has the meaning set forth in Section 2.14.

"Seller" means the Trustee.

"Settlement" has the meaning set forth in Section 2.3(d)(i).

"Settlement Date" has the meaning set forth in Section 2.3(d)(i).

"Skylab Road" means Skylab Road LLC, a Delaware limited liability company.

"Solvent" means, with respect to any Person on a particular date, as of the date of determination both (A) (i) the then fair saleable value of the property of such Person is (y) greater than the total amount of liabilities (including contingent liabilities) of such Person and (z) not less than the amount that will be required to pay the probable liabilities on such Person's then existing debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to such Person; (ii) such Person's capital is not unreasonably small in relation to its business or any contemplated or undertaken transaction; and (iii) such Person does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due; and (B) such Person is "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any contingent liability at any time shall be computed at the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Stock" means all shares, options, warrants, interests, limited liability company interests, participations, or other equivalents (regardless of how designated) of or in a Person, whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"Subsidiary" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the shares of Stock having ordinary voting power to elect a majority of the board of directors (or appoint other comparable managers) of such corporation, partnership, limited liability company, or other entity.

"Success Fee Letter" means that certain Letter Agreement, dated as of April 8, 2004, by and between the Agent, the Borrowers and the Management Shareholders.

"Surfside Princess" means that certain vessel owned by Surfside Princess LLC and more particularly described in the Preferred Ship Mortgage executed by Surfside Princess LLC and listed on Schedule P-3.

"Surfside Princess LLC" means Surfside Princess LLC, a Delaware limited liability company.

"Surfside Princess Loan Agreement" mean that certain Loan and Security Agreement, dated as of April 8, 2004, by and among Surfside Princess, Orchard and the lenders party thereto.

"Surfside Princess Loan Documents" mean the Surfside Princess Loan Agreement and any other agreement entered into, now or in the future, by Surfside Princess in connection with the Surfside Princess Loan Agreement.

"Surfside Princess Security Agreement" means that certain Security Agreement, dated as of April 8, 2004, made by Surfside Princess LLC in favor of Agent for the benefit of the Lenders to secure the obligations of Surfside Princess under its Guaranty.

"Surfside Princess LLC Subordination Agreement" means a subordination agreement executed and delivered by Surfside Princess LLC and Agent, in form and substance satisfactory to Agent in its Permitted Discretion.

"SunCruz" means SunCruz Casinos, LLC, a Florida limited liability company.

"Taxes" has the meaning set forth in Section 16.11.

"Term Loan" means Term Loan A or Term Loan B or Term Loan C and "Term Loans" means Term Loan A, Term Loan B and Term Loan C.

"Term Loan A" has the meaning set forth in Section 2.2(a).

"Term Loan A Amount" means (a) on the Closing Date, $7,000,000, and (b) on any date of determination after the Closing Date, the outstanding principal balance of Term Loan A.

"Term Loan A Commitment" means, with respect to each Lender, its Term Loan A Commitment, and, with respect to all Lenders, their Term Loan A Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 or in the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder in accordance with the provisions of Section 14.1.

"Term Loan B" has the meaning set forth in Section 2.2(b).

"Term Loan B Amount" means (a) on the Closing Date, $27,896,907.22, and (b) on any date of determination after the Closing Date, the outstanding principal balance of Term Loan B.

"Term Loan B Commitment" means, with respect to each Lender, its Term Loan B Commitment, and, with respect to all Lenders, their Term Loan B Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 or in the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder in accordance with the provisions of Section 14.1.

"Term Loan C" has the meaning set forth in Section 2.2(c).

"Term Loan C Amount" means (a) on the Closing Date, $5,000,000, and (b) on any date of determination after the Closing Date, the outstanding principal balance of Term Loan C.

"Term Loan C Commitment" means, with respect to each Lender, its Term Loan C Commitment, and, with respect to all Lenders, their Term Loan C Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 or in the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder in accordance with the provisions of Section 14.1.

"Total Commitment" means, with respect to each Lender, its Total Commitment, and, with respect to all Lenders, their Total Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 attached hereto or on the signature page of the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder in accordance with the provisions of Section 14.1.

"Transaction" means that certain sale by Seller to Borrowers of substantially all of the assets of SunCruz and JAB pursuant to the Acquisition Agreement.

"Trustee" means Jeffrey H. Beck, chapter 11 Trustee of each of SunCruz, JAB, and VSC.

"TTM EBITDA" means, as of any date of determination and with respect to a Person, the EBITDA of such Person and its Subsidiaries for the 12 month period most recently

ended.  For purposes of this definition, EBITDA for the following periods shall mean the following corresponding amounts:

| EBITDA | Fiscal Quarter Ending |
|--------|----------------------|
| $2,254,261 | 9/30/03 |
| $1,288,013 | 12/31/03 |
| $2,078,773 | 3/31/04 |

"UCC Filing Authorization Letter" means a letter duly executed by each Obligor authorizing Agent to file appropriate financing statements on Form UCC-1 without the signature of such Obligor, as applicable, in such office or offices as may be necessary or, in the opinion of Agent, desirable to perfect the security interests purported to be created by the Loan Documents.

"United States" means the United States of America.

"Vessels" means each of the vessels listed on Schedule V-1 hereto and each other Vessel owned by the Borrowers, in each case together with all engines, boilers, machinery, masts, anchors, cables, rigging, tackle, apparel, furniture, boats, chains, equipment and all other appurtenances to such vessels whether aboard or removed from such vessels, together with any and all additions, improvements and/or replacements which may hereafter be made to, on or in such vessels or any part thereof.

"Voidable Transfer" has the meaning set forth in Section 17.7.

"WCV" means W-C Vessels, LLC, a Delaware limited liability company.

1.2    **Accounting Terms.**  All accounting terms not specifically defined herein shall be construed in accordance with GAAP.  When used herein, the term "financial statements" shall include the notes and schedules thereto.  Whenever the term "Borrowers" is used in respect of a financial covenant or a related definition, it shall be understood to mean Borrowers and their Subsidiaries on a consolidated basis unless the context clearly requires otherwise.

1.3    **Code.**  Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein.

1.4    **Construction.**  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be.  Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement or in the other Loan Documents to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and

supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). Any reference herein (excluding those in Section 2.4(b)(iv)) to the repayment in full of the Obligations shall mean the repayment in full in cash of all Obligations other than contingent indemnification Obligations. Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in the other Loan Documents shall be satisfied by the transmission of a Record (and if transmitted by facsimile such transmission shall be supported by a confirmation receipt) and any Record transmitted shall constitute a representation and warranty as to the accuracy and completeness of the information contained therein.

**1.5**    Schedules and Exhibits. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

**2.**    **LOAN AND TERMS OF PAYMENT.**

**2.1**    Revolver Advances.

(a)    Subject to the terms and conditions of this Agreement, and during the term of this Agreement, each Lender with a Revolver Commitment agrees (severally, not jointly or jointly and severally) to make advances ("Advances") to Borrowers in an amount at any one time outstanding not to exceed such Lender's Pro Rata Share of an amount equal to the Maximum Revolver Amount *less* the aggregate amount of reserves, if any, established by Agent under Section 2.1(b). Borrower may only request an Advance of at least $250,000 and integral multiples of $25,000 in excess thereof.

(b)    Anything to the contrary in this Section 2.1 notwithstanding, Agent shall have the right to establish reserves against the Maximum Revolver Amount in such amounts, and with respect to such matters, as Agent in its Permitted Discretion shall deem necessary or appropriate, including reserves with respect to (i) sums that Borrowers are required to pay (such as taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay under any Section of this Agreement or any other Loan Document, (ii) amounts owing by Borrowers to any Person to the extent secured by a Lien on, or trust over, any of the Collateral (other than any existing Permitted Lien set forth on Schedule P-2 which is specifically identified thereon as entitled to have priority over the Agent's Liens), which Lien or trust, in the Permitted Discretion of Agent likely would have a priority superior to the Agent's Liens (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for ad valorem, excise, sales, or other taxes where given priority under applicable law) in and to such item of the Collateral, and (iii) Inventory that contains Intellectual Property licensed to a Borrower where such Intellectual Property could adversely affect the ability of Agent to exercise its rights under Section 9.1 or the value of such Inventory on liquidation. Agent shall endeavor to notify Administrative Borrower at or before the time any such reserve is to be established, but a non-willful failure of Agent to so notify Administrative Borrower shall not be a breach of this Agreement and shall not cause such reserve to be ineffective.

(c)     The Lenders with Revolver Commitments shall have no obligation to make additional Advances hereunder to the extent such additional Advances would cause the outstanding Advances to exceed the Maximum Revolver Amount.

(d)     Amounts borrowed pursuant to this Section 2.1 may be repaid and, subject to the terms and conditions of this Agreement, reborrowed at any time during the term of this Agreement.

## 2.2     Term Loans.

(a)     **Term Loan A.**  Subject to the terms and conditions of this Agreement, on the Closing Date each Lender with a Term Loan A Commitment agrees (severally, not jointly or jointly and severally) to make term loans (collectively, "Term Loan A") to Borrowers in an amount equal to such Lender's Pro Rata Share of the Term Loan A Amount.  Installment Payments in connection with Term Loan A shall be made in accordance with Section 2.2(d).  The outstanding unpaid principal balance and all accrued and unpaid interest under Term Loan A shall be due and payable on the earlier of (y) the Maturity Date, and (z) the date of termination of this Agreement, whether by its terms, by prepayment, or by acceleration.  All amounts outstanding under Term Loan A shall constitute Obligations.  Borrowers shall prepay Term Loan A at such times and in such amounts as may be required under Section 2.4(c).  Borrowers may make voluntary prepayments of principal with respect to Term Loan A from time to time so long as: (i) Borrowers provide Agent not less than 3 Business Days prior written notice of such prepayment, and (ii) the amount of any prepayment is in a minimum amount of $100,000 and integral multiples thereof, or the remaining principal balance of Term Loan A, if less.  Any such voluntary prepayments shall be applied to installments due thereunder in the inverse order of their maturity.  In connection with each voluntary prepayment, Borrowers shall concurrently pay to Agent for the benefit of the Term Loan A Lenders a prepayment fee in an amount equal to Applicable Prepayment Premium on the amount prepaid.  Amounts repaid under Term Loan A may not be reborrowed.

(b)     **Term Loan B.**  Subject to the terms and conditions of this Agreement, on the Closing Date each Lender with a Term Loan B Commitment agrees (severally, not jointly or jointly and severally) to make term loans (collectively, "Term Loan B") to Borrowers in an amount equal to such Lender's Pro Rata Share of the Term Loan B Amount.  Installment Payments in connection with Term Loan B shall be made in accordance with Section 2.2(d).  The outstanding unpaid principal balance and all accrued and unpaid interest under Term Loan B shall be due and payable on the earlier of (y) the Maturity Date, and (z) the date of termination of this Agreement, whether by its terms, by prepayment, or by acceleration.  All amounts outstanding under Term Loan B shall constitute Obligations.  Borrowers shall prepay Term Loan B at such times and in such amounts as may be required under Section 2.4(c).  Borrowers may make voluntary prepayments of principal with respect to Term Loan B from time to time so long as: (i) Borrowers provide Agent not less than 3 Business Days prior written notice of such prepayment, and (ii) the amount of any prepayment is in a minimum amount of $100,000 and integral multiples thereof, or the remaining principal balance of Term Loan B, if less.  Any such voluntary prepayments shall be applied to installments due thereunder in the inverse order of their maturity.  In connection with each voluntary prepayment, Borrowers shall concurrently pay to Agent for the benefit of the Term Loan B Lenders a prepayment fee in an amount equal to

Applicable Prepayment Premium on the amount prepaid. Amounts repaid under Term Loan B may not be reborrowed.

(c)    Term Loan C. Subject to the terms and conditions of this Agreement, on the Closing Date each Lender with a Term Loan C Commitment agrees (severally, not jointly or jointly and severally) to make term loans (collectively, "Term Loan C") to Borrowers in an amount equal to such Lender's Pro Rata Share of the Term Loan C Amount. Installment Payments in connection with Term Loan C shall be made in accordance with Section 2.2(d). The outstanding unpaid principal balance and all accrued and unpaid interest under Term Loan C shall be due and payable on the earlier of (y) the Maturity Date, and (z) the date of termination of this Agreement, whether by its terms, by prepayment, or by acceleration. All amounts outstanding under Term Loan C shall constitute Obligations. Borrowers shall prepay Term Loan C at such times and in such amounts as may be required under Section 2.4(c). Borrowers may make voluntary prepayments of principal with respect to Term Loan C from time to time so long as: (i) Borrowers provide Agent not less than 3 Business Days prior written notice of such prepayment, and (ii) the amount of any prepayment is in a minimum amount of $100,000 and integral multiples thereof, or the remaining principal balance of Term Loan C, if less. Any such voluntary prepayments shall be applied to installments due thereunder in the inverse order of their maturity. In connection with each voluntary prepayment, Borrowers shall concurrently pay to Agent for the benefit of the Term Loan C Lenders a prepayment fee in an amount equal to Applicable Prepayment Premium on the amount prepaid. Amounts repaid under Term Loan C may not be reborrowed.

(d)    Borrowers shall make scheduled principal payments on the Term Loans in the following aggregate amounts, at the following times and applied in the following manner: (i) $100,000 each month, on the first day of each month during the eight (8) month period beginning on May 1, 2004 and ending on December 31, 2004; (ii) $167,000 each month, on the first day of each month during the twelve (12) month period beginning on January 1, 2005 and ending on December 31, 2005; (iii) $216,000 each month, on the first day of each month during the twelve (12) month period beginning on January 1, 2006 and ending on December 31, 2006; (iv) on the first day of each month, an amount equal to 85% of the Excess Cash Flow of Borrowers and their Subsidiaries for the immediately preceding calendar month. Each scheduled principal payment shall be applied, first, to the installments of principal on Term Loan A until paid in full, second, to the installments of principal on Term Loan B until paid in full, and third, to the installments of principal on Term Loan C until paid in full.

2.3    Borrowing Procedures and Settlements.

(a)    Procedure for Borrowing. Except for the initial Borrowing made on the Closing Date in connection with the financing of the Transaction, each Borrowing shall be made by an irrevocable written request by an Authorized Person delivered to Agent (which notice must be received by Agent no later than 10:00 a.m. (New York time) on the Business Day prior to the date that is the requested Funding Date) specifying (i) the amount of such Borrowing, and (ii) the requested Funding Date, which shall be a Business Day. At Agent's election, in lieu of delivering the above-described written request, any Authorized Person may give Agent telephonic notice of such request by the required time. In such circumstances, Borrowers agree that any such telephonic notice will be confirmed in writing within 24 hours of the giving of such

notice and the failure to provide such written confirmation shall not affect the validity of the request.

(b)     Making of Loans.

(i)     Promptly after receipt of a request for a Borrowing pursuant to Section 2.3(a), Agent shall notify the Lenders, not later than 1:00 p.m. (New York time) on the Business Day immediately preceding the Funding Date applicable thereto, by telecopy, telephone, or other similar form of transmission, of the requested Borrowing. Each Lender shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Agent in immediately available funds, to Agent's Account, not later than 10:00 a.m. (New York time) on the Funding Date applicable thereto. After Agent's receipt of the proceeds of such Advances (or the Term Loans, as applicable), Agent shall make the proceeds thereof available to Administrative Borrower on the applicable Funding Date by transferring immediately available funds equal to such proceeds received by Agent to the Designated Account; provided, however, that Agent shall not request any Lender to make, and no Lender shall have the obligation to make, any Advance (or its portion of any Term Loan) if Agent shall have actual knowledge that one or more of the applicable conditions precedent set forth in Section 3 will not be satisfied on the requested Funding Date for the applicable Borrowing unless such condition has been waived.

(ii)     Unless Agent receives notice from a Lender on or prior to the Closing Date or, with respect to any Borrowing after the Closing Date, prior to 9:00 a.m. (New York time) on the date of such Borrowing, that such Lender will not make available as and when required hereunder to Agent for the account of Borrowers the amount of that Lender's Pro Rata Share of the Borrowing, Agent may assume that each Lender has made or will make such amount available to Agent in immediately available funds on the Funding Date and Agent may (but shall not be so required), in reliance upon such assumption, make available to Borrowers on such date a corresponding amount. If and to the extent any Lender shall not have made its full amount available to Agent in immediately available funds and Agent in such circumstances has made available to Borrowers such amount, that Lender shall on the Business Day following such Funding Date make such amount available to Agent, together with interest at the Defaulting Lender Rate for each day during such period. A notice submitted by Agent to any Lender with respect to amounts owing under this subsection shall be conclusive, absent manifest error. If such amount is so made available, such payment to Agent shall constitute such Lender's Advance (or portion of any Term Loan, as applicable) on the date of Borrowing for all purposes of this Agreement. If such amount is not made available to Agent on the Business Day following the Funding Date, Agent will notify Administrative Borrower of such failure to fund and, upon demand by Agent, Borrowers shall pay such amount to Agent for Agent's account, together with interest thereon for each day elapsed since the date of such Borrowing, at a rate per annum equal to the interest rate applicable at the time to the Advances (or portion of any Term Loan, as applicable) composing

such Borrowing. The failure of any Lender to make any Advance (or portion of any Term Loan, as applicable) on any Funding Date shall not relieve any other Lender of any obligation hereunder to make an Advance (or its portion of any Term Loan, as applicable) on such Funding Date, but no Lender shall be responsible for the failure of any other Lender to make the Advance (or its portion of any Term Loan, as applicable) to be made by such other Lender on any Funding Date.

(iii)   Agent shall not be obligated to transfer to a Defaulting Lender any payments made by Borrowers to Agent for the Defaulting Lender's benefit, and, in the absence of such transfer to the Defaulting Lender, Agent shall transfer any such payments to each other non-Defaulting Lender member of the Lender Group ratably in accordance with their Pro-Rata Shares (but only to the extent that such Defaulting Lender's portion of the Advances and/or Term Loans was funded by the other members of the Lender Group) or, if so directed by Administrative Borrower and if no Default or Event of Default had occurred and is continuing (and to the extent such Defaulting Lender's portion of an Advance was not funded by the Lender Group), retain same to be re-advanced to Borrowers as if such Defaulting Lender had made Advances to Borrowers. Subject to the foregoing, Agent may hold, and in its Permitted Discretion, re-lend to Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by Agent for the account of such Defaulting Lender. Solely for the purposes of voting or consenting to matters with respect to the Loan Documents, such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Pro-Rata Shares shall be deemed to be zero. This Section shall remain effective with respect to such Lender until (x) the Obligations under this Agreement shall have been declared or shall have become immediately due and payable, (y) the non-Defaulting Lenders, Agent, and Administrative Borrower shall have waived such Defaulting Lender's default in writing, or (z) the Defaulting Lender makes its Pro Rata Share of the applicable Advance and/or Term Loan and pays to Agent all amounts owing by Defaulting Lender in respect thereof. The operation of this Section shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by Borrowers of their duties and obligations hereunder to Agent or to the Lenders other than such Defaulting Lender. Any such failure to fund by any Defaulting Lender shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle Administrative Borrower at its option, upon written notice to Agent, to arrange for a substitute Lender to assume the Commitment of such Defaulting Lender, such substitute Lender to be acceptable to Agent which consent shall not be unreasonably withheld. In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Acceptance in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever; provided,

however, that any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Lender Groups' or Borrowers' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund.

(c)     **Agent Advances.**

(i)     Agent hereby is authorized by Borrowers and the Lenders, from time to time in Agent's sole discretion, (1) after the occurrence and during the continuance of a Default or an Event of Default, or (2) at any time that any of the other applicable conditions precedent set forth in Section 3 have not been satisfied, to make Advances to Borrowers on behalf of the Lenders that Agent, in its Permitted Discretion deems necessary or desirable (A) to preserve or protect the Collateral, or any portion thereof, (B) to enhance the likelihood of repayment of the Obligations, or (C) to pay any other amount chargeable to Borrowers pursuant to the terms of this Agreement, including Lender Group Expenses and the costs, fees, and expenses described in Section 10 (any of the Advances described in this Section 2.3(c) shall be referred to as "Agent Advances") provided, however, that notwithstanding anything to the contrary contained in this Section 2.3(c), the aggregate principal amount of Agent Advances outstanding at any time shall not exceed an amount equal to $250,000. Each Agent Advance shall be deemed to be an Advance hereunder, and all payments thereon shall be payable to Agent solely for its own account.

(ii)     The Agent Advances shall be repayable on demand, secured by the Agent's Liens granted to Agent under the Loan Documents, constitute Obligations hereunder, and bear interest at the rate applicable to Term Loan B.

(d)     **Settlement.**     It is agreed that each Lender's funded portion of the Advances is intended by the Lenders to equal, at all times, such Lender's Pro Rata Share of the outstanding Advances.     Such agreement notwithstanding, Agent and the other Lenders agree (which agreement shall not be for the benefit of or enforceable by Borrowers) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among them as to the Advances and the Agent Advances shall take place on a periodic basis in accordance with the following provisions:

(i)     Agent shall request settlement ("Settlement") with the Lenders on a weekly basis, or on a more frequent basis if so determined by Agent, (1) for itself, with respect to each Agent Advance, and (2) with respect to Borrowers' or their Subsidiaries' Collections received, as to each by notifying the Lenders by telecopy, telephone, or other similar form of transmission, of such requested Settlement, no later than 2:00 p.m. (New York time) on the Business Day immediately prior to the date of such requested Settlement (the date of such requested Settlement being the "Settlement Date"). Such notice of a Settlement Date shall include a summary statement of the amount of outstanding Advances and Agent Advances for the period since the prior Settlement Date. Subject to the terms and conditions contained herein (including Section 2.3(b)(iii)); (y) if a

Lender's balance of the Advances (including Agent Advances) exceeds such Lender's Pro Rata Share of the Advances (including Agent Advances) as of a Settlement Date, transfer in immediately available funds to a Deposit Account of such Lender (as such Lender may designate), an amount such that each such Lender shall, upon receipt of such amount, have as of the Settlement Date, its Pro Rata Share of the Advances (including Agent Advances), and (z) if a Lender's balance of the Advances (including Agent Advances) is less than such Lender's Pro Rata Share of the Agent Advances as of a Settlement Date, such Lender shall no later than 12:00 p.m. (New York time) on the Settlement Date transfer in immediately available funds to the Agent's Account, an amount such that each such Lender shall, upon transfer of such amount, have as of the Settlement Date, its Pro Rata Share of the Advances (including Agent Advances). Such amounts made available to Agent under the immediately preceding sentence shall be applied against the amounts of the applicable Agent Advances and, together with the portion of such Agent Advances representing such Lender's Pro Rata Share thereof, shall constitute Advances of such Lenders. If any such amount is not made available to Agent by any Lender on the Settlement Date applicable thereto to the extent required by the terms hereof, Agent shall be entitled to recover for its account such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate.

(ii)   In determining whether a Lender's balance of the Advances and Advances is less than, equal to, or greater than such Lender's Pro Rata Share of the Advances and Agent Advances as of a Settlement Date, Agent shall, as part of the relevant Settlement, apply to such balance the portion of payments actually received in good funds by Agent with respect to principal, interest, fees payable by Borrowers and allocable to the Lenders hereunder, and proceeds of Collateral. To the extent that a net amount is owed to any such Lender after such application, such net amount shall be distributed by Agent to that Lender as part of such next Settlement.

(iii)   During the period between Settlement Dates, Agent with respect to Agent Advances, and each Lender (subject to the effect of agreements between Agent and individual Lenders) with respect to the Advances other than Agent Advances, shall be entitled to interest at the applicable rate or rates payable under this Agreement on the daily amount of funds employed by Agent, or the Lenders, as applicable.

(e)   **Notation.** Agent shall record on its books the principal amount of the Advances (or portion of the Term Loans, as applicable) owing to each Lender, including the Agent Advances owing to Agent, and the interest therein of each Lender, from time to time and such records shall, absent manifest error, conclusively be presumed to be correct and accurate. In addition, each Lender is authorized, at such Lender's option, to note the date and amount of each payment or prepayment of principal of such Lender's Advances (or portion of the Term Loans, as applicable) in its books and records, including computer records.

(f)     **Lender's Failure to Perform.**   All Advances (other than Agent Advances) shall be made by the Lenders contemporaneously and in accordance with their Pro Rata Shares.  It is understood that (i) no Lender shall be responsible for any failure by any other Lender to perform its obligation to make any Advance (or other extension of credit) hereunder, nor shall any Commitment of any Lender be increased or decreased as a result of any failure by any other Lender to perform its obligations hereunder, and (ii) no failure by any Lender to perform its obligations hereunder shall excuse any other Lender from its obligations hereunder.

2.4     **Payments.**

(a)     **Payments by Borrowers.**

(i)     Except as otherwise expressly provided herein, all payments by Borrowers shall be made to Agent's Account for the account of the Lender Group and shall be made in immediately available funds, no later than 11:00 a.m. (New York time) on the date specified herein.  Any payment received by Agent later than 11:00 a.m. (New York time) shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(ii)     Unless Agent receives notice from Administrative Borrower prior to the date on which any payment is due to the Lenders that Borrowers will not make such payment in full as and when required, Agent may assume that Borrowers have made (or will make) such payment in full to Agent on such date in immediately available funds and Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent Borrowers do not make such payment in full to Agent on the date when due, each Lender severally shall repay to Agent on demand such amount distributed to such Lender, together with interest thereon at the Defaulting Lender Rate for each day from the date such amount is distributed to such Lender until the date repaid.

(b)     **Apportionment and Application of Payments.**

(i)     Except as otherwise provided with respect to Defaulting Lenders and except as otherwise provided in the Loan Documents (including agreements between Agent and individual Lenders), aggregate principal and interest payments shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the Obligations to which such payments relate held by each Lender) and payments of fees and expenses (other than fees or expenses that are for Agent's separate account, after giving effect to any agreements between Agent and individual Lenders) shall be apportioned ratably among the Lenders having a Pro Rata Share of the type of Commitment or Obligation to which a particular fee relates.  Except as otherwise specifically provided in paragraph (b)(iii) below or Section 2.4(d), all payments shall be remitted to Agent and all such payments, and all proceeds of Collateral received by Agent, shall be applied as follows:

A.    first, to pay any Lender Group Expenses then due to Agent under the Loan Documents, until paid in full,

B.    second, to pay any Lender Group Expenses then due to the Lenders under the Loan Documents, on a ratable basis, until paid in full,

C.    third, to pay any fees then due to Agent by Borrowers and not any amount owing to Agent by a Defaulting Lender (for its separate account, after giving effect to any agreements between Agent and the individual Lenders) under the Loan Documents, until paid in full,

D.    fourth, to pay any fees then due by Borrowers to any or all of the Lenders (after giving effect to any agreements between Agent and individual Lenders) under the Loan Documents, on a ratable basis, until paid in full, provided that, if an Event of Default has occurred and is continuing, the priority of the payment of any fee payable to any Lender in respect of Term Loan B and Term Loan C shall, unless the Required Lenders agree in their sole discretion to forgo deferring such payment, be deferred to item "sixteenth" and "seventeenth" below, respectively,

E.    fifth, to pay interest due in respect of all Agent Advances, until paid in full,

F.    sixth, to pay interest due in respect of the Advances (other than Agent Advances), until paid in full,

G.    seventh, ratably to pay interest due in respect of Term Loan A until paid in full,

H.    eighth, so long as no Event of Default has occurred and is continuing or, if an Event of Default has occurred and is continuing and the Required Lenders agree in their sole discretion, ratably to pay interest due in respect of Term Loan B, until paid in full (if an Event of Default has occurred and is continuing and the Required Lenders have not agreed to allow the payment of interest due in respect of Term Loan B, the priority of the payment of interest on Term Loan B shall be deferred to item "eighteenth" below),

I.    ninth, as no Event of Default has occurred and is continuing or, if an Event of Default has occurred and is continuing and the Required Lenders agree in their sole discretion, ratably to pay interest due in respect of Term Loan C, until paid in full (if an Event of Default has occurred and is continuing and the Required Lenders have not agreed to allow the payment of interest due in respect of Term Loan C, the priority of the payment of interest on Term Loan C shall be deferred to item "nineteenth" below),

J.    tenth, to pay the principal of all Agent Advances until paid in full,

K.    eleventh, so long as no Event of Default has occurred and is continuing or, if an Event of Default has occurred and is continuing and the Required Lenders agree in their sole discretion, ratably to pay all principal amounts then due and payable (other than as a result of an acceleration thereof) with respect to Term Loan A until paid in full (if an Event of Default has occurred and is continuing and the Required Lenders have not agreed to allow the payment of principal due in respect of Term Loan A, the priority of the payment of principal then due with respect to Term Loan A shall be deferred to item "fifteenth" below),

L.      twelfth, so long as no Event of Default has occurred and is continuing or, if an Event of Default has occurred and is continuing and the Required Lenders agree in their sole discretion, ratably to pay all principal amounts then due and payable (other than as a result of an acceleration thereof) with respect to Term Loan B, until paid in full (if an Event of Default has occurred and is continuing and the Required Lenders have not agreed to allow the payment of principal due in respect of Term Loan B, the priority of the payment of principal then due with respect to Term Loan B shall be deferred to item "twentieth" below),

M.      thirteenth, so long as no Event of Default has occurred and is continuing or, if an Event of Default has occurred and is continuing and the Required Lenders agree in their sole discretion, ratably to pay all principal amounts then due and payable (other than as a result of an acceleration thereof) with respect to Term Loan C, until paid in full (if an Event of Default has occurred and is continuing and the Required Lenders have not agreed to allow the payment of principal due in respect of Term Loan C, the priority of the payment of principal then due with respect to Term Loan C shall be deferred to item "twenty-first" below),

N.      fourteenth, to pay the principal of all Advances (other than Agent Advances) until paid in full,

O.      fifteenth, if an Event of Default has occurred and is continuing, to pay the outstanding principal balance of Term Loan A (in the inverse order of the maturity of the installments due thereunder), until Term Loan A is paid in full,

P.      sixteenth, if an Event of Default has occurred and is continuing, to pay fees due in respect of Term Loan B, until paid in full,

Q.      seventeenth, if an Event of Default has occurred and is continuing, to pay fees due in respect of Term Loan C, until paid in full,

R.      eighteenth, if an Event of Default has occurred and is continuing, to pay interest due in respect of Term Loan B, until paid in full,

S.      nineteenth, if an Event of Default has occurred and is continuing, to pay interest due in respect of Term Loan C, until paid in full,

T.      twentieth, if an Event of Default has occurred and is continuing, to pay the outstanding principal balance of Term Loan B (in the inverse order of maturity of the installments due thereunder), until Term Loan B is paid in full,

U.      twenty-first, if an Event of Default has occurred and is continuing, to pay the outstanding principal balance of Term Loan C (in the inverse order of maturity of the installments due thereunder), until Term Loan C is paid in full,

V.      twenty-second, if an Event of Default has occurred and is continuing, to pay the Applicable Prepayment Premium then due and payable until paid in full,

W.      twenty-third, to pay any other Obligations until paid in full, and

X.    twenty-fourth, to Borrowers (to be remitted by wire transfer to the Designated Account) or such other Person entitled thereto under applicable law.

(ii)    Agent promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from each Lender in writing, such funds as it may be entitled to receive, subject to a Settlement delay as provided in Section 2.3(d).

(iii)    In each instance, so long as no Default or Event of Default has occurred and is continuing or would result therefrom, Section 2.4(b) shall not be deemed to apply to any payment by Borrowers specified by Borrowers to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement.

(iv)    For purposes of the foregoing (other than clause (P)), "paid in full" means payment of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any Insolvency Proceeding), default interest, interest on interest, and expense reimbursements, except to the extent that default or overdue interest (but not any other interest) and loan fees, each arising from or related to a default, are disallowed in any Insolvency Proceeding; provided, however, that for the purposes of clause (F), "paid in full" means payment of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any Insolvency Proceeding), default interest, interest on interest, and expense reimbursements, whether or not the same would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(v)    In the event of a direct conflict between the priority provisions of this Section 2.4 and other provisions contained in any other Loan Document, it is the intention of the parties hereto that such priority provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.4 shall control and govern.

(c)    **Mandatory Prepayments.**

(i)    Within 5 days of delivery to Agent of the quarterly financial statements pursuant to Section 6.3(a) and the annual financial statements pursuant to Section 6.3(b), commencing with the delivery to Agent of the financial statements for the fiscal quarter ended June 30, 2004, or, if such financial statements are not delivered to Agent on the date such statements are required to be delivered pursuant to Sections 6.3(a) or 6.3(b), as applicable, 5 days after the date such statements are required to be delivered to Agent pursuant to Section 6.3(a) or 6.3(b), Borrowers shall prepay the outstanding Obligations in an amount equal to 85% of the Excess Cash Flow of Borrowers and their Subsidiaries for such fiscal quarter, such prepayment to be applied to the outstanding Obligations in accordance with clause (d) below.

(ii)    Immediately upon any voluntary or involuntary sale or disposition by a Borrower or any of its Subsidiaries of property or assets (other than sales or dispositions which qualify as Permitted Dispositions under clauses (b), (c), (d), (e), (f), or (g) of the definition

of Permitted Dispositions), such Borrower shall prepay the outstanding Obligations in accordance with clause (d) below in an amount equal to 100% of the Net Cash Proceeds received by such Borrower in connection with such sales or dispositions; provided, however, to the extent the aggregate amount of Net Cash Proceeds received by Borrowers during a fiscal year of Borrowers' is less than $100,000 and such proceeds are reinvested by Borrowers in their core business within 90 days of receipt thereof and until reinvested, and such proceeds are held as Qualified Cash pending their actual reinvestment, then Borrowers shall not be required to use such Net Cash Proceeds to make a mandatory prepayment. Nothing contained in this subclause (ii) shall permit Borrowers or any of their Subsidiaries to sell or otherwise dispose of any property or assets other than in accordance with Section 7.4.

(iii)    Immediately upon the receipt by a Borrower or any of its Subsidiaries of any Extraordinary Receipts, Borrowers shall prepay the outstanding Obligations in accordance with clause (d) below in an amount equal to 100% of such Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts.

(iv)    Immediately upon the issuance or incurrence by a Borrower or any of its Subsidiaries of any Indebtedness (other than Indebtedness referred to in clauses (c), (d), (e), (f), (g), (h), or (i) of Section 7.1), or the sale or issuance by a Borrower or any of its Subsidiaries of any shares of its Stock, Borrowers shall prepay the outstanding principal of the Obligations in accordance with clause (d) below in an amount equal to 100% of the net cash proceeds received by a Borrower or its Subsidiaries in connection with such sale, issuance, or incurrence.  The provisions of this subsection (iv) shall not be deemed to be implied consent to any such sale, issuance, or incurrence otherwise prohibited by the terms and conditions of this Agreement.

(v)    Immediately upon the occurrence of a Change of Control, Borrowers shall prepay all of the outstanding Obligations.

(d)    Prepayment Fee and Application of Payments.  In connection with each mandatory prepayment (other than a mandatory prepayment under Section 2.4(c)(ii)), Borrowers shall concurrently pay to Agent for the benefit of the Lenders a prepayment fee in an amount equal to the Applicable Prepayment Premium on the amount prepaid.  Each prepayment pursuant to subclauses (c)(i), (ii), (iii), and (iv) above shall be applied, first, to accrued and unpaid interest on the Term Loans, second, to the installments of principal on Term Loan A in the inverse order of maturity, until paid in full, third, to the installments of principal on Term Loan B in the inverse order of maturity, until paid in full, fourth, to the installments of principal on Term Loan C in the inverse order of maturity, until paid in full, fifth, to accrued and unpaid interest on the Advances, and sixth, to the outstanding principal balance of the Advances with a corresponding permanent reduction in the Maximum Revolver Amount.

2.5    Interest Rates, Payments, and Calculations.

(a)    Interest Rates.  Except as provided in clause (b) below, all Obligations that have been charged to the Loan Account pursuant to the terms hereof shall bear interest on the Daily Balance thereof as follows (i) if the relevant Obligation is an Advance or Term Loan A, at a per annum rate equal to the Base Rate plus the Base Rate Margin, (ii) if the relevant Obligation is Term Loan B, at a per annum rate equal to the Applicable Term Loan B & C

(iii)   Upon the occurrence and during the continuation of an Event of Default (and at the election of Agent or the Required Lenders), all Obligations that have been charged to the Loan Account pursuant to the terms hereof shall bear interest on the Daily Balance thereof at a per annum rate equal to 4 percentage points above the per annum rate otherwise applicable hereunder.

(c)   **Payment.** Interest and all other fees payable hereunder shall be due and payable, in arrears, on the first day of each month at any time that Obligations or Commitments are outstanding. Borrowers hereby authorize Agent, from time to time without prior notice to Borrowers, to charge such interest and fees, all Lender Group Expenses (as and when incurred), the fees and costs provided for in Section 2.10 (as and when accrued or incurred), and all other payments as and when due and payable under any Loan Document (including the amounts due and payable with respect to any Term Loan) to Borrowers' Loan Account, which amounts thereafter shall constitute Obligations hereunder and, until paid to Agent, shall accrue interest at the rate set forth in Section 2.5(a)(iii). Any interest not paid when due shall be compounded by being charged to Borrowers' Loan Account and shall thereafter constitute Obligations hereunder and shall accrue interest at the rate set forth in Section 2.5(a)(iii); provided, however, that if the past due interest is in respect of Term Loan B then such amount shall be compounded and added to the outstanding principal balance of Term Loan B.

(d)   **Computation.** All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360 day year for the actual number of days elapsed. In the event the Base Rate is changed from time to time hereafter, the rates of interest hereunder based upon the Base Rate automatically and immediately shall be increased or decreased by an amount equal to such change in the Base Rate.

(e)   **Intent to Limit Charges to Maximum Lawful Rate.** In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Borrowers and the Lender Group, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, however, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, ipso facto, as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum as allowed by law, and payment received from Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

2.6   **Cash Management.**

(a)   Borrowers shall, and shall cause each of their Subsidiaries that is an Obligor to, (i) establish and maintain cash management services of a type and on terms satisfactory to Agent at one or more of the banks set forth on Schedule 2.6(a) (each, a "Cash Management Bank"), and (ii) deposit or cause to be deposited promptly, and in any event no later than five (5) Business Days after the date of receipt thereof, all of their Collections into a bank account in Agent's name (a "Cash Management Account") at one of the Cash Management Banks.

(b)     Each Cash Management Bank shall establish and maintain Cash Management Agreements with Agent and the applicable Obligor, in form and substance acceptable to Agent. Each such Cash Management Agreement shall provide, among other things, that (i) all items of payment deposited in such Cash Management Account and proceeds thereof are held by such Cash Management Bank as agent or bailee-in-possession for Agent, (ii) the Cash Management Bank has no rights of setoff or recoupment or any other claim against the applicable Cash Management Account other than for payment of its service fees and other charges directly related to the administration of such Cash Management Account and for returned checks or other items of payment, and (iii) if such Cash Management Account contains Collections of a Borrower, it immediately will forward by daily sweep all amounts in the applicable Cash Management Account to the Agent's Account. The Collections deposited into the Agent's Account shall be applied pursuant to Section 2.4(b).

(c)     So long as no Default or Event of Default has occurred and is continuing, Administrative Borrower may amend Schedule 2.6(a) to add or replace a Cash Management Bank or Cash Management Account; provided, however, that (i) such prospective Cash Management Bank shall be satisfactory to Agent and Agent shall have consented in writing in advance to the opening of such Cash Management Account with the prospective Cash Management Bank, and (ii) prior to the time of the opening of such Cash Management Account, the applicable Obligor and such prospective Cash Management Bank shall have executed and delivered to Agent a Cash Management Agreement. The applicable Obligor shall close any of its Cash Management Accounts (and establish replacement cash management accounts in accordance with the foregoing sentence) promptly and in any event within 30 days of notice from Agent that the creditworthiness of any Cash Management Bank is no longer acceptable in Agent's reasonable judgment, or as promptly as practicable and in any event within 60 days of notice from Agent that the operating performance, funds transfer, or availability procedures or performance of the Cash Management Bank with respect to Cash Management Accounts or Agent's liability under any Cash Management Agreement with such Cash Management Bank is no longer acceptable in Agent's reasonable judgment.

(d)     The Cash Management Accounts shall be cash collateral accounts, with all cash, checks and similar items of payment in such accounts securing payment of the Obligations, and in which each Borrower hereby grants (with respect to their Cash Management Accounts) and each other Obligor shall grant pursuant to its Loan Documents (with respect to its Cash Management Accounts) a Lien to Agent.

2.7     Crediting Payments; Float Charge. The receipt of any payment item by Agent (whether from transfers to Agent by the Cash Management Banks pursuant to the Cash Management Agreements or otherwise) shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to the Agent's Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Agent only if it is received into the Agent's Account on a Business Day on or before 11:00 a.m. (New York time). If any payment item is received into the Agent's Account on a non-Business Day or after 11:00 a.m. (New York time) on a Business Day, it shall be deemed to have been received

by Agent as of the opening of business on the immediately following Business Day.  From and after the Closing Date, Agent shall be entitled to charge Borrowers for 3 Business Days of 'clearance' or 'float' at the rate then applicable under Section 2.5(a)(iii) or (b), as applicable, on all Collections that are received by the Borrowers and their Subsidiaries (regardless of where collected).  This across-the-board 3 Business Days clearance or float charge on all Collections of the Borrowers and their Subsidiaries is acknowledged by the parties to constitute an integral aspect of the pricing of the financing of Borrowers and shall apply irrespective of whether or not there are any outstanding monetary Obligations; the effect of such clearance or float charge being the equivalent of charging interest on such Collections through the completion of a period ending 3 Business Days after the receipt thereof.  The parties acknowledge and agree that the economic benefit of the foregoing provisions of this Section 2.7 shall be for the exclusive benefit of Agent.

2.8     **Designated Account.**  Agent is authorized to make the Advances and the Term Loans based upon telephonic or other instructions received from anyone purporting to be an Authorized Person, or without instructions if pursuant to Section 2.5(d).  Administrative Borrower agrees to establish and maintain the Designated Account with the Designated Account Bank for the purpose of receiving and (i) the proceeds of the Advances requested by Borrowers and made by Agent or the Lenders hereunder and (ii) Collection, payable to Borrowers pursuant to Section 2.4(b)(i).  Unless otherwise agreed by Agent and Administrative Borrower, any Advance or Agent Advance requested by Borrowers and made by Agent or the Lenders hereunder shall be made to the Designated Account.

2.9     **Maintenance of Loan Account; Statements of Obligations.**  Agent shall maintain an account on its books in the name of Borrowers (the "Loan Account") on which Borrowers will be charged with the Term Loans, all Advances (including Agent Advances) made by Agent or the Lenders to Borrowers or for Borrowers' account, and all other payment Obligations hereunder or under the other Loan Documents, including, accrued interest, fees and expenses, and Lender Group Expenses.  In accordance with Section 2.7, the Loan Account will be credited with all payments received by Agent from Borrowers or for Borrowers' account, including all amounts received in the Agent's Account from any Cash Management Bank.  Agent shall render statements regarding the Loan Account to Administrative Borrower, including principal, interest, fees, and including an itemization of all charges and expenses constituting Lender Group Expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and the Lender Group unless, within 60 days after receipt thereof by Administrative Borrower, Administrative Borrower shall deliver to Agent written objection thereto describing the error or errors contained in any such statements.  Administrative Borrower shall be entitled, upon written request to Agent, to receive supporting documentation substantiating any expense being charged to it in excess of $5,000 per expense.

2.10    **Fees.**  Borrowers shall pay to Agent the following fees and charges, which fees and charges are non-refundable when paid (irrespective of whether this Agreement is terminated thereafter) and shall be apportioned among the Lenders in accordance with the terms of agreements between Agent and individual Lenders:

(a)     **Unused Line Fee.** On the first day of each month during the term of this Agreement, an unused line fee in an amount equal to 0.60% per annum *times* the result of (i) the Maximum Revolver Amount, *less* (ii) the average Daily Balance of Advances that were outstanding during the immediately preceding month.

(b)     **Origination Fee.** On the Closing Date, an origination fee in the amount of $1,289,690.72 (which shall be deducted from the proceeds of Term Loan B).

(c)     **Annual Fee.** On the first day of each consecutive twelve month period commencing on the Closing Date, Borrowers shall be liable for a fee in an amount equal to one percent (1%) of the Maximum Revolver Amount plus the outstanding principal balance of the Term Loans on the first day of each such twelve month period. The annual fee corresponding to a twelve month period shall be due and payable on the earliest of (i) the last day of such twelve month period, (ii) the date of a prepayment in full of the Obligations pursuant to Section 3.6, and (iii) the date all Obligations become due and payable as a result of Agent declaring all Obligations due and payable following the occurrence of an Event of Default.

(d)     **Monthly Administrative Fee.** On the first day of each calendar month during the term of this Agreement (and on the Closing Date) a monthly administrative fee in the amount of $5,000 each.

(e)     **Audit, Appraisal, and Valuation Charges.** Audit, appraisal, and valuation fees and charges as follows (i) a fee of $1250 per day, per auditor, plus out-of-pocket expenses for each collateral or financial audit of the Obligors performed by personnel employed by or affiliated with Agent, (ii) the actual charges paid or incurred by Agent if it elects to employ the services of one or more third Persons to perform collateral audits of the Obligors or any of their Subsidiaries, or to appraise the Collateral, or any portion thereof, and (iii) the actual charges paid or incurred by Agent if it elects to employ the services of one or more third Persons to assess the Obligors' or any of their Subsidiaries business valuation; provided, however, that so long as no Event of Default shall have occurred and be continuing, Borrowers shall not be obligated to reimburse Agent for more than 4 collateral audits during any calendar year, more than 1 appraisal of the Collateral during any calendar year or more than 1 business valuation in any calendar year.

**2.11    Intentionally Omitted.**

**2.12    Intentionally Omitted.**

**2.13    Capital Requirements.** If, after the date hereof, any Lender determines that (i) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies, or any change in the interpretation or application thereof by any Governmental Authority charged with the administration thereof, or (ii) compliance by such Lender or its parent bank holding company with any guideline, request, or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on such Lender's or such holding company's capital as a consequence of such Lender's Commitments hereunder to a level below that which such Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into

consideration such Lender's or such holding company's then existing policies with respect to capital adequacy) by any amount deemed by such Lender to be material, then such Lender shall notify Administrative Borrower and Agent thereof. Following receipt of such notice, Borrowers agree to pay such Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable within 90 days after presentation by such Lender of a statement in the amount and setting forth in reasonable detail such Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error); provided, however, that Borrowers shall not be required to compensate any Lender pursuant to this Section 2.13 for such reduction of rate of return of capital incurred more than 180 days prior to the date that such Lender delivers such statement, which shall include notice of the law, regulation, guideline request or any interpretation thereof, of the Federal Reserve Board, any central bank or other governmental entity, as applicable, giving rise to such reduction. In determining such amount, such Lender shall use reasonable averaging and attribution methods, and such Lender shall charge its other borrowers, to the extent applicable, on a comparable basis.

2.14   **Securitization.** Each Borrower hereby acknowledges that the Lenders and each of their Affiliates may sell or securitize one or more of the Term Loans (a "Securitization") through the pledge of one or more of the Term Loans as collateral security for loans to such Lenders or their Affiliates or through the sale of one or more of the Term Loans or the issuance of direct or indirect interests in one or more of the Term Loans, which loans to such Lenders or their Affiliate or direct or indirect interests will be rated by Moody's, Standard & Poor's or one or more other rating agencies (the "Rating Agencies"). Each Borrower agrees to use commercially reasonable efforts to cooperate with such Lenders and their Affiliates to effect the Securitization including, without limitation, by (a) executing such additional documents, as reasonably requested by such Lenders in order to effectuate the Securitization, provided that (i) any such additional documentation does not impose additional costs on Borrowers, and (ii) any such additional documentation does not adversely affect the rights, or increase the Obligations, of Borrowers under the Loan Documents or change or affect in a manner adverse to Borrowers the financial terms of the Term Loans, (b) providing such information as may be reasonably requested by such Lenders in connection with the rating of the Term Loans or the Securitization, and (c) providing in connection with any rating of the Borrowings a certificate (i) agreeing to indemnify such Lenders and any of their Affiliates, any of the Rating Agencies, or any party providing credit support or otherwise participating in the Securitization (collectively, the "Securitization Parties") for any losses, claims, damages or liabilities (the "Liabilities") to which such Lenders, their Affiliates or such Securitization Parties may become subject insofar as the Liabilities arise out of or are based upon a breach of the representation and warranty contained in Section 5.19 hereof (as if such representation or warranty were made to the best of Borrowers' knowledge), and (ii) agreeing to reimburse such Securitization Parties for any legal or other expenses reasonably incurred by such Persons in connection with defending the Liabilities.

2.15   **Registered Notes.** Agent, on behalf of the Administrative Borrower, agrees to record each Term Loan A, Term Loan B, and Term Loan C on the Register referred to in Section 14.1(h). Each Term Loan A, Term Loan B, and Term Loan C recorded on the Register (a "Registered Loan") may not be evidenced by promissory notes other than Registered Notes (as defined below). Upon the registration of any Term Loan A, Term Loan B and Term Loan C, each Borrower agrees, at the request of Agent, on behalf of the applicable Lender with a Term

Loan A Commitment, Term Loan B Commitment, and Term Loan C Commitment, to execute and deliver to Agent, for the benefit of such Lender, a promissory note, in conformity with the terms of this Agreement, in registered form to evidence such Registered Loan, in form and substance satisfactory to such Lender, and registered as provided in Section 14.1(h) (a "Registered Note"), payable to the order of such Lender and otherwise duly completed.  Once recorded on the Register, a Registered Loan may not be removed from the Register so long as it remains outstanding, and a Registered Note may not be exchanged for a promissory note that is not a Registered Note.

2.16   Joint and Several Liability of Borrowers.

(a)     Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by Agent and Lenders under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(b)     Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 2.16), it being the intention of the parties hereto that all the Obligations shall be the joint and several Obligations of each Borrower without preferences or distinction among them.

(c)     If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation.

(d)     The Obligations of each Borrower under the provisions of this Section 2.16 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each such Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstances whatsoever.

(e)     Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Advances pursuant to this Agreement, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Agent or Lenders under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement). Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Agent or Lender at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term,

covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Agent or Lenders in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower. Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this <u>Section 2.16</u> afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this <u>Section 2.16</u>, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of such Borrower under this <u>Section 2.16</u> shall not be discharged except by performance and then only to the extent of such performance. The Obligations of each Borrower under this <u>Section 2.16</u> shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any Borrower or Agent or any Lender. The joint and several liability of the Borrowers hereunder shall continue in full force and effect notwithstanding any absorption, merger, amalgamation or any other change whatsoever in the name, constitution or place of formation of any of Borrowers or Lender.

(f)     Each Borrower represents and warrants to Agent and Lenders that such Borrower is currently informed of the financial condition of each Borrower and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations. Each Borrower further represents and warrants to Agent and Lenders that such Borrower has read and understands the terms and conditions of the Loan Documents. Each Borrower hereby covenants that such Borrower will continue to keep informed of each Borrower's financial condition, the financial condition of other guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(g)     The provisions of this <u>Section 2.16</u> are made for the benefit of Agent and Lenders and its respective successors and assigns, and may be enforced by it or them from time to time against any or all of the Borrowers as often as occasion therefor may arise and without requirement on the part of Agent or Lenders, or any of their successors, or assigns, first to marshal any of its or their claims or to exercise any of its or their rights against any of the other Borrowers or to exhaust any remedies available to it or them against any of the other Borrowers or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this <u>Section 2.16</u> shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by Agent or Lenders upon the insolvency, bankruptcy or reorganization of any of the Borrowers, or otherwise, the provisions of this <u>Section 2.16</u> will forthwith be reinstated in effect, as though such payment had not been made.

(h)     Each of the Borrowers hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrowers with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to

Agent or Lenders with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to Agent or Lenders hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

3.    CONDITIONS; TERM OF AGREEMENT.

    3.1    Conditions Precedent to the Initial Extension of Credit. The obligation of the Lender Group (or any member thereof) to make the initial Advance (or otherwise to extend any credit provided for hereunder on the Closing Date), is subject to the fulfillment, to the satisfaction of, or the waiver by, the Agent in its sole discretion, of each of the conditions precedent set forth below:

        (a)    the Closing Date shall occur on or before March 31, 2004 unless extended by the Bankruptcy Court;

        (b)    Agent shall have received a UCC Filing Authorization Letter, duly executed by each Obligor, together with appropriate financing statements on Form UCC-1 duly filed in such office or offices as may be necessary or, in the opinion of Agent, desirable to perfect the Agent's Liens in and to the Collateral, and Agent shall have received searches reflecting the filing of all such financing statements;

        (c)    Agent shall have received each of the following documents, in form and substance satisfactory to the Agent in its sole discretion, duly executed, and each such document shall be in full force and effect:

            (i)    the Obligor Documents,

            (ii)    the Flow of Funds Agreement, and

            (iii)    the Success Fee Letter.

        (d)    Agent shall have received a certificate from the Secretary of each Obligor attesting to the resolutions of such Obligor's Board of Directors or managing members (or other governing body) authorizing its execution, delivery, and performance of this Agreement and the other Loan Documents to which such Obligor is a party and authorizing specific officers of such Obligor to execute the same;

        (e)    Agent shall have received copies of each Obligor's Governing Documents, as amended, modified, or supplemented to the Closing Date, certified by the Secretary of such Obligor;

(f)     Agent shall have received a certificate of status with respect to each Obligor, dated within 10 days of the Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of such Borrower, which certificate shall indicate that such Obligor is in good standing in such jurisdiction;

(g)     Agent shall have received certificates of status with respect to each Obligor, each dated within 30 days of the Closing Date, such certificates to be issued by the appropriate officer of the jurisdictions (other than the jurisdiction of organization of such Obligor) in which its failure to be duly qualified or licensed would constitute a Material Adverse Change, which certificates shall indicate that such Obligor is in good standing in such jurisdictions;

(h)     Agent shall have received an opinion of each Obligor's counsel in form and substance satisfactory to the Agent in its sole discretion;

(i)     Agent shall have received satisfactory evidence (including a certificate of the chief financial officer of each Obligor) that all tax returns required to be filed by each Obligor have been timely filed and all taxes upon each Obligor or any of its properties, assets, income, and franchises (including Real Property taxes, sales taxes, and payroll taxes) have been paid prior to delinquency, except such taxes that are the subject of a Permitted Protest;

(j)     Agent shall have completed its business, legal, and collateral due diligence, including (i) a collateral audit and review of Borrowers' books and records and verification of each Obligor's representations and warranties to the Lender Group, the results of which shall be satisfactory to the Agent in its sole discretion, (ii) a review of Borrowers' financial statements for the month ending February 29, 2004, (iii) an inspection of each of the locations where Obligors' Inventory is located, the results of which shall be satisfactory to the Agent in its sole discretion;

(k)     Agent shall have received completed reference checks with respect to each Obligor's senior management, the results of which are satisfactory to the Agent in its sole discretion;

(l)     Agent shall have received the Closing Date Business Plan;

(m)     Borrowers shall have paid all Lender Group Expenses incurred in connection with the transactions evidenced by this Agreement and all fees required to be paid on or before the Closing Date pursuant to Section 2.10;

(n)     Agent and its counsel shall be satisfied, in their sole discretion (i) that all assets subject to the Transaction are adequate and sufficient for Borrowers to operate the "cruise-to-nowhere" business as contemplated in the projections provided to Agent, (ii) with the Bankruptcy Court's findings of fact and conclusions of law that the Transaction qualifies as a good faith transaction under Section 363(m) of the Bankruptcy Code, (iii) that there has been proper service of notice of the Transaction to all interested parties, and (iv) that the Final Order approving the Transaction provides that (a) the assets purchased shall be free and clear of all claims against the bankruptcy estate of SunCruz, JAB and VSC and Liens and (b) that Borrowers are buyers in good faith;

(o)     Agent shall have received copies of the final executed Acquisition Agreement, with all schedules and exhibits thereto, together with a certificate of the Secretary of Administrative Borrower certifying each such document as being a true, correct, and complete copy thereof and the Agent and its counsel shall be satisfied, in their sole discretion, (y) that all conditions precedent to closing the Acquisition Agreement shall have been satisfied, and that none of such conditions shall have been waived without the prior written consent of the Agent and (z) with the material terms, exhibits and schedules of the Acquisition Agreement;

(p)     Agent and its counsel shall be satisfied, in their sole discretion that (i) Borrowers have not assumed more than $1,000,000 of prior creditor debt and claims of the bankruptcy estate of SunCruz, JAB and VSC and, in this connection, any such assumption is on terms and conditions satisfactory to Agent (including the subordination of such indebtedness to the Term Loans), and (ii) Borrowers have not assumed more than $2,500,000 of normal and customary accounts payable of the bankruptcy estate of SunCruz, JAB, and VSC and that WCV has received a cash credit at closing or adequate escrow arrangement for deposit of funds from the bankruptcy estate of SunCruz, JAB and VSC;

(q)     Agent shall be satisfied, in its sole discretion, with the sources and uses of funds related to the Transaction;

(r)     Agent shall have received, and the Agent and its counsel shall be satisfied, in their sole discretion, with all abstracts of title and certificates of inspection with respect to all of the Vessels subject to Preferred Ship Mortgages;

(s)     Borrowers shall have entered into agreements with the Boulis Estate regarding assets of the Boulis Estate which are material to the operation of Borrowers' business, including an assignment of the "SunCruz" name, all on terms and conditions satisfactory to the Agent and its counsel, in their sole discretion;

(t)     Agent shall have received written evidence, satisfactory to the Agent and its counsel in their sole discretion, of resolution of (i) the transfer of the parking permit at the Port Canaveral, Florida location, and (ii) the submerged land issues at the Ponce Inlet, Florida location;

(u)     Agent and its counsel shall be satisfied, in their sole discretion, that Borrowers have received valid assignments of or entered into all leases (including real property, parking lot and dock leases and other leases of material assets) (collectively, the "Leases"), and have obtained, or received valid assignments of, all permits (including parking permits) (collectively, the "Permits") necessary for the operation of the business on terms and conditions, and at each location, as contemplated in the projections provided to Agent. Agent and its counsel shall be satisfied, in their sole discretion, that (i) all such Leases and Permits have a minimum term of three (3) years from the Closing Date (or that Borrowers hold and exercise options to extend such Leases and Permits for a minimum term of three (3) years from the Closing Date), (ii) all Leases and Permits contain terms and conditions standard and customary for the locations in which they are entered, and (iii) Borrowers have taken all necessary measures to maintain sufficient parking to operate the business at each location;

(v)   Agent shall have received copies of all bareboat charters, maintenance contracts and other material contracts for conducting Borrowers' business, together with a certificate of the Secretary of Administrative Borrower certifying each such document as being a true, correct, and complete copy thereof, and Agent and Borrowers shall have entered into collateral assignment agreements (other than the Collateral Assignments of Leases), containing terms and conditions satisfactory to Agent and its counsel, in their sole discretion, of each such charter or contract;

(w)   Agent and its counsel shall be satisfied, in their sole discretion, that each Obligor shall have obtained or received (i) all licenses, approvals or evidence of other actions required by any Governmental Authority in connection with the execution and delivery by each Obligor of the Loan Documents and the Acquisition Agreement, or with the consummation of the transactions (including the Transactions) contemplated thereby and (ii) all registrations required under, and have otherwise complied with, all applicable federal, state and local laws (including without limitation the Gambling Devices Act and the Gambling Ship Act), regulations, ordinances or orders of any court or governmental agency which are necessary or beneficial for Borrowers to legally own or lease gaming equipment and to operate a gaming business and a "cruise-to-nowhere" business;

(x)   no disruption of or adverse change in conditions in the financial, banking, or capital markets shall have occurred which Agent, in its sole discretion deems material in connection with the financing contemplated hereby;

(y)   all other documents and legal matters in connection with the transactions contemplated by this Agreement (including the Transaction) shall have been delivered, executed, or recorded and shall be in form and substance satisfactory to the Agent, in its sole discretion;

(z)   Agent shall have received satisfactory evidence that all conditions precedent set forth in that certain Letter, dated as of April 8, 2004 (the "Dale Letter"), from Margaret A. Dale, Esq. to Stephen E. Kravit, Esq. and J. Reid Bingham, Esq. have been satisfied in Agent's sole discretion, and that none of such conditions shall have been waived without the prior written consent of the Agent;

(aa)   Agent shall have received satisfactory evidence that all filings and records required to be filed or maintained by each Obligor pursuant to the Gambling Ship Act and the Gambling Devices Act have been timely filed or maintained with the applicable Governmental Authorities; and

(bb)   Agent shall have received those certain mutual general releases of any and all claims, demands, actions, causes of action, cross-claims, counterclaims, and third-party claims for any act or omission that occurred prior to the Closing Date in connection with the consummation of the transactions contemplated by the Loan Documents, executed by and between the Borrowers, the Management Shareholders, the Agent, the Lenders and others.

3.2   Conditions Subsequent to the Initial Extension of Credit.   The obligation of the Lender Group (or any member thereof) to continue to make Advances (or otherwise extend credit hereunder) is subject to the fulfillment, on or before the date applicable thereto, of each of

the conditions subsequent set forth below (the failure by Borrowers to so perform or cause to be performed constituting an Event of Default):

(a) within 5 Business Days of the Closing Date, Agent shall have received satisfactory evidence that VSC has been qualified to do business in the State of South Carolina and is in good standing under the laws of such jurisdiction.

(b) within 5 days of the Closing Date, Agent shall have received each of the following documents or items, in form and substance satisfactory to Agent in its sole discretion:

(i) evidence that Agent has a perfected first priority Lien upon all of the assets acquired by Borrowers pursuant to the Acquisition Agreement, which evidence shall include but shall not be limited by, the following: (i) U.S. Coast Guard documentation, records and abstracts (the latter of which shall be dated no more than three days prior to the Closing Date) showing that the Vessels are free and clear of all Liens as well as a current U.S. Coast Guard certification for each Vessel, and (ii) executed and notarized bills of sale approved by the U.S. Coast Guard for the purchase of each Vessel; such bills of sale shall list VCI as the owner of the Vessels (other than the Surfside Princess which shall list Surfside Princess LLC as the owner) and shall contain a statement of the Seller's representations and warranties as to the fact that there are no outstanding Liens and that the Seller was the sole owner of the Vessels prior to the sale of the Vessels (other than the Surfside Princess) to the Borrowers;

(ii) evidence satisfactory to Agent in its sole discretion that Agent's Lien upon the Surfside Princess secures the obligations of Surfside Princess LLC under the Guaranty and that such Lien is a perfected second priority Lien, which evidence shall include but not be limited by, U.S. Coast Guard documentation, records and abstracts (the latter of which shall be dated no more than three days prior to the Closing Date) showing that the Surfside Princess is free and clear of all Liens (except the Lien of Orchard, as agent under the Surfside Princess Loan Documents (the "First Mortgage")), as well as a current U.S. Coast Guard certification for the Surfside Princess;

(iii) an assignment of any and all proceeds earned by the Vessels;

(iv) the Management Shareholder Employment Agreements; and

(v) certified copies of the policies of insurance, together with the endorsements thereto, as are required by Section 6.8, the form and substance of which shall be satisfactory to Agent and its counsel.

(c) within 15 days of the Closing Date, Administrative Borrower shall deliver to Agent executed copies of the credit card notifications as set forth in Section 5.27 of the Loan Agreement, the form and substance of which shall be satisfactory to Agent in its Permitted Discretion;

(d)     within 30 days of the Closing Date, Agent shall have received each of the following documents or items, in form and substance satisfactory to Agent in its sole discretion:

(i)     the Cash Management Agreements;

(ii)    the Control Agreements of Borrowers;

(iii)   a collateral assignment of a key man life insurance policy on the lives of Robert Weisberg, Spiro Naos, Greg Karan, and such other members of Borrowers' senior management as may be required by Agent, as required by Section 6.8(d), the form and substance of which shall be satisfactory to Agent;

(iv)    the Collateral Access Agreements with respect to each of the locations listed on Schedule 3.2(c); and

(v)     the Collateral Assignment of Leases, containing terms and conditions satisfactory to Agent and its counsel, in their sole discretion; provided, however, that so long as Administrative Borrower is using its best efforts to get such Collateral Assignment of Leases, an Event of Default shall not be deemed to have occurred if Agent does not receive all such Collateral Assignment of Leases; provided, further, however, that failure to deliver to Agent all such Collateral Assignment of Leases shall cause the interest rates to be adjusted pursuant to Section 2.5(b)(i) of this Agreement.

(e)     within the corresponding time periods set forth in the Dale Letter, Agent shall have received satisfactory evidence that all the conditions subsequent set forth in the Dale Letter have been satisfied in Agent's sole and absolute discretion, and that none of such conditions have been waived without the prior written consent of the Agent; and

(f)     as soon as available, but in any event within 60 days after the Closing Date, Administrative Borrower shall cause to be delivered to Agent a final closing balance sheet respecting the Borrowers, reviewed by Navigant Consulting, reflecting all purchase price adjustments arising out of the Transaction.

3.3     **Conditions Precedent to all Extensions of Credit.** The obligation of the Lender Group (or any member thereof) to make the Term Loans (or to extend any other credit hereunder) shall be subject to the following conditions precedent:

(a)     the representations and warranties contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date);

(b)     no Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof;

(c)     no injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been

issued and remain in force by any Governmental Authority against any Obligor, Agent, any Lender, or any of their Affiliates; and

      (d)    no Material Adverse Change shall have occurred.

    3.4    **Term.** This Agreement shall continue in full force and effect for a term ending on April 8, 2007 (the "Maturity Date"). The foregoing notwithstanding, the Lender Group, upon the election of the Required Lenders, shall have the right to terminate its obligations under this Agreement immediately and without notice upon the occurrence and during the continuation of an Event of Default.

    3.5    **Effect of Termination.** On the date of termination of this Agreement, all Obligations immediately shall become due and payable without further notice or demand. No termination of this Agreement, however, shall relieve or discharge any Obligor of their duties, Obligations, or covenants hereunder and the Agent's Liens in the Collateral shall remain in effect until all Obligations have been paid in full. When this Agreement has been terminated and all of the Obligations have been paid in full, Agent will, at Borrowers' sole expense, execute and deliver any UCC termination statements, lien releases, re-assignments of trademarks, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, the Agent's Liens and all notices of security interests and liens previously filed by Agent with respect to the Obligations.

    3.6    **Early Termination by Borrower.** Borrowers have the option, at any time upon not less than 90 days prior written notice by Administrative Borrower to Agent (the "Notice Period"), to terminate this Agreement by paying to Agent, in cash, the Obligations, in full, together with the Applicable Prepayment Premium (to be allocated based upon letter agreements between Agent and individual Lenders). If Administrative Borrower has sent a notice of termination pursuant to the provisions of this Section, then, unless Administrative Borrower rescinds such notice of termination prior to the expiration of the relevant Notice Period specified therein, the Commitments shall terminate and Borrowers shall be obligated to repay the Obligations, in full, together with the Applicable Prepayment Premium, on the date set forth as the date of termination of this Agreement in such notice. In the event of the termination of this Agreement and repayment of the Obligations at any time prior to the Maturity Date, for any other reason, including (a) termination upon the election of the Required Lenders to terminate after the occurrence and during the continuation of an Event of Default, (b) foreclosure and sale of Collateral, (c) sale of the Collateral in any Insolvency Proceeding, or (d) restructure, reorganization, or compromise of the Obligations by the confirmation of a plan of reorganization or any other plan of compromise, restructure, or arrangement in any Insolvency Proceeding, then, in view of the impracticability and extreme difficulty of ascertaining the actual amount of damages to the Lender Group or profits lost by the Lender Group as a result of such early termination, and by mutual agreement of the parties as to a reasonable estimation and calculation of the lost profits or damages of the Lender Group, Borrowers shall pay the Applicable Prepayment Premium to Agent (to be allocated based upon letter agreements between Agent and individual Lenders), measured as of the date of such termination.

## 4.   CREATION OF SECURITY INTEREST.

**4.1    Grant of Security Interest.** Each Borrower hereby grants to Agent, for the benefit of the Lender Group, a continuing security interest in all of its right, title, and interest in all currently existing and hereafter acquired or arising Borrowers Collateral in order to secure prompt repayment of any and all of the Obligations in accordance with the terms and conditions of the Loan Documents and in order to secure prompt performance by Borrowers of each of their covenants and duties under the Loan Documents. The Agent's Liens in and to the Borrowers Collateral shall attach to all Borrowers Collateral without further act on the part of Agent or any Borrower. Anything contained in this Agreement or any other Loan Document to the contrary notwithstanding, except for Permitted Dispositions, Borrowers and their Subsidiaries have no authority, express or implied, to dispose of any item or portion of the Collateral.

**4.2    Negotiable Collateral.** In the event that any Borrowers Collateral, including proceeds, is evidenced by or consists of Negotiable Collateral, and if and to the extent that Agent determines that perfection or priority of Agent's security interest is dependent on or enhanced by possession, the applicable Borrower, promptly upon the request of Agent, shall endorse and deliver physical possession of such Negotiable Collateral to Agent (except for checks that are received in the ordinary course of business and that are deposited into a Cash Management Account in accordance with Section 2.6).

**4.3    Collection of Accounts, General Intangibles, and Negotiable Collateral.** At any time after the occurrence and during the continuation of an Event of Default, Agent or Agent's designee may (a) notify Account Debtors of Borrowers that the Borrowers' Accounts, chattel paper, or General Intangibles have been assigned to Agent or that Agent has a security interest therein, or (b) collect Borrowers' Accounts, chattel paper, or General Intangibles directly and charge the collection costs and expenses to the Loan Account. Upon the instruction of Agent at any time after the occurrence and during the continuation of an Event of Default, each Borrower agrees that it will hold in trust for the Lender Group, as the Lender Group's trustee, any of its or its Subsidiaries' Collections that it receives and immediately will deliver such Collections to Agent or a Cash Management Bank in their original form as received by such Borrower.

**4.4    Filing of Financing Statements; Commercial Tort Claims; Delivery of Additional Documentation Required.**

(a)    Each Obligor party hereto authorizes Agent to file any financing statement necessary or desirable to effectuate the transactions contemplated by the Loan Documents, and any continuation statement or amendment with respect thereto, in any appropriate filing office without the signature of such Obligor where permitted by applicable law. Each Obligor party hereto hereby ratifies the filing of any financing statement filed without the signature of such Obligor prior to the date hereof.

(b)    If any Obligor acquires any commercial tort claims after the date hereof, such Obligor shall promptly (but in any event within 3 Business Days after such acquisition) deliver to Agent a written description of such commercial tort claim and shall deliver a written agreement, in form and substance satisfactory to Agent, pursuant to which such Obligor shall

pledge and collaterally assign all of its right, title and interest in and to such commercial tort claim to Agent, as security for the Obligations (a "Commercial Tort Claim Assignment").

(c)    At any time upon the request of Agent, each Obligor shall execute or deliver to Agent, any and all financing statements, original financing statements in lieu of continuation statements, fixture filings, security agreements, pledges, assignments, Commercial Tort Claim Assignments, endorsements of certificates of title, and all other documents (collectively, the "Additional Documents") that Agent may request in its Permitted Discretion, in form and substance satisfactory to Agent, to create, perfect, and continue perfected or to better perfect the Agent's Liens in the assets of such Obligor (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), to create and perfect Liens in favor of Agent in any Real Property acquired after the Closing Date, and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents. To the maximum extent permitted by applicable law, each Obligor that is a party hereto authorizes Agent to execute any such Additional Documents in such Obligor's name and authorizes Agent to file such executed Additional Documents in any appropriate filing office and Agent shall provide such Obligor with copies of any Additional Documents filed pursuant to this Section 4.4(c). In addition, on such periodic basis as Agent shall reasonably require, each Obligor shall (i) provide Agent with a report of all new material patentable, copyrightable, or trademarkable materials acquired or generated by such Obligor during the prior period (other than those that such Obligor determines in its commercially reasonable judgment are of negligible value in the operation of its business), (ii) cause all material patents, copyrights, and trademarks acquired or generated by such Obligor that are not already the subject of a registration with the appropriate filing office (or an application therefor diligently prosecuted) to be registered with such appropriate filing office in a manner sufficient to impart constructive notice of such Obligor's ownership thereof, and (iii) cause to be prepared, executed, and delivered to Agent supplemental schedules to the applicable Loan Documents to identify such patents, copyrights, and trademarks as being subject to the security interests created thereunder; provided, however, that the Obligors may not register with the U.S. Copyright Office any unregistered copyrights (whether in existence on the Closing Date or thereafter acquired, arising, or developed) unless (i) Administrative Borrower provides Agent with written notice of the applicable Obligor's intent to register such copyrights not less than 30 days prior to the date of the proposed registration, and (ii) prior to such registration, the applicable Obligors execute and deliver to Agent an Intellectual Property Security Agreement, supplemental schedules to an existing Intellectual Property Security Agreement, or such other documentation as Agent deems necessary in order to perfect and continue perfected Agent's Liens on such copyrights following such registration.

4.5    Power of Attorney. To the extent permitted by law, each Obligor that is a party hereto hereby irrevocably makes, constitutes, and appoints Agent (and any of Agent's officers, employees, or agents designated by Agent) as such Obligor's true and lawful attorney, with power to (a) if such Obligor refuses to, or fails timely to execute and deliver any of the documents described in Section 4.4, sign the name of such Obligor on any of the documents described in Section 4.4, (b) at any time that an Event of Default has occurred and is continuing, sign such Obligor's name on any invoice or bill of lading relating to the Borrowers Collateral, drafts against Account Debtors, or notices to Account Debtors, (c) send requests for verification of such Obligor's Accounts, (d) endorse such Obligor's name on any of its payment items (including all of its Collections) that may come into the Lender Group's possession, (e) at any

time that an Event of Default has occurred and is continuing, make, settle, and adjust all claims under such Obligor's policies of insurance and make all determinations and decisions with respect to such policies of insurance, and (f) at any time that an Event of Default has occurred and is continuing, settle and adjust disputes and claims respecting such Obligor's Accounts, chattel paper, or General Intangibles directly with Account Debtors, for amounts and upon terms that Agent determines to be reasonable, and Agent may cause to be executed and delivered any documents and releases that Agent determines to be necessary. The appointment of Agent as each such Obligor's attorney, and each and every one of its rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully and finally repaid and performed.

4.6    **Right to Inspect; Retain Consultants.** Agent and each Lender (through any of their respective officers, employees, or agents) shall have the right, at any time during the term of this Agreement, to inspect the Books and make copies or abstracts thereof and to check, test, and appraise the Collateral, or any portion thereof, in order to verify each Borrower's and their respective Subsidiaries' financial condition or the amount, quality, value, condition of, or any other matter relating to, the Collateral and to retain outside consultants to review the activities and operations of Borrowers and the background and activities of senior management of Borrowers, including the Chief Financial Officer.

4.7    **Control Agreements.** Each Obligor that is a party hereto agrees that it will not transfer assets out of any of its Deposit Accounts or Securities Accounts; provided, however, that so long as no Event of Default has occurred and is continuing or would result therefrom, such Obligor may use such assets (and the proceeds thereof) to the extent not prohibited by this Agreement or the other Loan Documents and, if the transfer is to another bank or securities intermediary, so long as such Obligor (or its Subsidiary, as applicable), Agent, and the substitute bank or securities intermediary have entered into a Control Agreement. Each such Obligor agrees that it will take any or all reasonable steps that Agent requests in order for Agent to obtain control in accordance with Sections 9-104, 9-105, 9-106, and 9-107 of the Code with respect to any of its or their Securities Accounts, Deposit Accounts, electronic chattel paper, Investment Property, and letter-of-credit rights. No arrangement contemplated hereby or by any Control Agreement in respect of any Securities Accounts or other Investment Property shall be modified by any Obligor without the prior written consent of Agent. Upon the occurrence of an Event of Default, Agent may notify any bank or securities intermediary to liquidate the applicable Deposit Account or Securities Account or any related Investment Property maintained or held thereby and remit the proceeds thereof to the Agent's Account.

5.    **REPRESENTATIONS AND WARRANTIES.**

In order to induce the Lender Group to enter into this Agreement, each Obligor that is a party hereto makes the following representations and warranties to the Lender Group which shall be true, correct, and complete, in all material respects, as of the date hereof, and shall be true, correct, and complete, in all material respects, as of the Closing Date, and at and as of the date of the making of each Advance (or other extension of credit) made thereafter, as though made on and as of the date of such Advance (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement:

5.1    **No Encumbrances.**  Each Obligor has good and indefeasible title to their personal property assets and good and marketable title to their material Real Property, in each case, free and clear of Liens except for Permitted Liens.

5.2    *[Intentionally Omitted].*

5.3    *[Intentionally Omitted].*

5.4    **Equipment.**  All of the material Equipment of each Obligor is used or held for use in their business and is in good working order, ordinary wear and tear excepted.

5.5    **Location of Inventory and Equipment.**  Except as set forth on Schedule 7.17, the Inventory and Equipment of each Obligor (other than vessels, vehicles or Equipment out for repairing) are not stored with a bailee, warehouseman, or similar party and are located only at, or in-transit between, the locations identified on Schedule 5.5 (as such Schedule may be updated pursuant to Section 6.9).

5.6    **Equipment Records.**  Each Obligor keeps correct and accurate records itemizing and describing the type, quality, and quantity of their Equipment and the book value thereof.

5.7    **State of Incorporation; Location of Chief Executive Office; FEIN; Organizational ID Number; Commercial Tort Claims.**

(a)    The jurisdiction of organization of each Obligor is set forth on Schedule 5.7(a).

(b)    The chief executive office (or equivalent office) of each Obligor is located at the address indicated on Schedule 5.7(b) (as such Schedule may be updated pursuant to Section 6.9).

(c)    Each Obligor's FEIN and organizational identification number, if any, are identified on Schedule 5.7(c).

(d)    As of the Closing Date, no Obligor holds any commercial tort claims, except as set forth on Schedule 5.7(d).

5.8    **Due Organization and Qualification; Subsidiaries.**

(a)    Borrowers and each of their respective Subsidiaries is duly organized and existing and in good standing under the laws of the jurisdiction of its organization and qualified to do business and in good standing in any state where the failure to be so qualified reasonably could be expected to have a Material Adverse Change.

(b)    Set forth on Schedule 5.8(b), is a complete and accurate description of the authorized capital Stock of each Obligor, by class, and, as of the Closing Date, a description of the number of shares of each such class that are issued and outstanding. Other than as described on Schedule 5.8(b), there are no subscriptions, options, warrants, or calls relating to any shares of any Obligor's capital Stock, including any right of conversion or exchange under any

outstanding security or other instrument, other than issued or granted after the Closing Date with respect to any Stock of a Borrower. Borrowers are not subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of their capital Stock or any security convertible into or exchangeable for any of its capital Stock.

(c)     Set forth on Schedule 5.8(c), is a complete and accurate list of each Borrower's direct and indirect Subsidiaries as of the Closing Date, showing: (i) the number of shares of each class of common and preferred Stock authorized for each of such Subsidiaries, and (ii) the number and the percentage of the outstanding shares of each such class owned directly or indirectly by such Borrower. All of the outstanding capital Stock of each such Subsidiary has been validly issued and is fully paid and, to the extent applicable, non-assessable.

(d)     Except as set forth on Schedule 5.8(d), there are no subscriptions, options, warrants, or calls relating to any shares of any Obligor's Subsidiaries' capital Stock, including any right of conversion or exchange under any outstanding security or other instrument. No Obligor or any of its respective Subsidiaries is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of any Obligor's Subsidiaries' capital Stock or any security convertible into or exchangeable for any such capital Stock.

### 5.9    Due Authorization; No Conflict.

(a)     The execution, delivery, and performance by Obligors of this Agreement and the Loan Documents to which each, individually or collectively, is a party have been duly authorized by all necessary action on the part of such Person.

(b)     The execution, delivery, and performance by Obligors of this Agreement and the Loan Documents to which each, individually or collectively, is a party do not and will not (i) violate any of the Governing Documents of such Person, (ii) violate any provision of federal, state, or local law or regulation applicable to such Person, or any order, judgment, or decree of any court or other Governmental Authority binding on such Person, which violation reasonably could be expected to result in a Material Adverse Change, (iii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation of such Person, which conflict, breach, or default could reasonably be expected to result in a Material Adverse Change, (iv) result in or require the creation or imposition of any Lien of any nature whatsoever upon any properties or assets of such Person, other than Permitted Liens, (v) require any approval of such Person's interestholders (except as have been obtained), or (vi) require any approval or consent of any Person under any material contractual obligation of such Person (except as have been obtained), which approval or consent if not obtained could reasonably be expected to result in a Material Adverse Change.

(c)     Other than the filing of financing statements and other perfection filings, the execution, delivery, and performance by Obligors of this Agreement and the other Loan Documents to which such Person is a party do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than consents or approvals that have been obtained and that are still in force and except where the failure to obtain or make any of the foregoing would not reasonably be expected to result in a Material Adverse Change.

(d)  This Agreement and the other Loan Documents to which an Obligor each, individually or collectively, is a party, and all other documents contemplated hereby and thereby, when executed and delivered by such Person will be the legally valid and binding obligations of such Person, enforceable against such Person in accordance with their respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

(e)  The Agent's Liens are validly created, perfected (to the extent a security interest in the Collateral may be perfected by (i) the filing of financing statements, (ii) the filing of notices with the United States Patent and Trademark Office or the United States Copyright Office, (iii) taking possession of stock certificates, (iv) entering into Control Agreements, (v) the recording of a preferred ship mortgage, and (vi) the execution and delivery of the relevant security agreement), and first priority Liens, subject only to Permitted Liens.

5.10  <u>Litigation.</u>  Other than those matters disclosed on <u>Schedule 5.10</u>, there are no actions, suits, or proceedings pending or, to the best knowledge of each Obligor, threatened against any of the Obligors, or any of their Subsidiaries, except for (a) matters that are fully covered by insurance (subject to customary deductibles), and (b) matters arising after the Closing Date that reasonably could not be expected to result in a Material Adverse Change.

5.11  <u>GAAP; No Material Adverse Change.</u>  All financial statements relating to any Obligor that have been delivered by any Obligor to the Lender Group have been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for the lack of footnotes and being subject to year-end audit adjustments) and present fairly in all material respects, the applicable Obligor's financial condition as of the date thereof and results of operations for the period then ended. There has not been a Material Adverse Change with respect to any Obligor since the date of the latest financial statements submitted to the Lender Group on or before the Closing Date.

5.12  <u>Fraudulent Transfer.</u>

(a)  Obligors and each of their Subsidiaries are Solvent.

(b)  No transfer of property is being made by an Obligor or its Subsidiaries and no obligation is being incurred by an Obligor or its Subsidiaries in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Obligor or its Subsidiaries.

5.13  <u>Employee Benefits.</u>  None of the Obligors, nor any of their Subsidiaries, nor any of their ERISA Affiliates maintains or contributes to any Benefit Plan.

5.14  <u>Environmental Condition.</u>  Except as set forth on <u>Schedule 5.14</u>, (a) to each Obligor's knowledge, none of its or its Subsidiaries assets has ever been used by such Obligor, its Subsidiaries, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such production, storage, handling, treatment, release or transport was in violation, in any material respect, of applicable Environmental Law and reasonably could be expected to result in a Material Adverse Change, (b) to each Obligor's knowledge, none of its or its Subsidiaries properties or assets has ever been

designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site which designation or identification reasonably could be expected to result in a Material Adverse Change, (c) neither Obligors nor any of their Subsidiaries have received written notice that a Lien arising under any Environmental Law has attached to any revenues or to any Real Property owned or operated by any Obligor or its Subsidiaries, and (d) neither Obligors nor their Subsidiaries have received a written summons, citation, notice, or directive from the Environmental Protection Agency or any other federal or state governmental agency concerning any action or omission by any Obligor or its Subsidiaries resulting in the releasing or disposing of Hazardous Materials into the environment which release or disposal reasonably could be expected to result in a Material Adverse Change.

   5.15   **Brokerage Fees.**  Neither Borrowers nor any of their Subsidiaries has utilized the services of any broker or finder in connection with obtaining financing from the Lender Group under this Agreement and no brokerage commission or finders fee is payable by Borrowers or their Subsidiaries in connection herewith.

   5.16   **Intellectual Property.**  Obligors and their Subsidiaries own, or hold licenses in, all material trademarks, trade names, copyrights, patents, patent rights, and licenses that are necessary to the conduct of their business as currently conducted.  Attached hereto as Schedule 5.16 (as updated from time to time) is a true, correct, and complete listing of all material Intellectual Property (other than Obsolete Intellectual Property) as to which an Obligor or any of its Subsidiaries is the owner or is an exclusive licensee.

   5.17   **Leases.**  Subject to the last sentence of this Section 5.17, each Obligor and its Subsidiaries enjoy peaceful and undisturbed possession under all leases material to their business and to which they are parties or under which they are operating.  All of such leases are valid and subsisting and no material default by an Obligor or its Subsidiaries exists under any of them (other than defaults that are the subject of a Permitted Protest).

   5.18   **Deposit Accounts and Securities Accounts.**  Set forth on Schedule 5.18 are all of each Obligor's and their respective Subsidiaries' Deposit Accounts and Securities Accounts, including, with respect to each bank or securities intermediary (i) the name and address of such Person, and (ii) the account numbers of the Deposit Accounts or Securities Accounts maintained with such Person.

   5.19   **Complete Disclosure.**  All factual information (taken as a whole) furnished by or on behalf of each Obligor and their respective Subsidiaries in writing to Agent or any Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement, the other Loan Documents, or any transaction contemplated herein or therein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of each Obligor or their respective Subsidiaries in writing to Agent or any Lender will be, true and accurate, in all material respects, on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided.  On the Closing Date, the Closing Date Projections represent, and as of the date on which any other Projections are delivered to Agent, such additional Projections represent each Borrower's good faith best

estimate of its and its Subsidiaries' future performance for the periods covered thereby; *provided,* that to the extent any of the foregoing information was, is or will be based upon or constitutes a forecast or projection, each Borrower represents only that it acted in good faith and utilized reasonable assumptions and due care in the preparation of such information (it being understood that such projections and forecasts are subject to significant uncertainties and contingencies, many of which are beyond the control of the Borrowers and that no assurance can be given that such projections or forecasts will be realized).

5.20    **Indebtedness.**  Set forth on Schedule 5.20 is a true and complete list of all Indebtedness of Obligors and their Subsidiaries outstanding immediately prior to the Closing Date that is to remain outstanding after the Closing Date and such Schedule accurately reflects the aggregate principal amount of such Indebtedness and the principal terms thereof as of the Closing Date.

5.21    **Material Contracts.**  Neither the consummation of the Transaction, nor the consummation of the transactions contemplated under the Acquisition Agreement, nor the grant by Obligors or any of their Subsidiaries of security interests in the Collateral as contemplated hereunder and under the other Loan Documents will conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation or material lease of Obligors or their Subsidiaries.

5.22    **Intellectual Property of Subsidiaries.**  No Subsidiary of Borrowers owns any material Intellectual Property.

5.23    **No Violation of Law.**  None of the Obligors nor any of their Subsidiaries are in violation of any law, statute, regulation, ordinance, judgment, order or decree applicable to it which violation could reasonably be expected to have a Material Adverse Change.

5.24    **No Default.**  None of the Obligors nor any of their Subsidiaries are in default with respect to any note, indenture, loan agreement, mortgage, lease, deed, or other agreement to which such Obligor or such Subsidiary is a party or by which it is bound, which default could reasonably be expected to have a Material Adverse Change.

5.25    **Taxes.**  Each Obligor and each of its Subsidiaries have filed all federal and other tax returns and reports required to be filed, and have paid all federal and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable unless such unpaid taxes and assessments would constitute a Permitted Lien.

5.26    **Solvency.**  Each Borrower is Solvent prior to and after giving effect to the Term Loans to be made on the Closing Date, and shall remain Solvent during the term of this Agreement.

5.27    **Credit Card Processors.**  Set forth on Schedule 5.27 are all of Borrowers' credit card clearinghouses or other processors, including, with respect to each clearinghouse or processor (i) the name and address of such clearinghouse or processor, and (ii) the account numbers of the accounts maintained with such clearinghouse or processor.

### 5.28   Admiralty Representations.

(a)     Each Obligor is a corporation or limited liability company, respectively, (i) of which more than 50% of its Stock is owned of record and beneficially by citizens of, or entities organized in, the United States of America (the "U.S."), (ii) that is run by a board of directors or similar managing group of which the majority are citizens of the U.S., and (iii) whose chief executive officer, chief operating officer and managing member are citizens of the U.S.

(b)     Each Obligor conducted a thorough search to determine if there are any potential outstanding hidden Liens or recorded Liens of suppliers of goods, services, necessaries or repairs, tort claimants or lawsuits against any of the Vessels, in any of the ports where the Vessels are presently operating, have been in operation or may have been taken for repairs or supplies.

(c)     The Vessels are (i) U.S. flag, (ii) documented for Jones Act trade, (iii) certified by the U.S. Coast Guard to carry passengers, and (iv) suitable for use in the day cruise, offshore gambling industry.

(d)     Borrowers have conducted a thorough search of Seller's records to determine if there are any unpaid charges due and owing any vessel agents, general agents, vessel husbanding agent, crew wages, crewmember maintenance and cure, insurance premiums or calls, crew travel expenses (including air fare, taxis and hotel), wharfage and/or dock leases, port fees, pilotage fees, deductibles on claims covered by insurance, governmental fees, fines, penalties or forfeitures, salvage claims or Liens, stevedore charges, surveyor's fees, advertising, crew supplies, and/or broker's fees with respect to any Vessel, and to the extent there are any unpaid charges as noted above, or any other unpaid charges which could constitute a maritime Lien pursuant to the Commercial Instruments and Maritime Lien Act, 46 U.S.C. §31301 and/or the general maritime law of the U.S., the Borrowers have secured sufficient security from Seller to guarantee those unpaid charges.

(e)     All Vessel certificates, licenses, permits and/or other operating documents for the Vessels are up-to-date with compliance for all contingencies.

(f)     Borrowers examined the records, books and documentation of the Seller to determine the identity of all known suppliers of necessaries, repairs and other services provided to the Vessels in all ports where these Vessels have been in operation or may have been taken for repairs or suppliers.

(g)     Borrowers have examined the records, documents and files of the Seller to obtain disclosure of all unrepaired hull and machinery claims currently pending, whether by collision, mechanical breakdown or otherwise for the Vessels, and whether or not the pending claims are being handled under a reservation of rights or non-waiver agreement, each Borrower warrants and represents that it has obtained sufficient security from the Sellers to cover those repairs should the insurance coverage be denied.

(h)     Borrowers reviewed the records, books and files of the Seller and upon such review are able to conclude that there are (i) no known Liens as contemplated by the

Commercial Instruments and Maritime Lien Act, 46 U.S.C. §31301, (ii) no ship mortgages pursuant to the Ship Mortgage Act, 46 U.S.C. §§31301-3 1343, (iii) no violations of the Federal Water Pollution Prevention & Control Act, 33 U.S.C. §§125 1-1361 or OPA 90, (iv) no pending limitation of Vessel owner's liability at the proceedings pursuant to 46 U.S.C. §§181-195, (v) no violations of the Tariff Act of 1930, 19 U.S.C. §1584, (vi) no violations of the Rivers and Harbors Act, 33 U.S.C. §403 and 408, and (vii) no Liens by subrogation wherein the Seller received funds to pay a Lien on the Vessel and transferred to the lender the subrogation rights for the Lien so paid.

6.    **AFFIRMATIVE COVENANTS.**

Each Obligor that is a party hereto, jointly and severally, covenants and agrees that, until termination of all of the Commitments and payment in full of the Obligations, each such Obligor shall and shall cause each of their Subsidiaries to do all of the following:

6.1    **Accounting System.** Maintain a system of accounting that enables Obligors and each Subsidiary to produce financial statements in accordance with GAAP and maintain records pertaining to the Collateral that contain information as from time to time reasonably may be requested by Agent. Obligors also shall maintain, in all material respects, their respective billing systems/practices as approved by Agent prior to the Closing Date, with the same not to be materially modified without Agent's prior written consent.

6.2    **Collateral Reporting.** Provide Agent (and if so requested by Agent, with copies for each Lender) with the following documents at the following times in form satisfactory to Agent:

| Weekly | (a)    a weekly operating report, including a collection journal and schedule of expenses paid since the last such report, |
| | (b)    a summary aging, by vendor, of Obligors' accounts payable and any book overdraft. |
| Monthly (not later than the 25th day after the end of each month) | (c)    a monthly operating report, including a collection journal and schedule of expenses paid since the last such report-, |
| | (d)    a detailed report regarding each Obligor's cash and Cash Equivalents. |
| Upon request by Agent | (e)    such other reports as to the Collateral or the financial condition of the Obligors and their Subsidiaries, as Agent may reasonably request. |

6.3    **Financial Statements, Reports, Certificates.** Deliver to Agent, with copies to each Lender:

(a)    as soon as available, but in any event within 30 days (45 days in the case of a month that is the end of one of Borrower's fiscal quarters) after the end of each month during each of Borrower's fiscal years,

(i)     a company prepared consolidated balance sheet, income statement, and statement of cash flow covering each Borrower's and its Subsidiaries' operations during such period, and if such month is the last month in a fiscal quarter a company prepared consolidated and consolidating balance sheet, income statement, and statement of cash flow covering each Borrower's and each of its Subsidiary's operations during such fiscal quarter then ended, together with a statement of all Permitted Intercompany Advances for such fiscal quarter,

(ii)    a certificate signed by the chief financial officer, chief executive officer, president, or controller of the Administrative Borrower to the effect that:

(A)     the financial statements delivered hereunder have been prepared in accordance with GAAP (except for the lack of footnotes and being subject to year-end audit adjustments) and fairly present in all material respects the financial condition of Borrowers and their Subsidiaries,

(B)     the representations and warranties of each Obligor contained in this Agreement and the other Loan Documents are true and correct in all material respects on and as of the date of such certificate, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date), and

(C)     there does not exist any condition or event that constitutes a Default or Event of Default (or, to the extent of any non-compliance, describing such non-compliance as to which he or she may have knowledge and what action the applicable Obligor has taken, is taking, or proposes to take with respect thereto), and

(D)     for each month that is the date on which a financial covenant in Section 7.18 is to be tested, a Compliance Certificate demonstrating, in reasonable detail, including any purchase accounting adjustments, compliance at the end of such period with the applicable financial covenants contained in Section 7.18,

(b)     as soon as available, but in any event within 90 days after the end of each of Borrower's fiscal years,

(i)     financial statements of each Borrower and its Subsidiaries for each such fiscal year, audited by independent certified public accountants reasonably acceptable to Agent and certified, without any qualifications, by such accountants to have been prepared in accordance with GAAP (such audited financial statements to include a balance sheet, income statement, and statement of cash flow and, if prepared, such accountants' letter to management), and

(ii)    a certificate of such accountants addressed to Agent and the Lenders stating (without the requirement of any independent testing) that such

accountants do not have knowledge of the existence of any Default or Event of Default under Section 7.18.

(c)    as soon as available, but in any event no later than the start of each of Borrowers' fiscal years, copies of Projections, in form and substance (including as to scope and underlying assumptions) satisfactory to Agent, in its Permitted Discretion, for the forthcoming 3 years, year by year, and for the forthcoming fiscal year, month by month, certified by the chief financial officer of Administrative Borrower as conforming to the standards set forth under Section 5.19.

(d)    as requested by Agent, satisfactory evidence of payment of applicable excise taxes in each jurisdiction (i) in which any Obligor or any of its Subsidiaries (unless subject to a Permitted Protest) conducts business or is required to pay any such excise tax, (ii) where any Obligor's or any of its Subsidiaries' failure to pay any such applicable excise tax would result in a Lien on the properties or assets of any Obligor or any of its Subsidiaries (unless subject to a Permitted Protest), or (iii) where any Obligor's or any of its Subsidiaries' failure to pay any such applicable excise tax reasonably could be expected to result in a Material Adverse Change,

(e)    as soon as any Obligor has knowledge of any event or condition that constitutes a Default or an Event of Default, notice thereof and a statement of the curative action that such Obligor proposes to take with respect thereto,

(f)    promptly after the commencement thereof, but in any event within 5 days after the service of process with respect thereto on an Obligor or any of its Subsidiaries, notice of all actions, suits, or proceedings brought by or against such Obligor or any of its Subsidiaries before any Governmental Authority which reasonably could be expected to result in a Material Adverse Change,

(g)    (a) within 10 days of the delivery to any Borrower's or any other Obligor's Board of Directors, copies of the monthly board reports so delivered; provided, however, that the Obligors may, in the exercise of their reasonable business judgment, redact information relating to the evaluation of strategic alternatives from such reports prior to delivery to the Lender Group,

(h)    upon the request of Agent, any other report reasonably requested relating to the financial condition of the Obligors or their Subsidiaries.

In addition to the financial statements referred to above, Borrowers agree that no Subsidiary of an Obligor will have a fiscal year different from that of Borrowers.  Borrowers agree to cooperate with Agent to allow Agent to consult with its independent certified public accountants if Agent reasonably requests the right to do so and that, in such connection, its independent certified public accountants are authorized to communicate with Agent (so long as, prior to the occurrence and continuation of an Event of Default, a representative of the Obligors is present and, after the occurrence and during the continuation of an Event of Default, Obligors are afforded the opportunity to (but need not) be present) and to release to Agent whatever financial information concerning Obligors or their Subsidiaries as Agent reasonably may request.

6.4    Guarantor Reports.  Cause each Guarantor to deliver its annual financial statements at the time when any Borrower provides its audited financial statements to Agent, but only to the extent such Guarantor's financial statements are not consolidated with such Borrower's financial statements, and, upon the request of Agent, copies of all federal income tax returns as soon as the same are available and in any event no later than 30 days after the same are required to be filed by law.

6.5    Returns.  Cause returns and allowances, as between any of the Obligors, on the one hand, and their Account Debtors, on the other hand, to be on the same basis and in accordance with the usual customary practices of such Obligors, as they exist at the time of the execution and delivery of this Agreement.

6.6    Maintenance of Properties, Licenses and Permits.

(a)    Maintain and preserve all of its properties which are necessary or useful in the proper conduct to its business in good working order and condition, ordinary wear and tear, and casualty excepted (and except where the failure to do so could not be expected to result in Material Adverse Change), and comply at all times with the provisions of all leases to which it is a party as lessee so as to prevent any loss or forfeiture thereof or thereunder;

(b)    Maintain at all times required gaming, maritime, liquor and other regulatory licenses and requirements in order to operate the "cruise-to-nowhere" business as is contemplated in the Closing Date Business Plan;

(c)    Maintain at all times sufficient parking for the operation of its "cruise-to-nowhere" business as is contemplated in the Closing Date Business Plan.

(d)    Maintain at all times all material leases for the operation of its "cruise-to-nowhere" business as is contemplated in the Closing Date Business Plan.

6.7    Taxes.  Cause all assessments and taxes, whether real, personal, or otherwise, due or payable by, or imposed, levied, or assessed against any Obligor or any of its Subsidiaries, or any of their respective assets, to be paid in full before delinquency or before the expiration of any extension period, except to the extent that the validity of such assessment or tax shall be the subject of a Permitted Protest. Each Obligor will and will cause its Subsidiaries to make timely payment or deposit of all tax payments and withholding taxes required of it and them by applicable laws, including those laws concerning F.I.C.A., F.U.T.A., state disability, and local, state, and federal income taxes, and will, upon request, furnish Agent with proof satisfactory to Agent indicating that each Obligor and its Subsidiaries have made such payments or deposits.

6.8    Insurance.

(a)    At each Obligor's expense, maintain insurance respecting its and its Subsidiaries' assets wherever located, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses. Each Obligor also shall maintain to the extent available business interruption (if requested by Agent), public liability, and product liability insurance, as well as insurance against larceny, embezzlement, and criminal misappropriation. All such policies of insurance

shall be in such amounts and with such insurance companies as are reasonably satisfactory to Agent. Each Obligor shall deliver copies of all such policies to Agent with a satisfactory lender's loss payable endorsement naming Agent as sole loss payee or additional insured, as appropriate; provided, however, absent notice to Obligor from Agent of any objection thereto within fifteen days after Agent received such policies, receipt by Agent of copies of policies referred to herein shall be acknowledgement of Agent as to the sufficiency of the amount of insurance being carried by Obligor. Each policy of insurance or endorsement shall contain a clause requiring the insurer to give not less than 30 days prior written notice to Agent in the event of cancellation of the policy for any reason whatsoever.

(b)     Each Obligor shall give Agent prompt notice of any loss exceeding $50,000 covered by such insurance. Prior to an Event of Default, the applicable Obligor shall have the exclusive right to adjust any losses payable under any such insurance policies which are less than $50,000. Following an Event of Default, or in the case of any losses payable under such insurance exceeding $50,000, Agent shall have the exclusive right to adjust any losses payable under any such insurance policies, without any liability to any Obligor whatsoever in respect of such adjustments. Any monies received as payment for any loss under any insurance policy mentioned above (other than liability insurance policies) or as payment of any award or compensation for condemnation or taking by eminent domain, shall (i) if no Event of Default has occurred and is continuing, at the applicable Obligor's option, be used to (a) rebuild, repair, or replace the affected assets, (b) prepay the respective Obligations of the applicable Obligor, or (c) any combination thereof, and (ii) if an Event of Default has occurred and is continuing, be paid over to Agent to be applied at the option of the Agent either to the prepayment of the Obligations or shall be disbursed to Borrowers under staged payment terms reasonably satisfactory to the Agent for application to the cost of repairs, replacements, or restorations. Any such repairs, replacements, or restorations shall be effected with reasonable promptness and shall be of a value at least equal to the value of the items of property taken or destroyed prior to such taking, damage or destruction.

(c)     Each Obligor will not and will not suffer or permit its Subsidiaries to take out separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 6.8, unless Agent is included thereon as named insured with the loss payable to Agent under a lender's loss payable endorsement or its equivalent. Each Obligor immediately shall notify Agent whenever such separate insurance is taken out, specifying the insurer thereunder and full particulars as to the policies evidencing the same, and copies of such policies promptly shall be provided to Agent.

(d)     At Borrowers' expense, maintain key man life insurance policies with respect to (i) Robert Weisberg, in an amount of at least $3,000,000 or such other amount as may be required by Agent, (ii) Spiro Naos, in an amount of at least $5,000,000, and (iii) Greg Karan, in an amount of at least $2,000,000, and (iv) such other members of Borrowers' senior management as may be required by Agent, in an aggregate amount of at least $10,000,000. Borrowers shall furnish Agent with an "Absolute Assignment" of such key man life insurance policies, shall record such "Absolute Assignment" with the issuer of the policies, and shall furnish proof of such issuer's acceptance of such assignment. All proceeds payable under such key man life insurance policies shall be payable to Agent to be applied on account of the Obligations in accordance with Section 2.4(d).

6.9    Location of Inventory and Equipment.   Keep each Obligor's and their Subsidiaries' Inventory and Equipment (other than vehicles and Equipment out for repair) only at the locations identified on Schedule 5.5 and their chief executive offices only at the locations identified on Schedule 5.7(b); provided, however, that each Obligor may amend Schedule 5.5, Schedule 5.7 and Schedule 7.9, so long as such amendment occurs by written notice to Agent not less than 10 days prior to the date on which such Inventory or Equipment is moved to such new location or such chief executive office is relocated, so long as (with respect to the domestic Obligors) such new location is within the continental United States, and so long as, at the time of such written notification, such Obligor provides Agent a Collateral Access Agreement with respect to such locations on which Inventory or material Equipment is located.

6.10    Compliance with Laws.   Comply with the requirements of all applicable laws (including gaming and maritime laws), rules, regulations, and orders of any Governmental Authority, including the Fair Labor Standards Act, the Americans With Disabilities Act, ERISA, the Gambling Ship Act, and the Gambling Devices Act, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change.

6.11    Leases.   Pay when due all rents and other amounts payable under any "material leases" to which such Obligor or any of its Subsidiaries is a party or by which such Obligor's or any such Subsidiaries' properties and assets are bound, unless such payments are the subject of a Permitted Protest.   For purposes of this Section 6.11, "material leases" shall mean the leases listed on Schedule 6.11 and leases under which relevant Person's obligations to pay rent and other amounts thereunder during any fiscal year is greater than $100,000, in the aggregate.

6.12    Existence and Operation.

(a)    Except as otherwise permitted under Section 7.3, at all times preserve and keep in full force and effect each Obligor's and its Subsidiary's valid existence and good standing under the laws of its jurisdiction of organization and any rights and franchises material to their businesses.

(b)    At all times during the term of this Agreement, preserve and keep in full force and effect a corporate and organizational structure whereby (i) the Chief Executive Officer of each Borrower shall be subject to the direct management and control of, and shall report directly to, the Chairman of the Board of such Borrower, (ii) the outside casino security specialist retained pursuant to Section 6.16 shall report directly to the Chairman of the Board of the Borrowers, and (iii) any check to be drawn on an account of any Borrower in an amount over $25,000 shall require the prior authorization, approval and signature of the Chairman of the Board of the Borrowers.

6.13    Environmental.   (a) Keep any property either owned or operated by each Obligor or any of its Subsidiaries free of any Environmental Liens or post bonds or other financial assurances sufficient to satisfy the obligations or liability evidenced by such Environmental Liens where failure to do so reasonably could be expected to result in a Material Adverse Change, (b) comply with Environmental Laws where failure to do so reasonably could be expected to result in a Material Adverse Change and provide to Agent documentation of such

compliance which Agent reasonably requests, (c) promptly notify Agent of any release of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Obligor or any of its Subsidiaries and take any Remedial Actions required to abate said release or otherwise to come into compliance with applicable Environmental Law, in each case where the failure to do so reasonably could be expected to result in a Material Adverse Change, and (d) promptly, but in any event within 10 days of its receipt thereof, provide Agent with written notice of any of the following: (i) written notice that an Environmental Lien has been filed against any of the real or personal property of an Obligor or any of its Subsidiaries, (ii) commencement of any Environmental Action or notice that an Environmental Action will be filed against an Obligor or any of its Subsidiaries, which Environmental Action or notice reasonably could be expected to result in a Material Adverse Change, and (iii) notice of a violation, citation, or other administrative order which reasonably could be expected to result in a Material Adverse Change.

     **6.14**   **Disclosure Updates.** Promptly and in no event later than 5 Business Days after obtaining knowledge thereof, (a) notify Agent if any written information, exhibit, or report furnished to the Lender Group contained any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made, and (b) correct any defect or error that may be discovered therein. The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of any prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the affect of amending or modifying this Agreement or any of the Schedules hereto.

     **6.15**   **Formation of Subsidiaries.** At the time an Obligor forms any direct or indirect Subsidiary or acquires any direct or indirect Subsidiary after the Closing Date, such Obligor shall (a) cause such new Subsidiary to provide to Agent a Guaranty and a security agreement, and such other security documents (including mortgages with respect to any vessel or Real Property of such new Subsidiary), as well as appropriate UCC-1 financing statements (and with respect to all property subject to a mortgage, fixture filings), all in form and substance satisfactory to Agent (including being sufficient to grant Agent a first priority Lien (subject to Permitted Liens) in and to the assets of such newly formed or acquired Subsidiary), (b) provide to Agent a pledge agreement and appropriate certificates and powers or UCC-1 financing statements, hypothecating all of the direct or beneficial ownership interest in such new Subsidiary, in form and substance satisfactory to Agent, and (c) provide to Agent all other documentation, including one or more opinions of counsel satisfactory to Agent, which in its opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above (including policies of title insurance or other documentation with respect to all property subject to a Mortgage). Any document, agreement, or instrument executed or issued pursuant to this Section 6.15 shall be a Loan Document.

     **6.16**   **Security Specialist.** Borrowers shall engage, at Borrowers' expense, an outside casino security specialist (approved by Agent) for the term of this Agreement to review Borrowers' business operations and make recommendations to Agent and Borrowers in order to minimize theft or misappropriation of funds. Agent shall have the right to audit security measures of Borrowers at Agent's sole discretion.

LA 133549v12                                       67

6.17   **Admiralty Covenants.** Maintain a current U.S. Coast Guard certification for each Vessel. Comply with (i) all U.S. Coast Guard requirements for the type of service the Vessels are engaged in, (ii) all manning requirements, and (iii) all requirements of the protection and indemnity and hull underwriters as is necessary to ensure full insurance coverage. Promptly, satisfy all maritime Liens, other than Liens created pursuant to the Preferred Ship Mortgages and any other Permitted Liens. Cause (i) 50% or more of its Stock to be owned of record and beneficially by citizens of, or entities organized in the U.S., (ii) a majority of the members of its board of directors or similar managing group to be citizens of the U.S., and (iii) its chief executive officer, chief operating officer and managing member to be citizens of the U.S.

6.18   **Inspections and Appraisals.** Borrowers shall obtain and deliver to the Lenders within 30 days prior to the end of each anniversary of the Closing Date, (i) an inspection report acceptable to the Agent with respect to each Vessel by a third party acceptable to the Agent, and (ii) an appraisal with respect to each Vessel on a forced liquidation value basis, prepared by a third party appraiser acceptable to the Required Lenders.

7.   **NEGATIVE COVENANTS.**

Each of the Obligors that is a party hereto jointly and severally covenants and agrees that, until termination of all of the Commitments and payment in full of the Obligations, such Obligors will not and will not permit any of their Subsidiaries to do any of the following:

7.1   **Indebtedness.** Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except:

(a)   Indebtedness evidenced by this Agreement and the other Loan Documents;

(b)   Indebtedness set forth on Schedule 5.20;

(c)   Permitted Purchase Money Indebtedness;

(d)   Permitted Intercompany Advances;

(e)   Indebtedness in respect of guarantees issued by an Obligor or its Subsidiaries consisting of (i) guarantees existing as of the Closing Date (and detailed on Schedule 5.20), including extensions and renewals thereof which do not increase the amount of such guarantee as of the date of such extension or renewal; (ii) unsecured guarantees arising with respect to customary indemnification obligations to purchasers in connection with dispositions permitted under Section 7.4; and (iv) unsecured guarantees of (A) Indebtedness of an Obligor permitted to be incurred by such Obligor under this Agreement, (B) leases of an Obligor permitted to be incurred by such Obligor under this Agreement, and (C) other unsecured contractual obligations of an Obligor permitted to be incurred by such Obligor under this Agreement and incurred in the ordinary course of business;

(f)   Indebtedness incurred in the ordinary course of business under performance, surety, statutory and appeal bonds or with respect to workers' compensation claims or other bonds or obligations to the extent permitted under Section 7.2;

(g)     Indebtedness consisting of the financing in the ordinary course of business of insurance premiums;

(h)     refinancings, renewals, or extensions of Indebtedness permitted under clauses (b) through (g) of this Section 7.1 (and continuance or renewal of any Permitted Liens associated therewith) so long as:  (i) such refinancings, renewals, or extensions do not result in an increase in the then outstanding principal amount of the Indebtedness so refinanced, renewed, or extended, (ii) such refinancings, renewals, or extensions do not result in a shortening of the average weighted maturity of the Indebtedness so refinanced, renewed, or extended, nor are they on terms or conditions that, taken as a whole, are materially more burdensome or restrictive to the Obligors or any of their Subsidiaries, (iii) if the Indebtedness that is refinanced, renewed, or extended was subordinated in right of payment to the Obligations, then the terms and conditions of the refinancing, renewal, or extension Indebtedness must include subordination terms and conditions that are at least as favorable to Lenders as those that were applicable to the refinanced, renewed, or extended Indebtedness, and (iv) the Indebtedness that is refinanced, renewed, or extended is not recourse to any Person that is liable on account of the Obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed, or extended;

(i)     endorsement of instruments or other payment items for deposit; and

(j)     other than Indebtedness permitted hereunder, Indebtedness without the Agent's and the Lenders' consent provided that (i) such Indebtedness is incurred from a bona-fide third party completely independent of any Obligor, any Management Shareholder or any of their Affiliates, (ii) the proceeds of such Indebtedness are paid directly to the Agent for the benefit of the Lenders, and (iii) the proceeds of such Indebtedness are sufficient to repay in full all of the outstanding Obligations under this Agreement and to redeem all of the outstanding Stock held by the Agent and the Lenders.

7.2     **Liens.**  Create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens (including Liens that are replacements of Permitted Liens to the extent that the original Indebtedness is refinanced, renewed, or extended under Section 7.1(h) and so long as the replacement Liens only encumber those assets that secured the refinanced, renewed, or extended Indebtedness).

7.3     Restrictions on Fundamental Changes.

(a)     Enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its Stock.

(b)     Liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution).

(c)     Convey, sell, lease, license, assign, transfer, or otherwise dispose of, in one transaction or a series of transactions, all or any substantial part of its assets.

7.4     **Disposal of Assets.**  Other than Permitted Dispositions, convey, sell, lease, license, assign, transfer, or otherwise dispose of any of the assets of any Obligor or any Subsidiary of an Obligor.

7.5     **Change Name.**  Change any Obligor's or any of its Subsidiaries' names, FEINs, organizational identification number, state of organization or organizational identity; provided, however, that an Obligor or any of its Subsidiaries may change their names upon at least 30 days prior written notice to Agent of such change and so long as, at the time of such written notification, such Obligor or its Subsidiary provides any financing statements (or other perfection document) necessary to perfect and continue perfected the Agent's Liens.

7.6     **Nature of Business.**  Make any change in the principal nature of its or their business.

7.7     **Prepayments and Amendments.**  Except in connection with a refinancing permitted by Section 7.1(h),

        (a)     Prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of any Obligor or any Subsidiary or an Obligor except:

                (i)      the Obligations, in accordance with this Agreement; and

                (ii)     in connection with refinancings permitted by Section 7.1(h).

        (b)     Except in connection with a refinancing permitted by Section 7.1(h), directly or indirectly, amend, modify, alter, increase, or change any of the terms or conditions of any agreement, instrument, document, indenture, or other writing evidencing or concerning Indebtedness permitted under Sections 7.1(b) or (c), if such amendment, modification, alteration, increase or change would be adverse to Lenders or the issuer of such Indebtedness in any respect (provided that any change (i) that requires any payment to be made earlier than the date originally scheduled on such Indebtedness, (ii) that increases the interest rate applicable to such Indebtedness or (iii) to the subordination provisions, if any, of such Indebtedness, in each case, shall be deemed to be adverse to Lenders).

7.8     **Change of Control.**  Cause, permit, or suffer, directly or indirectly, any Change of Control.

7.9     **Consignments.**  Consign any of its or their Inventory or sell any of its or their Inventory on bill and hold, sale or return, sale on approval, or other conditional terms of sale.

7.10    **Distributions.**  Make any distribution or declare or pay any dividends (in cash or other property) on, or purchase, acquire, redeem, or retire any Stock of an Obligor or any Subsidiary of an Obligor, of any class, whether now or hereafter outstanding, except that:

        (a)     A Subsidiary of an Obligor may make cash distributions or declare and make dividend payments to such Obligor;

(b)     Each Obligor and its Subsidiaries may declare and make dividend payments and other distributions payable solely in its equity interest so long as Agent's security interests in the equity of the issuer are not adversely affected; and

(c)     Borrowers shall be entitled to make the following payments to Surfside Princess so long as no Event of Default has occurred and is continuing and so long as following the making of such payments Borrowers will continue to be in compliance with all financial covenants: (1) $250,000 at such time as the outstanding principal balance of the Term Loans is reduced to $15,000,000, (2) $250,000 at such time as the outstanding principal balance of the Term Loans is reduced to $12,000,000, (3) $250,000 at such time as the outstanding principal balance of the Term Loans is reduced to $9,000,000, and (4) $250,000 at such time as the outstanding principal balance of the Term Loans is reduced to $6,000,000.

7.11    **Accounting Methods.**   Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP) or enter into, modify, or terminate any agreement currently existing, or, at any time hereafter entered into with any third party accounting firm or service bureau for the preparation or storage of an Obligor's or its Subsidiaries' accounting records without said accounting firm or service bureau agreeing to provide Agent information regarding such Obligor and its Subsidiaries' financial condition to the extent required herein.

7.12    **Investments.**   Except for Permitted Investments, directly or indirectly, make or acquire any Investment or incur any liabilities (including contingent obligations) for or in connection with any Investment; *provided, however,* that no Obligor shall have Permitted Investments (other than Investments in the Cash Management Accounts) in Deposit Accounts or Securities Accounts in an aggregate amount in excess of $50,000 for more than 2 Business Days unless such Obligor and the applicable securities intermediary or bank have entered into Control Agreements governing such Permitted Investments in order to perfect (and further establish) the Agent's Liens in such Permitted Investments.

7.13    **Transactions with Affiliates.**   Directly or indirectly enter into or permit to exist any transaction with any Affiliate of an Obligor except for:  (a) transactions that are in the ordinary course of such Obligor's or its Subsidiaries' (as the case may be) business, upon fair and reasonable terms, that are fully disclosed to Lenders, and that are not materially less favorable to such Obligor or its Subsidiaries than would be obtained in an arm's length transaction with a non-Affiliate; (b) Permitted Investments and Permitted Dispositions, (c) Permitted Intercompany Advances, and (d) Borrowers shall be entitled to charter the Surfside Princess from Surfside Princess LLC subject to the following conditions: (1) the lease term shall be for a period of not less than 5 years, maximum charter hire of $200,000 per month, subject to adjustment as set forth below, and shall contain terms and conditions acceptable to Lenders, (2) only so long as Lenders are owed the Term Loans, Surfside Princess LLC shall accrue a portion of its monthly hire such that the monthly cash payments for the hire of the Surfside Princess shall be equal to (a) $75,000 each month, during the six (6) month period beginning on April 1, 2004 and ending on September 30, 2004, (b) $100,000 each month, during the six (6) month period beginning on October 1, 2004 and ending on March 31, 2005, (c) $125,000 each month, during the six (6) month period beginning on April 1, 2005 and ending on September 30, 2005, (d) $150,000 each month, for each month thereafter, and (3) the payment of the monthly hire shall

be subordinated to the repayment of the Term Loans with the understanding that so long as no Event of Default has occurred and is continuing under the Term Loans, then Borrowers shall be entitled to pay, and Surfside Princess LLC shall be entitled to receive, the regularly scheduled monthly hire payments (Borrower shall not make and Surfside Princess LLC shall not be entitled to receive any prepayments of the monthly hire payment).

7.14    <u>Suspension</u>.  Suspend or go out of a substantial portion of its or their business.

7.15    <u>Compensation</u>.  Increase the annual fee or per-meeting fees paid to the members of its Board of Directors during any year by more than 10% over the prior year.

7.16    <u>Use of Proceeds</u>.  Use the proceeds of the Advances and the Term Loans for any purpose other than (a) on the Closing Date, (i) to consummate the Transaction, and (ii) to pay transactional fees, costs, and expenses incurred in connection with this Agreement, the other Loan Documents, and the transactions contemplated hereby and thereby, and (b) thereafter, to provide working capital for general corporate purposes for the Borrowers, consistent with the terms and conditions hereof, and for their lawful and permitted purposes.

7.17    <u>Inventory and Equipment with Bailees</u>.  Except as set forth in <u>Schedule 7.17</u>, store the Inventory or Equipment of any Obligor at any time now or hereafter with a bailee, warehouseman, or similar party without Agent's prior written consent.

7.18    <u>Financial Covenants</u>.

(a)    Fail to maintain or achieve:

(i)    <u>Minimum TTM EBITDA</u>.  A TTM EBITDA of Borrowers, measured on a fiscal quarter-end basis, of at least the required amount set forth in the following table for the applicable period set forth opposite thereto:

| Required Amount | Measurement Date |
| --- | --- |
| $8,623,185 | 6/30/04 |
| $10,723,827 | 9/30/04 |
| $11,150,257 | 12/31/04 |
| $13,656,292 | 3/31/05 |
| $15,647,953 | 6/30/05 |
| $16,765,369 | 9/30/05 |
| $17,444,870 | 12/31/05 |
| $17,944,142 | 3/31/06 |
| $18,484,641 | 6/30/06 |

LA 133549v12                                      72

| $19,005,882 | 9/30/06 |
| $19,679,229 | 12/31/06 |

(ii)    **Interest Coverage Ratio.**  An Interest Coverage Ratio, measured on the last day of each fiscal quarter, of not less than the applicable ratio set forth in the following table for the applicable measurement date set forth opposite thereto.

| Applicable Ratio | Measurement Date |
|---|---|
| 2.0:1.0 | 12/31/04 |
| 2.1:1.0 | 3/31/05 |
| 2.4:1.0 | 6/30/05 |
| 2.6:1.0 | 9/30/05 |
| 2.8:1.0 | 12/31/05 |
| 3.0:1.0 | 3/31/06 |
| 3.2:1.0 | 6/31/06 |
| 3.4:1.0 | 9/30/06 |
| 3.8:1.0 | 12/31/06 |

(iii)    **Leverage Ratio.**  A Leverage Ratio, measured on the last day of each fiscal quarter, of not more than the applicable ratio set forth in the following table for the applicable measurement date set forth opposite thereto.

| Applicable Ratio | Measurement Date |
|---|---|
| 3.6:1.0 | 12/31/04 |
| 2.8:1.0 | 3/31/05 |
| 2.3:1.0 | 6/30/05 |
| 2.0:1.0 | 9/30/05 |
| 1.9:1.0 | 12/31/05 |
| 1.7:1.0 | 3/31/06 |
| 1.5:1.0 | 6/30/06 |

| 1.3:1.0 | 9/30/06 |
|---------|---------|
| 1.2:1.0 | 12/31/06 |

(iv)　**Fixed Charge Coverage Ratio.**  A Fixed Charge Coverage Ratio, measured on the last day of each fiscal quarter, of not less than the applicable ratio set forth in the following table for the applicable measurement date set forth opposite thereto.

| Applicable Ratio | Measurement Date |
|------------------|------------------|
| 1.5:1.0 | 12/31/04 |
| 1.3:1.0 | 3/31/05 |
| 1.3:1.0 | 6/30/05 |
| 1.3:1.0 | 9/30/05 |
| 1.4:1.0 | 12/31/05 |
| 1.4:1.0 | 3/31/06 |
| 1.4:1.0 | 6/30/06 |
| 1.4:1.0 | 9/30/06 |
| 1.4:1.0 | 12/31/06 |

(b)　Make:

(i)　**Capital Expenditures.**  Capital Expenditures in any fiscal year in excess of the amount set forth in the following table for the applicable period:

| Closing Date through the end of Fiscal Year 2004 | $2,250,000 |
|---------------------------------------------------|------------|
| Fiscal year through December 31, 2005 | $3,000,000 |
| Fiscal year through December 31, 2006 | $3,000,000 |
| Fiscal year through December 31, 2007 | $3,000,000 |

(ii)    Purchase of Vessel.  A purchase of any vessel.

7.19    Margin Stock.  Purchase or carry of Margin Stock.

7.20    Stock Issuances.  Issue any Stock to any Person (other than a Management Shareholder so long as such Stock is pledged to Agent for the benefit of the Lenders pursuant to a Pledge Agreement) without the Agent's and the Lenders' consent provided that and consent is not required if (i) such Stock is issued to a bona-fide third party completely independent of any Obligor, any Management Shareholder or any of their Affiliates, (ii) the proceeds of the issuance of such Stock are paid directly to the Agent for the benefit of the Lenders, and (iii) the proceeds of the issuance of such Stock are sufficient to repay in full all of the outstanding Obligations under this Agreement and to redeem all of the outstanding Stock held by the Agent and the Lenders.

7.21    Employment and Consulting Agreements.  Without the prior consent of the Agent, (i) amend any of the terms or provisions of any of the Management Shareholder Employment Agreements, or (ii) enter into any new employment or consulting agreements with any Person.

7.22    Maritime Industry Standards.

(a)     Permit any Vessel to be used for any illegal purpose or to commence or continue a voyage in unseaworthy condition.

(b)     Permit any charterer of any Vessel to operate any Vessel out of a port other than a United States port.

(c)     Remove any Vessel from the United States other than on occasional voyages.

7.23    Transactions with Convicted Felons.  To Borrowers' knowledge, directly or indirectly enter into or permit to exist any agreement or transaction with any Person convicted under state or federal law of a felony.

8.      EVENTS OF DEFAULT.

Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement:

8.1     If Borrowers fail to pay when due and payable, or when declared due and payable, all or any portion of the Obligations (whether of principal, interest (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on such amounts), fees and charges due the Lender Group, reimbursement of Lender Group Expenses, or other amounts constituting Obligations).

8.2     If any Obligor or any of its Subsidiaries fails to perform, keep, or observe: (a) any term, provision, condition, or agreement contained in Sections 6.2, 6.3, 6.5 or 6.9 and such

failure continues for a period of five (5) days; (b) any term, provision, condition or agreement contained in Sections 6.1, 6.11, 6.13 or 6.14 and such failure continues for a period of fifteen (15) days; or (c) any other term, provision, condition, covenant, or agreement contained in this Agreement or in any of the other Loan Documents;

8.3     If any material portion of any Obligor's or any of its Subsidiaries' assets is attached, seized, subjected to a writ or distress warrant, levied upon, or comes into the possession of any third Person;

8.4     If an Insolvency Proceeding is commenced by an Obligor or any of its Subsidiaries;

8.5     If an Insolvency Proceeding is commenced against any Obligor, or any of its Subsidiaries, and any of the following events occur:  (a) such Obligor or such Subsidiary consents to the institution of such Insolvency Proceeding against it, (b) the petition commencing the Insolvency Proceeding is not timely controverted, (c) the petition commencing the Insolvency Proceeding is not dismissed within 60 calendar days of the date of the filing thereof, (d) an interim trustee is appointed to take possession of all or any substantial portion of the properties or assets of, or to operate all or any substantial portion of the business of, an Obligor or any of its Subsidiaries, or (e) an order for relief shall have been entered therein;

8.6     If (a) any Obligor is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs; or (b) any Subsidiary of an Obligor is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs and such enjoinment, restraint, or prevention reasonably could be expected to result in a Material Adverse Change;

8.7     If a notice of Lien, levy, or assessment (together with all other existing notices of Lien, levy or assessment) is filed of record with respect to any of an Obligor's or any of its Subsidiaries' assets by the United States, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or Governmental Authority, or if any taxes or debts that individually or in the aggregate equal or exceed $100,000 at any time hereafter become a Lien, whether choate or otherwise, upon any of an Obligor's or any of its Subsidiaries' assets and the same are not paid before such payment is delinquent;

8.8     If a judgment, award, or prejudgment provisional remedy becomes a Lien or encumbrance upon any material portion of an Obligor's or any of its Subsidiaries' assets and the same is not released, discharged, bonded against, or stayed pending appeal before the earlier of 10 days after the date it first arises or 5 days prior to the date on which such asset is subject to being forfeited by such Person;

8.9     If there is a default in (a) any agreement with the Boulis Estate or (b) any other agreement to which an Obligor or any of its Subsidiaries is a party and such default (i) is with respect to any payment obligation, (ii) occurs at the final maturity of the obligations thereunder, or (iii) results in a right by the other party thereto, irrespective of whether exercised, to accelerate the maturity of such Obligor's or its Subsidiaries' obligations thereunder or to terminate such agreement;

8.10    If an Obligor or any of its Subsidiaries makes any payment on account of Indebtedness that has been contractually subordinated in right of payment to the payment of the Obligations, except to the extent such payment is permitted by the terms of the subordination provisions applicable to such Indebtedness;

8.11    If any material misstatement or misrepresentation in any warranty, representation, statement, or Record made to the Lender Group by an Obligor, its Subsidiaries, or any officer, employee, agent, or director of an Obligor or any of its Subsidiaries exists when made or furnished or deemed made to the Lender Group;

8.12    If any obligation of any Guarantor under its guaranty is limited or terminated by operation of law or by such Guarantor thereunder provided that Borrowers shall be permitted to provide a substitute Guarantor (within 30 days of the date such Guaranty is limited or terminated) satisfactory to Agent in its Permitted Discretion;

8.13    If this Agreement or any other Loan Document that purports to create a Lien, shall, for any reason (other than any action taken by Lender), fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien on or security interest in the Collateral covered hereby or thereby;

8.14    Any provision of any Loan Document shall at any time for any reason be declared to be null and void, or the validity or enforceability of any provision of any Loan Document shall be contested by an Obligor or its Subsidiaries, or a proceeding shall be commenced by an Obligor or its Subsidiaries, or by any Governmental Authority having jurisdiction over an Obligor or its Subsidiaries, seeking to establish the invalidity or unenforceability thereof, or an Obligor or its Subsidiaries shall deny that such Obligor or its Subsidiaries has any liability or obligation purported to be created under any Loan Document to which such Obligor or such Subsidiaries are a party;

8.15    If a Material Adverse Change has occurred and is continuing;

8.16    If Robert Weisberg becomes unable for any reason to perform the duties and responsibilities of Chairman of the Board of Directors or Chief Executive Officer of the Borrowers for a period of 60 days and the Borrowers are unable to replace him with someone acceptable to Agent, in its sole discretion;

8.17    If any reportable event, which Agent determines will have a material adverse effect on the financial condition of Borrowers or which Agent determines constitutes grounds for the termination of any deferred compensation plan by the Pension Benefit Guaranty Corporation or for the appointment by the appropriate United States District Court of a trustee to administer any such plan, shall have occurred and be continuing thirty (30) days after written notice of such determination shall have been given to Administrative Borrower by Agent, or any such Plan shall be terminated within the meaning of Title IV of ERISA, or a trustee shall be appointed by the appropriate United States District Court to administer any such plan, or the Pension Benefit Guaranty Corporation shall institute proceedings to terminate any plan and in case of any event described in this Section 8.17, the aggregate amount of the Borrowers' liability to the Pension

Benefit Guaranty Corporation under Sections 4062, 4063 or 4064 of ERISA shall exceed five percent (5%) of Borrowers' tangible net worth;

8.18    Either Borrower shall have withdrawn from a multi-employer plan described in Section 4001(a)(3) of ERISA and incurs withdrawal liability as a result thereof;

8.19    If (a) any Management Shareholder or other member of Borrowers' senior management team is terminated for any reason (including without cause) under their respective or employment or consulting agreements with the Borrowers including the Management Shareholder Employment Agreements and the Borrowers do not replace such Management Shareholder or other member of Borrowers' senior management team within 60 days with an employee whose qualifications are comparable, in Agent's sole discretion, to such Management Shareholder or other member of Borrowers' senior management team or (b) if there is a breach of the non-compete provision in any Management Shareholder Employment Agreement or employment or consulting agreement between a Borrower and any member of Borrowers' senior management team;

8.20    If any action, suit, proceeding under any federal or state racketeering statute (including the Racketeer Influenced and Corrupt Organization Act of 1970) is filed against any Borrower or any of its Subsidiaries, which action, suit, or proceeding (i) is not dismissed within 120 days, and (ii) could reasonably be expected to result in the confiscation or forfeiture of any material portion of the Collateral; or

8.21    If there occurs a Change of Control.

9.    **THE LENDER GROUP'S RIGHTS AND REMEDIES.**

9.1    **Rights and Remedies.** Upon the occurrence, and during the continuation, of an Event of Default, the Required Lenders (at their election but without notice of their election and without demand) may authorize and instruct Agent to do any one or more of the following on behalf of the Lender Group (and Agent, acting upon the instructions of the Required Lenders, shall do the same on behalf of the Lender Group), all of which are authorized by each Obligor:

(a)    Declare all Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable;

(b)    Cease advancing money or extending credit to or for the benefit of Borrowers under this Agreement, under any of the Loan Documents, or under any other agreement between a Borrower and the Lender Group;

(c)    Terminate this Agreement and any of the other Loan Documents as to any future liability or obligation of the Lender Group, but without affecting any of the Agent's Liens in the Collateral and without affecting the Obligations;

(d)    Settle or adjust disputes and claims directly with Borrowers' Account Debtors for amounts and upon terms which Agent considers advisable, and in such cases, Agent will credit Borrowers' Loan Account with only the net amounts received by Agent in payment of

such disputed Accounts after deducting all Lender Group Expenses incurred or expended in connection therewith;

(e)      Cause Borrowers to hold all of its returned Inventory in trust for the Lender Group and segregate all such Inventory from all other assets of Borrowers or in Borrowers' possession;

(f)      Without notice to or demand upon any Obligor, make such payments and do such acts as Agent considers necessary or reasonable to protect its security interests in the Collateral. Each Obligor that is a party hereto agrees to assemble the Collateral if Agent so requires, and to make the Collateral available to Agent at a place that Agent may designate which is reasonably convenient to both parties. Each such Obligor authorizes Agent to enter the premises where the Collateral is located in a commercially reasonable manner, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any Lien that in Agent's determination appears to conflict with the Agent's Liens in and to the Collateral and to pay all expenses incurred in connection therewith and to charge Borrowers' Loan Account therefor. With respect to any of Obligor's owned or leased premises, each Obligor hereby grants Agent a license to enter into possession of such premises and to occupy the same, without charge, in order to exercise any of the Lender Group's rights or remedies provided herein, at law, in equity, or otherwise;

(g)      Without notice to any Obligor (such notice being expressly waived), and without constituting an acceptance of any collateral in full or partial satisfaction of an obligation (within the meaning of the Code), set off and apply to the Obligations any and all (i) balances and deposits of any Obligor held by the Lender Group (including any amounts received in the Cash Management Accounts), or (ii) Indebtedness at any time owing to or for the credit or the account of any Obligor held by the Lender Group;

(h)      Hold, as cash collateral, any and all balances and deposits of any Obligor held by the Lender Group, and any amounts received in the Cash Management Accounts, to secure the full and final repayment of all of the Obligations;

(i)      Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) the Borrowers Collateral. Borrowers hereby grant to Agent a license or other right to use, without charge, Borrower's labels, patents, copyrights, trade secrets, trade names, trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Borrowers Collateral, in completing production of, advertising for sale, and selling any Borrowers Collateral and Borrowers' rights under all licenses and all franchise agreements shall inure to the Lender Group's benefit;

(j)      Sell the Borrowers Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including any Borrower's premises) as Agent determines is commercially reasonable. It is not necessary that the Borrowers Collateral be present at any such sale;

(k) Agent shall give notice of the disposition of the Borrowers Collateral as follows:

(i) Agent shall give each Borrower a notice in writing of the time and place of public sale, or, if the sale is a private sale or some other disposition other than a public sale is to be made of the Borrowers Collateral, the time on or after which the private sale or other disposition is to be made; and

(ii) The notice shall be personally delivered or mailed, postage prepaid, to each Borrower as provided in Section 12; provided, however, no notice needs to be given prior to the disposition of any portion of the Borrowers Collateral that is perishable or threatens to decline speedily in value or that is of a type customarily sold on a recognized market;

(l) Agent, on behalf of the Lender Group, may credit bid and purchase at any public sale;

(m) Agent may seek the appointment of a receiver or keeper to take possession of all or any portion of the Borrowers Collateral or to operate same and, to the maximum extent permitted by law, may seek the appointment of such a receiver without the requirement of prior notice or a hearing; and

(n) The Lender Group shall have all other rights and remedies available at law or in equity or pursuant to any other Loan Document;

provided, however, that upon the occurrence of any Event of Default described in Section 8.4 or Section 8.5, in addition to the remedies set forth above, without any notice to any Obligor or any other Person or any act by the Lender Group, the Commitments shall automatically terminate and the Obligations then outstanding, together with all accrued and unpaid interest thereon and all fees and all other amounts due under this Agreement and the other Loan Documents, shall become due and payable automatically and immediately, without presentment, demand, protest, or notice of any kind, all of which are expressly waived by each Obligor party hereto.

9.2 **Remedies Cumulative.** The rights and remedies of the Lender Group under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. The Lender Group shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity. No exercise by the Lender Group of one right or remedy shall be deemed an election, and no waiver by the Lender Group of any Event of Default shall be deemed a continuing waiver. No delay by the Lender Group shall constitute a waiver, election, or acquiescence by it.

10. **TAXES AND EXPENSES.**

If any Obligor fails to pay any monies (whether taxes, assessments, insurance premiums, or, in the case of leased properties or assets, rents or other amounts payable under such leases) due to third Persons, or fails to make any deposits or furnish any required proof of payment or deposit, all as required under the terms of this Agreement, then, Agent, in its sole discretion and without prior notice to any Obligor, may do any or all of the following: (a) make payment of the

same or any part thereof (except to the extent that the validity of such assessment or tax is the subject of a Permitted Protest), (b) in the case of the failure to comply with Section 6.8 hereof, obtain and maintain insurance policies of the type described in Section 6.8 and take any action with respect to such policies as Agent deems prudent. Any such amounts paid by Agent shall constitute Lender Group Expenses and any such payments shall not constitute an agreement by the Lender Group to make similar payments in the future or a waiver by the Lender Group of any Event of Default under this Agreement. Agent need not inquire as to, or contest the validity of, any such expense, tax, or Lien and the receipt of the usual official notice for the payment thereof shall be conclusive evidence that the same was validly due and owing.

## 11.    WAIVERS; INDEMNIFICATION.

11.1    Demand; Protest; etc. Except as otherwise specifically provided for herein, each Obligor waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by the Lender Group on which any such Obligor may in any way be liable.

11.2    The Lender Group's Liability for Borrowers Collateral. Each Obligor hereby agrees that: (a) so long as Agent complies with its obligations, if any, under the Code, the Lender Group shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Borrowers Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Borrowers Collateral shall be borne by Borrowers, except any thereof resulting from the gross negligence, bad faith, or willful misconduct or any Lender-Related Person as finally determined by a court of competent jurisdiction.

11.3    Indemnification. Each Obligor shall pay, indemnify, defend, and hold the Agent-Related Persons, the Lender-Related Persons, and each Participant (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, and damages, and all reasonable attorneys fees and disbursements and other costs and expenses actually incurred in connection therewith (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution, delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of an Obligor's and its Subsidiaries' compliance with the terms of the Loan Documents, and (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto (all the foregoing, collectively, the "Indemnified Liabilities"). The foregoing to the contrary notwithstanding, no Obligor shall have any obligation to any Indemnified Person under this Section 11.3 with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the bad faith, gross negligence, or willful misconduct of such Indemnified Person. This provision shall survive the

termination of this Agreement and the repayment of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which any Obligor was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by such Obligor with respect thereto. **WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON.**

12.   NOTICES.

Unless otherwise provided in this Agreement, all notices or demands by any Obligor that is a party to this Agreement or Agent to the other relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as the Obligors or Agent, as applicable, may designate to each other in accordance herewith), or telefacsimile to the Obligors or Agent with confirmation of receipt thereof, as the case may be, at its address set forth below:

|  |  |
|---|---|
| If to Obligors: | **OCEANS CASINO CRUISES, INC.**<br>**VESSEL CASINOS, INC.**<br>**VENTURES SOUTH CAROLINA, L.L.C.**<br>3408 Dover Road<br>Pompano Beach, FL 33062<br>Attn: Robert Weisberg<br>Fax No. 312-873-3739 |
| If to Agent: | **ORCHARD DRIVE, LLC**<br>c/o Schulte Roth & Zabel LLP<br>919 Third Avenue<br>New York, NY 10022<br>Attn: Yehuda M. Braunstein, Esq.<br>Fax. No. 212-593-5955 |
| with copies to: | **BUCHALTER, NEMER, FIELDS & YOUNGER**<br>601 So. Figueroa Street, Suite 2400<br>Los Angeles, California 90017<br>Attn: William Schoenholz, Esq.<br>Fax No. 213-896-0400 |

Agent and Administrative Borrower may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this Section 12, other than notices by Agent in connection with enforcement rights against the Borrowers Collateral under the provisions of the Code, shall be deemed received on the earlier of the date of actual receipt or 3 Business Days

after the deposit thereof in the mail. Each Obligor that is a party hereto acknowledges and agrees that notices sent by the Lender Group in connection with the exercise of enforcement rights against Borrowers Collateral under the provisions of the Code shall be deemed sent when deposited in the mail or personally delivered, or, where permitted by law, transmitted by telefacsimile or any other method set forth above.

13.   CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

(a)   THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b)   THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE BOROUGH OF MANHATTAN, STATE OF NEW YORK, PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY BORROWERS COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH BORROWERS COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH OBLIGOR AND THE LENDER GROUP WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 13(b).

(c)   EACH OBLIGOR THAT IS A PARTY TO THIS AGREEMENT AND THE LENDER GROUP HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH SUCH OBLIGOR AND THE LENDER GROUP REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT:

14.    ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS.

14.1    Assignments and Participations.

(a)    Any Lender may assign and delegate to one or more assignees (each an "Assignee") that are Eligible Transferees all, or any ratable part of all, of the Obligations, the Commitments and the other rights and obligations of such Lender hereunder and under the other Loan Documents; provided, however, that Borrowers and Agent may continue to deal solely and directly with such Lender in connection with the interest so assigned to an Assignee until (i) such Lender and its Assignee have delivered to Administrative Borrower and Agent an Assignment and Acceptance, and (iii) the assignor Lender or Assignee has paid to Agent for Agent's separate account a processing fee in the amount of $5,000. Notwithstanding anything contained in this Section 14.1(a) to the contrary, each Lender will retain and may exercise at any time all of its other rights and remedies under the Loan Documents, at law or in equity, irrespective of whether it has given a Transfer Notice or it has received a binding commitment from a proposed Assignee with respect thereto. Anything contained herein to the contrary notwithstanding, the payment of any fees shall not be required and the Assignee need not be an Eligible Transferee if (x) such assignment is in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion of the business or loan portfolio of such Lender or (y) the assignee is an Affiliate (other than individual(s)) of a Lender or a Related Fund.

(b)    From and after the date that Agent notifies the assignor Lender (with a copy to Administrative Borrower) that it has received an executed Assignment and Acceptance and payment of the above-referenced processing fee, (i) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, shall have the assigned and delegated rights and obligations of a Lender under the Loan Documents, and (ii) the assignor Lender shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned and delegated by it pursuant to such Assignment and Acceptance, relinquish its rights (except with respect to Section 11.3 hereof) and be released from any future obligations under this Agreement (and in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement and the other Loan Documents, such Lender shall cease to be a party hereto and thereto), and such assignment shall effect a novation between Borrowers and the Assignee.

(c)    By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (1) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto, (2) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrowers or the performance or observance by Borrowers of any of their obligations under this Agreement or any other Loan Document furnished pursuant hereto, (3) such Assignee confirms that it has received a copy of this Agreement, together with such other documents and information as it has deemed appropriate to make its own credit analysis and

decision to enter into such Assignment and Acceptance, (4) such Assignee will, independently and without reliance upon Agent, such assigning Lender or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, (5) such Assignee appoints and authorizes Agent to take such actions and to exercise such powers under this Agreement as are delegated to Agent, by the terms hereof, together with such powers as are reasonably incidental thereto, and (6) such Assignee agrees that it will perform all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)   Immediately upon Agent's receipt of the required processing fee payment and the fully executed Assignment and Acceptance, this Agreement shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the Commitments arising therefrom. The Commitment allocated to each Assignee shall reduce such Commitments of the assigning Lender pro tanto.

(e)   Any Lender may at any time sell to one or more commercial banks, financial institutions, or other Persons not Affiliates of such Lender (a "Participant") participating interests in its Obligations, the Commitment, and the other rights and interests of that Lender (the "Originating Lender") hereunder and under the other Loan Documents; provided, however, that (i) the Originating Lender shall remain a "Lender" for all purposes of this Agreement and the other Loan Documents and the Participant receiving the participating interest in the Obligations, the Commitments, and the other rights and interests of the Originating Lender hereunder shall not constitute a "Lender" hereunder or under the other Loan Documents and the Originating Lender's obligations under this Agreement shall remain unchanged, (ii) the Originating Lender shall remain solely responsible for the performance of such obligations, (iii) Obligors, Agent, and the Lenders shall continue to deal solely and directly with the Originating Lender in connection with the Originating Lender's rights and obligations under this Agreement and the other Loan Documents, (iv) no Lender shall transfer or grant any participating interest under which the Participant has the right to approve any amendment to, or any consent or waiver with respect to, this Agreement or any other Loan Document, except to the extent such amendment to, or consent or waiver with respect to this Agreement or of any other Loan Document would (A) extend the final maturity date of the Obligations hereunder in which such Participant is participating, (B) reduce the interest rate applicable to the Obligations hereunder in which such Participant is participating, (C) release all or substantially all of the Collateral or guaranties (except to the extent expressly provided herein or in any of the Loan Documents) supporting the Obligations hereunder in which such Participant is participating, (D) postpone the payment of, or reduce the amount of, the interest or fees payable to such Participant through such Lender, or (E) change the amount or due dates of scheduled principal repayments or prepayments or premiums, and (v) all amounts payable by Obligors hereunder shall be determined as if such Lender had not sold such participation, except that, if amounts outstanding under this Agreement are due and unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement. The rights of any Participant only shall be derivative through the Originating Lender with whom such Participant participates and no Participant shall have any rights under this Agreement or the other Loan Documents or any direct rights as to the

LA 133549v12                          85

other Lenders, Agent, Obligors, the Collections of an Obligor or its Subsidiaries, the Collateral, or otherwise in respect of the Obligations. No Participant shall have the right to participate directly in the making of decisions by the Lenders among themselves.

(f)     In connection with any such assignment or participation or proposed assignment or participation, a Lender may, subject to the provisions of Section 17.8, disclose all documents and information which it now or hereafter may have relating to Obligors and their Subsidiaries and their respective businesses.

(g)     Any other provision in this Agreement notwithstanding, any Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement in favor of any Federal Reserve Bank in accordance with Regulation A of the Federal Reserve Bank or U.S. Treasury Regulation 31 CFR §203.24, and such Federal Reserve Bank may enforce such pledge or security interest in any manner permitted under applicable law.

(h)     Agent, on behalf of Administrative Borrower, shall maintain, or cause to be maintained, a register (the "Register") on which it enters the name of a Lender as the registered owner of the Term Loan A, Term Loan B or Term Loan C held by such Lender. A Registered Loan (and the Registered Note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each Registered Note shall expressly so provide). Any assignment or sale of all or part of such Registered Loan (and the Registered Note, if any, evidencing same) may be effected only by registration of such assignment or sale on the Register, together with the surrender of the Registered Note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such Registered Note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new Registered Notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s). Prior to the registration of assignment or sale of any Registered Loan (and the Registered Note, if any evidencing the same), Borrowers shall treat the Person in whose name such Term Loan (and the Registered Note, if any, evidencing the same) is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary. In the case of an assignment or delegation covered by Section 14.1(a)(y), the assigning Lender shall maintain a comparable Register on behalf Agent, on behalf of Administrative Borrower.

(i)     In the event that a Lender sells participations in the Registered Loan, such Lender shall maintain a register on which it enters the name of all participants in the Registered Loans held by it (the "Participant Register"). A Registered Loan (and the Registered Note, if any, evidencing same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each Registered Note shall expressly so provide). Any participation of such Registered Loan (and the Registered Note, if any, evidencing the same) may be effected only by registration of such participation on the Participant Register.

14.2     Successors. This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, however, that no Obligor that is a party hereto may assign this Agreement or any rights or duties hereunder without the Lenders' prior

written consent and any prohibited assignment shall be absolutely void ab initio.  No consent to assignment by the Lenders shall release any Obligor that is a party hereto from its Obligations. A Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder pursuant to Section 14.1 hereof and, except as expressly required pursuant to Section 14.1 hereof, no consent or approval by any Obligor is required in connection with any such assignment.

## 15.   AMENDMENTS; WAIVERS.

15.1   _Amendments and Waivers_.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by Obligors therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by Agent at the written request of the Required Lenders) and each Obligor and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; _provided, however_, that no such waiver, amendment, or consent shall, unless in writing and signed by all of the Lenders affected thereby and each Obligor, do any of the following:

(i)   increase or extend any Commitment of any Lender,

(ii)   postpone or delay any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees, or other amounts due hereunder or under any other Loan Document,

(iii)   reduce the principal of, or the rate of interest on, any loan or other extension of credit hereunder, or reduce any fees or other amounts payable hereunder or under any other Loan Document,

(iv)   change the percentage of the Commitments that is required to take any action hereunder,

(v)   amend or modify this Section or any provision of the Agreement providing for consent or other action by all Lenders,

(vi)   release Collateral other than as permitted by Section 16.12,

(vii)   change the definition of "Required Lenders" or "Pro Rata Share",

(viii)   contractually subordinate any of the Agent's Liens,

(ix)   release any Obligor from any obligation for the payment of money,

(x)   change the definitions of Maximum Revolver Amount, Term Loan A Amount, Term Loan B Amount or Term Loan C Amount, or

(xi)   amend any of the provisions of Section 16.

and, provided further, however, that no amendment, waiver or consent shall, unless in writing and signed by Agent, affect the rights or duties of Agent under this Agreement or any other Loan Document. The foregoing notwithstanding, any amendment, modification, waiver, consent, termination, or release of, or with respect to, any provision of this Agreement or any other Loan Document that relates only to the relationship of the Lender Group among themselves, and that does not affect the rights or obligations of any Obligor, shall not require consent by or the agreement of the Obligors.

### 15.2   Replacement of Holdout Lender.

(a)   If any action to be taken by the Lender Group or Agent hereunder requires the unanimous consent, authorization, or agreement of all Lenders, and a Lender ("Holdout Lender") fails to give its consent, authorization, or agreement, then Agent, upon at least 5 Business Days prior irrevocable notice to the Holdout Lender, may permanently replace the Holdout Lender with one or more substitute Lenders (each, a "Replacement Lender"), and the Holdout Lender shall have no right to refuse to be replaced hereunder. Such notice to replace the Holdout Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.

(b)   Prior to the effective date of such replacement, the Holdout Lender and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Holdout Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever and without any right to receive any payments made under or pursuant to the Success Fee Letter. If the Holdout Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Holdout Lender shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Holdout Lender shall be made in accordance with the terms of Section 14.1.

### 15.3   Replacement of Non-Exempt Foreign Lender.

(a)   If Borrowers are obligated to make any material payments under Section 16.11 in respect of withholding taxes to any Lender that is a "foreign person" within the meaning of the IRC (a "Non-Exempt Foreign Lender"), then Administrative Borrower, upon at least 5 Business Days prior irrevocable notice to Agent and the Non-Exempt Foreign Lender, may permanently replace the Non-Exempt Foreign Lender with one or more substitute Lenders with the consent of Agent and Required Lenders (which shall not be unreasonably withheld or delayed) (each, a "Substitute Lender"), and the Non-Exempt Foreign Lender shall have no right to refuse to be replaced hereunder. Such notice to replace the Non-Exempt Foreign Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.

(b)   Prior to the effective date of such replacement, the Non-Exempt Foreign Lender and each Substitute Lender shall execute and deliver an Assignment and Acceptance, subject only to the Non-Exempt Foreign Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever. If the Non-Exempt Foreign Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance

prior to the effective date of such replacement, the Non-Exempt Foreign Lender shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Non-Exempt Foreign Lender shall be made in accordance with the terms of Section 14.1.

15.4    **No Waivers; Cumulative Remedies.**  No failure by Agent or any Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Agent or any Lender in exercising the same, will operate as a waiver thereof. No waiver by Agent or any Lender will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by Agent or any Lender on any occasion shall affect or diminish Agent's and each Lender's rights thereafter to require strict performance by Borrowers of any provision of this Agreement. Agent's and each Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Agent or any Lender may have.

## 16.    AGENT; THE LENDER GROUP.

16.1    **Appointment and Authorization of Agent.**  Each Lender hereby designates and appoints Orchard as its representative under this Agreement and the other Loan Documents and each Lender hereby irrevocably authorizes Agent to execute and deliver each of the other Loan Documents on its behalf and to take such other action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Agent agrees to act as such on the express conditions contained in this Section 16. The provisions of this Section 16 (other than the proviso to Section 16.11(e)) are solely for the benefit of Agent and the Lenders, and Obligors and their Subsidiaries shall have no rights as a third party beneficiary of any of the provisions contained herein. Any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document notwithstanding, Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Agent; it being expressly understood and agreed that the use of the word "Agent" is for convenience only, that Orchard is merely the representative of the Lenders, and only has the contractual duties set forth herein. Except as expressly otherwise provided in this Agreement, Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to Agent, Lenders agree that Agent shall have the right to exercise the following powers as long as this Agreement remains in effect: (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, the Collections of Obligors and their Subsidiaries, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, (c) make Agent Advances, for itself or on behalf of Lenders as provided in the Loan Documents, (d) exclusively receive, apply, and distribute the Collections of Obligors and their Subsidiaries as provided in the Loan

Documents, (e) open and maintain such bank accounts and cash management accounts as Agent deems necessary and appropriate in accordance with the Loan Documents for the foregoing purposes with respect to the Collateral and the Collections of Obligors and their Subsidiaries, (f) perform, exercise, and enforce any and all other rights and remedies of the Lender Group with respect to Borrowers, the Obligations, the Collateral, the Collections of Obligors and their Subsidiaries, or otherwise related to any of same as provided in the Loan Documents, and (g) incur and pay such Lender Group Expenses as Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents.

16.2    **Delegation of Duties.** Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects as long as such selection was made without gross negligence or willful misconduct.

16.3    **Liability of Agent.** None of the Agent-Related Persons shall (i) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (ii) be responsible in any manner to any of the Lenders for any recital, statement, representation or warranty made by any Borrower or any Subsidiary or Affiliate of any Borrower, or any officer or director thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of any Borrower or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the Books or properties of Borrowers or the books or records or properties of any of Borrowers' Subsidiaries or Affiliates.

16.4    **Reliance by Agent.** Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to Borrowers or counsel to any Lender), independent accountants and other experts selected by Agent. Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless Agent shall first receive such advice or concurrence of the Lenders as it deems appropriate and until such instructions are received, Agent shall act, or refrain from acting, as it deems advisable. If Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the requisite Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders.

16.5   **Notice of Default or Event of Default**.  Agent shall not be deemed to have
knowledge or notice of the occurrence of any Default or Event of Default, except with respect to
defaults in the payment of principal, interest, fees, and expenses required to be paid to Agent for
the account of the Lenders and, except with respect to Events of Default of which Agent has
actual knowledge, unless Agent shall have received written notice from a Lender or
Administrative Borrower referring to this Agreement, describing such Default or Event of
Default, and stating that such notice is a "notice of default." Agent promptly will notify the
Lenders of its receipt of any such notice or of any Event of Default of which Agent has actual
knowledge.  If any Lender obtains actual knowledge of any Event of Default, such Lender
promptly shall notify the other Lenders and Agent of such Event of Default.  Each Lender shall
be solely responsible for giving any notices to its Participants, if any.  Subject to Section 16.4,
Agent shall take such action with respect to such Default or Event of Default as may be
requested by the Required Lenders in accordance with Section 9.

16.6   **Credit Decision**.  Each Lender acknowledges that none of the Agent-Related
Persons has made any representation or warranty to it, and that no act by Agent hereinafter taken,
including any review of the affairs of Obligors and their Subsidiaries or Affiliates, shall be
deemed to constitute any representation or warranty by any Agent-Related Person to any Lender.
Each Lender represents to Agent that it has, independently and without reliance upon any Agent-
Related Person and based on such documents and information as it has deemed appropriate,
made its own appraisal of and investigation into the business, prospects, operations, property,
financial and other condition and creditworthiness of Borrowers and any other party to a Loan
Document, and all applicable bank regulatory laws relating to the transactions contemplated
hereby, and made its own decision to enter into this Agreement and to extend credit to
Borrowers.  Each Lender also represents that it will, independently and without reliance upon
any Agent-Related Person and based on such documents and information as it shall deem
appropriate at the time, continue to make its own credit analysis, appraisals and decisions in
taking or not taking action under this Agreement and the other Loan Documents, and to make
such investigations as it deems necessary to inform itself as to the business, prospects,
operations, property, financial and other condition and creditworthiness of Borrowers and any
other party to a Loan Document.  Except for notices, reports, and other documents expressly
herein required to be furnished to the Lenders by Agent, Agent shall not have any duty or
responsibility to provide any Lender with any credit or other information concerning the
business, prospects, operations, property, financial and other condition or creditworthiness of
Borrowers and any other party to a Loan Document that may come into the possession of any of
the Agent-Related Persons.

16.7   **Costs and Expenses; Indemnification**.  Agent may incur and pay Lender Group
Expenses to the extent Agent reasonably deems necessary or appropriate for the performance and
fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including
court costs, attorneys fees and expenses, fees and expenses of financial accountants, advisors,
consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees
and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral,
whether or not Borrowers are obligated to reimburse Agent or Lenders for such expenses
pursuant to the Loan Agreement or otherwise.  Agent is authorized and directed to deduct and
retain sufficient amounts from the Collections of Obligors and their Subsidiaries received by
Agent to reimburse Agent for such out-of-pocket costs and expenses prior to the distribution of

any amounts to Lenders. In the event Agent is not reimbursed for such costs and expenses from the Collections of Obligors and their Subsidiaries received by Agent, each Lender hereby agrees that it is and shall be obligated to pay to or reimburse Agent for the amount of such Lender's Pro Rata Share thereof. Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand the Agent-Related Persons (to the extent not reimbursed by or on behalf of Borrowers and without limiting the obligation of Borrowers to do so), according to their Pro Rata Shares, from and against any and all Indemnified Liabilities; provided, however, that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct nor shall any Lender be liable for the obligations of any Defaulting Lender in failing to make an Advance or other extension of credit hereunder. Without limitation of the foregoing, each Lender shall reimburse Agent upon demand for such Lender's Pro Rata Share of any costs or out-of-pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that Agent is not reimbursed for such expenses by or on behalf of Borrowers. The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of Agent.

16.8    Agent in Individual Capacity.    Orchard and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in, and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with Obligors and their Subsidiaries and Affiliates and any other party to any Loan Documents as though Orchard were not Agent hereunder, and, in each case, without notice to or consent of the other members of the Lender Group. The other members of the Lender Group acknowledge that, pursuant to such activities, Orchard or its Affiliates may receive information regarding Borrowers or their Affiliates and any other party to any Loan Documents that is subject to confidentiality obligations in favor of Borrowers or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver Agent will use its reasonable best efforts to obtain), Agent shall not be under any obligation to provide such information to them. The terms "Lender" and "Lenders" include Orchard in its individual capacity.

16.9    Successor Agent.    Agent may resign as Agent upon 45 days notice to the Lenders. If Agent resigns under this Agreement, the Required Lenders shall appoint a successor Agent for the Lenders. If no successor Agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with the Lenders, a successor Agent. If Agent has materially breached or failed to perform any material provision of this Agreement or of applicable law, the Required Lenders may agree in writing to remove and replace Agent with a successor Agent from among the Lenders. In any such event, upon the acceptance of its appointment as successor Agent hereunder, such successor Agent shall succeed to all the rights, powers, and duties of the retiring Agent and the term "Agent" shall mean such successor Agent and the retiring Agent's appointment, powers, and duties as Agent shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 16 shall inure to

its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. If no successor Agent has accepted appointment as Agent by the date which is 45 days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Lenders appoint a successor Agent as provided for above.

16.10   **Lender in Individual Capacity.**   Any Lender and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with Obligors and their Subsidiaries and Affiliates and any other party to any Loan Documents as though such Lender were not a Lender hereunder without notice to or consent of the other members of the Lender Group. The other members of the Lender Group acknowledge that, pursuant to such activities, such Lender and its respective Affiliates may receive information regarding Borrowers or their Affiliates and any other party to any Loan Documents that is subject to confidentiality obligations in favor of Borrowers or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver such Lender will use its reasonable best efforts to obtain), such Lender not shall be under any obligation to provide such information to them.

16.11   **Withholding Taxes.**

(a)   If any Lender is a "foreign person" within the meaning of the IRC and such Lender claims exemption from, or a reduction of, U.S. withholding tax under Sections 1441 or 1442 of the IRC, such Lender agrees with and in favor of Agent and Borrowers, to deliver to Agent and Administrative Borrower:

(i)   if such Lender claims an exemption from withholding tax pursuant to its portfolio interest exception, (A) a statement of the Lender, signed under penalty of perjury, that it is not a (I) a "bank" as described in Section 881(c)(3)(A) of the IRC, (II) a 10% shareholder of a Borrower (within the meaning of Section 871(h)(3)(B) of the IRC), or (III) a controlled foreign corporation related to a Borrower within the meaning of Section 864(d)(4) of the IRC, and (B) a properly completed and executed IRS Form W-8BEN, before the first payment of any interest under this Agreement and at any other time reasonably requested by Agent or Administrative Borrower;

(ii)   if such Lender claims an exemption from, or a reduction of, withholding tax under a United States tax treaty, properly completed and executed IRS Form W-8BEN before the first payment of any interest under this Agreement and at any other time reasonably requested by Agent or Administrative Borrower;

(iii)   if such Lender claims that interest paid under this Agreement is exempt from United States withholding tax because it is effectively connected with a United States trade or business of such Lender, two properly completed and executed copies of IRS Form W-8ECI before the first payment of any interest

is due under this Agreement and at any other time reasonably requested by Agent or Borrower;

(iv)    such other form or forms as may be required under the IRC or other laws of the United States as a condition to exemption from, or reduction of, United States withholding tax.

Such Lender agrees promptly to notify Agent and Administrative Borrower of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(b)    If any Lender claims exemption from, or reduction of, withholding tax under a United States tax treaty by providing IRS Form W-8BEN and such Lender sells, assigns, grants a participation in, or otherwise transfers all or part of the Obligations of Borrowers to such Lender, such Lender agrees to notify Agent of the percentage amount in which it is no longer the beneficial owner of Obligations of Borrowers to such Lender. To the extent of such percentage amount, Agent will treat such Lender's IRS Form W-8BEN as no longer valid.

(c)    If any Lender is entitled to a reduction in the applicable withholding tax, Agent may withhold from any interest payment to such Lender an amount equivalent to the applicable withholding tax after taking into account such reduction. If the forms or other documentation required by subsection (a) of this Section are not delivered to Agent, then Agent may withhold from any interest payment to such Lender not providing such forms or other documentation an amount equivalent to the applicable withholding tax.

(d)    If the IRS or any other Governmental Authority of the United States or other jurisdiction asserts a claim that Agent did not properly withhold tax from amounts paid to or for the account of any Lender (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify Agent of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason) such Lender shall indemnify and hold Agent harmless for all amounts paid, directly or indirectly, by Agent as tax or otherwise, including penalties and interest, and including any taxes imposed by any jurisdiction on the amounts payable to Agent under this Section, together with all costs and expenses (including attorneys fees and expenses). The obligation of the Lenders under this subsection shall survive the payment of all Obligations and the resignation or replacement of Agent.

(e)    All payments made by Borrowers hereunder or under any note or other Loan Document will be made without setoff, counterclaim, or other defense, except as required by applicable law other than for Taxes (as defined below). All such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction (other than the United States) or by any political subdivision or taxing authority thereof or therein (other than of the United States) with respect to such payments (but excluding, any tax imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein (i) measured by or based on the net income or net profits of a Lender, or (ii) to the extent that such tax results from a change in the circumstances of the Lender, including a change in the residence, place of organization, or principal place of business of the Lender, or a

change in the branch or lending office of the Lender participating in the transactions set forth herein) and all interest, penalties or similar liabilities with respect thereto (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "Taxes"). Lenders shall use commercially reasonable efforts to provide to Administrative Borrower, at Borrowers' expense, any forms or certifications reasonably requested by Administrative Borrower to eliminate or minimize any such Taxes owed, provided that Lenders shall have no liability for failure to provide such forms or certificates. If any Taxes are so levied or imposed, Borrowers agree to pay the full amount of such Taxes, and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement or under any note or any other Loan Document, including any amount paid pursuant to this Section 16.11(e) after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein; provided, however, that Borrowers shall not be required to increase any such amounts payable to Agent or any Lender (i) that is not organized under the laws of the United States, if such Person fails to comply with the other requirements of this Section 16.11, or (ii) if the increase in such amount payable results from Agent's or such Lender's own bad faith, willful misconduct, or gross negligence. Borrowers will furnish to Agent as promptly as possible after the date the payment of any Taxes is due, pursuant to applicable law certified copies of tax receipts evidencing such payment by Borrowers.

### 16.12  Collateral Matters.

(a)     The Lenders hereby irrevocably authorize Agent, at its option and in its sole discretion, to release any Lien on any Collateral (i) upon the termination of the Commitments and payment and satisfaction in full by Borrowers of all Obligations, (ii) constituting property being sold or disposed of if a release is required or desirable in connection therewith and if Administrative Borrower certifies to Agent that the sale or disposition is permitted under Section 7.4 of this Agreement or the other Loan Documents (and Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property in which an Obligor or its Subsidiaries owned no interest at the time the Agent's Lien was granted nor at any time thereafter, or (iv) constituting property leased to an Obligor or its Subsidiaries under a lease that has expired or is terminated in a transaction permitted under this Agreement. Except as provided above, Agent will not execute and deliver a release of any Lien on any Collateral without the prior written authorization of (y) if the release is of all or substantially all of the Collateral, all of the Lenders, or (z) otherwise, the Required Lenders. Upon request by Agent or Administrative Borrower at any time, the Lenders will confirm in writing Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this Section 16.12; provided, however, that (1) Agent shall not be required to execute any document necessary to evidence such release on terms that, in Agent's opinion, would expose Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of Borrowers in respect of) all interests retained by Borrowers, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

(b)     Agent shall have no obligation whatsoever to any of the Lenders to assure that the Collateral exists or is owned by Borrowers or is cared for, protected, or insured or has been encumbered, or that the Agent's Liens have been properly or sufficiently or lawfully

created, perfected, protected, or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, Agent may act in any manner it may deem appropriate, in its sole discretion given Agent's own interest in the Collateral in its capacity as one of the Lenders and that Agent shall have no other duty or liability whatsoever to any Lender as to any of the foregoing, except as otherwise provided herein.

### 16.13  Restrictions on Actions by Lenders; Sharing of Payments.

(a)    Each of the Lenders agrees that it shall not, without the express written consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of Agent, set off against the Obligations, any amounts owing by such Lender to Borrowers or any deposit accounts of Borrowers now or hereafter maintained with such Lender. Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings, to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)    If, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from Agent pursuant to the terms of this Agreement, or (ii) payments from Agent in excess of such Lender's ratable portion of all such distributions by Agent, such Lender promptly shall (1) turn the same over to Agent, in kind, and with such endorsements as may be required to negotiate the same to Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (2) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their Pro Rata Shares; provided, however, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

### 16.14  Agency for Perfection.  Agent hereby appoints each other Lender as its agent (and each Lender hereby accepts such appointment) for the purpose of perfecting the Agent's Liens in assets which, in accordance with Article 9 of the Code can be perfected only by possession or control. Should any Lender obtain possession or control of any such Collateral, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver possession or control of such Collateral to Agent or in accordance with Agent's instructions.

### 16.15  Payments by Agent to the Lenders.  All payments to be made by Agent to the Lenders shall be made by bank wire transfer of immediately available funds pursuant to such

wire transfer instructions as each party may designate for itself by written notice to Agent. Concurrently with each such payment, Agent shall identify whether such payment (or any portion thereof) represents principal, premium, or interest of the Obligations.

16.16  **Concerning the Collateral and Related Loan Documents.**  Each member of the Lender Group authorizes and directs Agent to enter into this Agreement and the other Loan Documents.  Each member of the Lender Group agrees that any action taken by Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

16.17  **Field Audits and Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information.**  By becoming a party to this Agreement, each Lender:

(a)  is deemed to have requested that Agent furnish such Lender, promptly after it becomes available, a copy of each field audit or examination report (each a "Report" and collectively, "Reports") prepared by Agent, and Agent shall so furnish each Lender with such Reports,

(b)  expressly agrees and acknowledges that Agent does not (i) make any representation or warranty as to the accuracy of any Report, and (ii) shall not be liable for any information contained in any Report,

(c)  expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that Agent or other party performing any audit or examination will inspect only specific information regarding Borrowers and will rely significantly upon the Books, as well as on representations of Borrowers' personnel,

(d)  agrees to keep all Reports and other material, non-public information regarding Obligors and their Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 17.8, and

(e)  without limiting the generality of any other indemnification provision contained in this Agreement, agrees:  (i) to hold Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of Borrowers, and (ii) to pay and protect, and indemnify, defend and hold Agent, and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorneys fees and costs) incurred by Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

In addition to the foregoing:  (x) any Lender may from time to time request of Agent in writing that Agent provide to such Lender a copy of any report or document provided by Borrowers to Agent that has not been contemporaneously provided by Borrowers to such Lender, and, upon

receipt of such request, Agent promptly shall provide a copy of same to such Lender, (y) to the extent that Agent is entitled, under any provision of the Loan Documents, to request additional reports or information from Borrowers, any Lender may, from time to time, reasonably request Agent to exercise such right as specified in such Lender's notice to Agent, whereupon Agent promptly shall request of Administrative Borrower the additional reports or information reasonably specified by such Lender, and, upon receipt thereof from Administrative Borrower, Agent promptly shall provide a copy of same to such Lender, and (z) any time that Agent renders to Administrative Borrower a statement regarding the Loan Account, Agent shall send a copy of such statement to each Lender.

16.18   **Several Obligations; No Liability.**   Notwithstanding that certain of the Loan Documents now or hereafter may have been or will be executed only by or in favor of Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of Agent (if any) to make any credit available hereunder shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis, according to their respective Commitments, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount of their respective Commitments. Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lender. Each Lender shall be solely responsible for notifying its Participants of any matters relating to the Loan Documents to the extent any such notice may be required, and no Lender shall have any obligation, duty, or liability to any Participant of any other Lender. Except as provided in Section 16.7, no member of the Lender Group shall have any liability for the acts of any other member of the Lender Group. No Lender shall be responsible to any Borrower or any other Person for any failure by any other Lender to fulfill its obligations to make credit available hereunder, nor to advance for it or on its behalf in connection with its Commitment, nor to take any other action on its behalf hereunder or in connection with the financing contemplated herein.

16.19   **Legal Representation of Agent.**   In connection with the negotiation, drafting, and execution of this Agreement and the other Loan Documents, or in connection with future legal representation relating to loan administration, amendments, modifications, waivers, or enforcement of remedies, Buchalter, Nemer, Fields & Younger ("BNFY") only has represented and only shall represent Orchard in its capacity as Agent and as a Lender. Each other Lender hereby acknowledges that BNFY does not represent it in connection with any such matters.

## 17.   GENERAL PROVISIONS.

17.1   **Effectiveness.**   This Agreement shall be binding and deemed effective when executed by the Obligors that are party hereto, Agent, and each Lender whose signature is provided for on the signature pages hereof.

17.2   **Section Headings.**   Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

17.3   **Interpretation.**   Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against the Lender Group or the Obligors that are party hereto,

whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

17.4    Severability of Provisions.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

17.5    Amendments in Writing.  This Agreement only can be amended by a writing signed by Agent (on behalf of the requisite Lenders) and Administrative Borrower (on behalf of Borrowers).

17.6    Counterparts; Telefacsimile Execution.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by telefacsimile shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document mutatis mutandis.

17.7    Revival and Reinstatement of Obligations.  If the incurrence or payment of the Obligations by any Obligor or the transfer to the Lender Group of any property should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (collectively, a "Voidable Transfer"), and if the Lender Group is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that the Lender Group is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys fees of the Lender Group related thereto, the liability of Obligors automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

17.8    Confidentiality.  Each Lender shall maintain in confidence in accordance with its customary procedures for handling confidential information, all written information that Obligors or any of their Subsidiaries, or any of their authorized representatives, furnishes to such Lender on a confidential basis ("Confidential Information"), other than any such Confidential Information that becomes generally available to the public other than as a result of a breach by such Lender of its obligations hereunder or that is or becomes available to such Lender from a source other than Obligors or any of their Subsidiaries, or any of their authorized representatives, and that is not, to the actual knowledge of the recipient thereof, subject to obligations of confidentiality with respect thereto; provided, however, that such Lender shall in any event have the right to deliver copies of any such documents, and to disclose any such information, to:

(a)    its Affiliates and Related Funds, directors, officers, trustees, partners, employees, agents, attorneys, and professional consultants who either have a duty of confidentiality to such Lender or who has otherwise agreed to keep such information confidential;

(b)    rating agencies;

(c)    any Person to which such Lender offers to sell (by way of assignment or participation) any portion of the Obligations and its other rights and obligations (provided such Person agrees to keep such information confidential on the terms set forth in this Section 17.8);

(d)    any federal or state regulatory authority or examiner, or any insurance industry association, regulating or having jurisdiction over such Lender;

(e)    any other Person to which such delivery or disclosure may be necessary or appropriate (i) in compliance with any applicable law, rule, regulation or order, (ii) in response to any subpoena or other legal process or informal investigative demand, (iii) in connection with any litigation to which such Lender is a party, or (iv) in connection with the enforcement of the rights and remedies of the Lender Group under this Agreement and the other Loan Documents at any time when an Event of Default has occurred and is continuing; provided, however, that, in the case of clause (ii) and (iii) above, such Lender shall use reasonable efforts to furnish Administrative Borrower with prior notice and an opportunity to object to such disclosure. Anything contained herein or in any other Loan Document to the contrary notwithstanding, the obligations of confidentiality contained herein and therein, as they relate to the transactions contemplated hereby, shall not apply to the federal tax structure or federal tax treatment of such transactions, and each party hereto (and any employee, representative, or agent of any party hereto) may disclose to any and all Persons, without limitation of any kind, the federal tax structure and federal tax treatment of such transactions (including all written materials related to such tax structure and tax treatment). The preceding sentence is intended to cause the transactions contemplated hereby to not be treated as having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the IRC, and shall be construed in a manner consistent with such purpose. In addition, each party hereto acknowledges that it has no proprietary or exclusive rights to the tax structure of the transactions contemplated hereby or any tax matter or tax idea related thereto.

17.9    **Administrative Agent for Borrowers.** Each Obligor that is a party hereto hereby irrevocably appoints OCC, as the borrowing agent and attorney-in-fact (the "**Administrative Borrower**") for all such Obligors which appointment shall remain in full force and effect unless and until Agent shall have received prior written notice signed by each such Obligor that such appointment has been revoked and that another Obligor has been appointed Administrative Borrower. Each Obligor that is a party hereto hereby irrevocably appoints and authorizes the Administrative Borrower (i) to provide Agent or Lenders with all notices with respect to Advances and all other notices and instructions under this Agreement and (ii) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Advances and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement. It is understood that the handling of the Loan Accounts and Collateral in a

combined fashion, as more fully set forth herein, is done solely as an accommodation to the Obligors party hereto in order to utilize the collective borrowing powers of the Obligors in the most efficient and economical manner and at their request, and that Lender shall not incur liability to any Obligor as a result hereof. Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Loan Accounts and the Collateral in a combined fashion since the successful operation of each Borrower party hereto is dependent on the continued successful performance of the integrated group.

17.10  **Integration.**  This Agreement, together with the other Loan Documents and excluding any agreements entered into in connection with the Dale Letter, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

17.11  **Confidentiality of the Pre-Closing Date Communications and Negotiations.**  Borrowers, Agent and Lenders shall maintain, and shall cause their representatives, Affiliates and Subsidiaries to maintain, in confidence in accordance with its customary procedures for handling confidential information, all written information, drafts, memorandum, documents and oral or written communications exchanged between the parties prior to the Closing Date or prepared by such Person in anticipation of a closing of transactions contemplated by the Loan Documents.

*[Signature pages to follow.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

OCEANS CASINO CRUISES, INC.,
a Delaware corporation

By: _____
Title: _____

VESSEL CASINOS, INC.,
a Delaware corporation

By: _____
Title: _____

VENTURES SOUTH CAROLINA, L.L.C.,
a Florida limited liability company

By: _____
Title: _____

**ORCHARD DRIVE, LLC,**
a Delaware limited liability company, as Agent and as a
Lender

By: _____
Title:

**SKYLAB ROAD LLC,**
a Delaware limited liability company, as a Lender

By: _____
Title: _____

CONSTANTINE DAKOLIAS
AUTHORIZED SIGNATORY



## EXHIBIT A-1

## FORM OF ASSIGNMENT AND ACCEPTANCE AGREEMENT

THIS ASSIGNMENT AND ACCEPTANCE AGREEMENT ("Assignment Agreement") is entered into as of _____ between _____ ("Assignor") and _____ ("Assignee"). Reference is made to the Agreement described in Item 2 of Annex I annexed hereto (the "Loan Agreement"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Loan Agreement.

1.     In accordance with the terms and conditions of Section 14 of the Loan Agreement, the Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, that interest in and to the Assignor's rights and obligations under the Loan Documents as of the date hereof with respect to the Obligations owing to the Assignor, and Assignor's portion of the Total Commitments, the Revolver Commitment, the Term Loan A Commitments, the Term Loan B Commitments, and the Term Loan C Commitments as specified in Item 4.a and Item 4.b of Annex I.

2.     The Assignor (a) confirms assignee is an Eligible Transferee; (b) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; (c) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Loan Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any other instrument or document furnished pursuant thereto; and (d) makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrower or the performance or observance by Borrower of any of its obligations under the Loan Documents or any other instrument or document furnished pursuant thereto.

3.     The Assignee (a) confirms it is an Eligible Transferee; (b) confirms that it has received copies of the Loan Agreement and the other Loan Documents, together with copies of the financial statements referred to therein and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement; (c) agrees that it will, independently and without reliance, as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents; (d) confirms that it is eligible as an assignee under the terms of the Loan Agreement; (e) appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to Agent by the terms thereof, together with such powers as are reasonably incidental thereto; (f) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender *[and (g) attaches the forms prescribed by the Internal Revenue Service of the United States certifying as to the Assignee's status for purposes of determining exemption from United States withholding taxes with respect to all payments to be made to the Assignee under the Loan Agreement or such other*

Exhibit A-1

i

*documents as are necessary to indicate that all such payments are subject to such rates at a rate reduced by an applicable tax treaty.]*

4.      Following the execution of this Assignment Agreement by the Assignor and Assignee, it will be delivered by the Assignor to the Agent for recording by the Agent.  The effective date of this Assignment (the "<u>Settlement Date</u>") shall be the later of (a) the date of the execution hereof by the Assignor and the Assignee, the payment by Assignor or Assignee to Agent for Agent's sole and separate account a processing fee in the amount of $5,000, and the receipt of any required consent of the Agent, and (b) the date specified in <u>Item 5</u> of <u>Annex I</u>.

5.      Upon recording by the Agent, as of the Settlement Date (a) the Assignee shall be a party to the Loan Agreement and, to the extent of the interest assigned pursuant to this Assignment Agreement, have the rights and obligations of a Lender thereunder and under the other Loan Documents, and (b) the Assignor shall, to the extent of the interest assigned pursuant to this Assignment Agreement, relinquish its rights and be released from its obligations under the Loan Agreement and the other Loan Documents.

6.      Upon recording by the Agent, from and after the Settlement Date, the Agent shall make all payments under the Loan Agreement and the other Loan Documents in respect of the interest assigned hereby (including, without limitation, all payments or principal, interest and commitment fees (if applicable) with respect thereto) to the Assignee.  Upon the Settlement Date, the Assignee shall pay to the Assignor the Assigned Share (as set forth in <u>Item 4.b</u> of <u>Annex I</u>) of the principal amount of any outstanding loans under the Loan Agreement and the other Loan Documents.  The Assignor and Assignee shall make all appropriate adjustments in payments under the Loan Agreement and the other Loan Documents for periods prior to the Settlement Date directly between themselves on the Settlement Date.

THIS ASSIGNMENT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

*[Remainder of page left intentionally blank.]*

<u>Exhibit A-1</u>
2

IN WITNESS WHEREOF, the parties hereto have caused this Assignment Agreement and Annex I hereto to be executed by their respective officers thereunto duly authorized, as of the first date above written.

*[NAME OF ASSIGNOR]*
as Assignor

By:_____

Title:_____


*[NAME OF ASSIGNEE]*
as Assignee

By:_____

Title:_____


ACCEPTED THIS _____ DAY OF
_____, 200_.

**ORCHARD DRIVE, LLC,**
a Delaware limited liability company, as Agent

By:_____
Title:

Exhibit A-1
3

<u>ANNEX I</u>

1.  Borrower:

2.  Name and Date of Loan Agreement:

    Loan and Security Agreement, dated as of _____ (as amended, modified, renewed, extended, or replaced from time to time, the "<u>Loan Agreement</u>"), among Oceans Casino Cruises, Inc., a Delaware corporation ("<u>OCC</u>"), Vessel Casinos, Inc., a Delaware corporation ("<u>VCI</u>"), and Ventures South Carolina, L.L.C., a Florida limited liability company ("<u>VSC</u>") (OCC, VCI and VSC are each a "<u>Borrower</u>" and collectively, jointly and severally the "<u>Borrowers</u>"), the lenders signatory thereto, and Orchard Drive, LLC, a Delaware limited liability company, as the arranger and administrative agent for the Lenders.

3.  Date of Assignment Agreement:                          _____

4.  Amounts:

    a.  Assigned Amount of Revolver Commitment          $_____

    b.  Assigned Amount of Term Loan A Commitment  :    $_____

    c.  Assigned Amount of Term Loan B Commitment      $_____

    d.  Assigned Amount of Term Loan C Commitment      $_____

5.  Settlement Date:                                       _____

6.  Notice and Payment Instructions, etc.

    Assignee:                          Assignor:

    _____                   _____
    _____                   _____
    _____                   _____

7.  Agreed and Accepted:

    *[ASSIGNOR]*                       *[ASSIGNEE]*

    By:_____                By:_____
    Title:_____             Title:_____

Accepted:

[NAME OF ASSIGNOR]
as Assignor

By:_____

Title:_____


[NAME OF ASSIGNEE]
as Assignee

By:_____

Title:_____

ACCEPTED THIS ____ DAY OF
_____, 200_.

ORCHARD DRIVE, LLC,
a Delaware limited liability company, as Agent

By:_____
Title:

# EXHIBIT C-1

## CLOSING DATE BUSINESS PLAN PROJECTIONS

## EXHIBIT C-2

### FORM OF COMPLIANCE CERTIFICATE

*[on Borrower's letterhead]*

To:    Orchard Drive, LLC
c/o Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Attention: Yehuda M. Braunstein, Esq.
Fax. (212) 593-5955

Re:    Compliance Certificate dated _____

Ladies and Gentlemen:

Reference is made to that certain Loan and Security Agreement, dated as of April 8, 2004 (the "Loan Agreement"), by and among Oceans Casino Cruises, Inc., a Delaware corporation ("OCC"), Vessel Casinos, Inc., a Delaware corporation ("VCI"), and Ventures South Carolina, L.L.C., a Florida limited liability company ("VSC") (OCC, VCI and VSC are each a "Borrower" and collectively, jointly and severally the "Borrowers"), the lenders signatory thereto (the "Lenders"), and Orchard Drive, LLC, a Delaware limited liability company, as the arranger and administrative agent for the Lenders. (in such capacity, the "Agent"). Initially capitalized terms used in this Compliance Certificate have the meanings set forth in the Loan Agreement unless specifically defined herein.

Pursuant to Section 6.3 of the Loan Agreement, the undersigned Responsible Officer of Administrative Borrower hereby certifies that:

1.    The financial information of Borrowers and their Subsidiaries furnished in Schedule 1 attached hereto, has been prepared in accordance with GAAP (except for year-end audited adjustments and the lack of footnotes, in the case of financial statements delivered under Section 6.3(a) of the Loan Agreement) and fairly presents in all material respects the financial condition of Borrowers and their Subsidiaries.

2.    Such Responsible Officer has reviewed the terms of the Loan Agreement and has made, or caused to be made under his/her supervision, a review in reasonable detail of the transactions and condition of Borrowers and their Subsidiaries during the accounting period covered by the financial statements delivered pursuant to Section 6.3 of the Loan Agreement.

3.    Such review has not disclosed the existence on and as of the date hereof, and the undersigned does not have knowledge of the existence as of the date hereof, of any event or condition that constitutes a Default or Event of Default, except for such conditions or events listed on Schedule 2 attached hereto, specifying the nature and period of existence thereof and what action Borrowers or their Subsidiaries has taken, is taking, or proposes to take with respect thereto.

4.     Borrowers are in timely compliance with all representations, warranties, and covenants set forth in the Loan Agreement and the other Loan Documents, except as set forth on Schedule 2 attached hereto. Without limiting the generality of the foregoing, Borrowers are in compliance with the covenants contained in Section 7.18 of the Loan Agreement as demonstrated on Schedule 3 hereof.

IN WITNESS WHEREOF, this Compliance Certificate is executed by the undersigned this _____ day of _____, _____.

a _____, as Administrative Borrower

By: _____
Name: _____
Title: _____

## SCHEDULE 1

## SCHEDULE 2

## SCHEDULE 3

1.  **Minimum TTM EBITDA.**

    Person's (and its Subsidiaries on a consolidated basis) EBITDA as of the last day of the fiscal quarter ending _____, _____ is $ _____, which amount *[is/is not]* less than the required amount set forth in the table in <u>Section 7.18(a)(i)</u> of the Loan Agreement for the corresponding period.

2.  **Interest Coverage Ratio.**

    The Interest Charge Coverage Ratio as of the last day of the fiscal quarter ending _____, _____ is \_\_:\_\_, which ratio *[is/is not]* less than the applicable ratio set forth in the table in <u>Section 7.18(a)(ii)</u> of the Loan Agreement for the corresponding period.

3.  **Leverage Ratio.**

    The Leverage Ratio as of the last day of the fiscal quarter ending _____, _____ is \_\_:\_\_, which ratio *[is/is not]* less than the applicable ratio set forth in the table in <u>Section 7.18(a)(iii)</u> of the Loan Agreement for the corresponding period.

4.  **Fixed Charge Coverage Ratio.**

    The Fixed Charge Coverage Ratio as of the last day of the fiscal quarter ending _____, \_\_\_\_ is \_\_:\_\_, which ratio *[is/is not]* more than the applicable ratio set forth in the table in <u>Section 7.18(a)(iv)</u> of the Loan Agreement for the corresponding period.

5.  **Capital Expenditures.**

    The aggregate amount of Capital Expenditures made or committed to be made for the fiscal year ending _____, _____ is $ _____, which amount *[is/is not]* more than the amount set forth in the table in <u>Section 7.18(b)(i)</u> of the Loan Agreement for the corresponding period.



## Schedule A-1
### Agent's Account

An account at a bank designated by Agent from time to time as the account into which Borrowers shall make all payments to Agent for the benefit of the Lender Group and into which the Lender Group shall make all payments to Agent under this Agreement and the other Loan Documents; unless and until Agent notifies Administrative Borrower and the Lender Group to the contrary, Agent's Account shall be that certain deposit account bearing account number _____ and maintained by Agent with _____.

## Schedule C-1
### Commitments

| | | | | | |
|---|---|---|---|---|---|
| Orchard Drive, LLC | $3,000,000 | $3,500,000 | $13,948,453.61 | $2,500,000 | $22,948,453.61 |
| Skylab Road LLC | $0 | $3,500,000 | $13,948,453.61 | $2,500,000 | $19,948,453.61 |
| All Lenders | $3,000,000 | $7,000,000 | $27,896,907.22 | $5,000,000 | $42,896,907.22 |

## Schedule D-1
### Designated Account

Account number _____ of Administrative Borrower maintained with Borrowers' Designated Account Bank, or such other deposit account of Administrative Borrower (located within the United States) that has been designed as such, in writing, by Administrative Borrower to Agent.

"Designated Account Bank" means _____, whose office is located at _____, and whose ABA number is _____. Account is in the name of _____.

## Schedule O-1
### Obligor Documents

Schedule P-1
Permitted Investments

1.    Vessel Casinos, Inc.

2.    Ventures South Carolina, L.L.C.

Schedule P-1

Schedule P-2
Permitted Liens

1.     Purchase money security interest to secure indebtedness to International Game
Technology for purchases of slot machines evidenced by promissory notes dated September 5,
2002 and July 9, 2003 in the original principal amounts of $303,500 and $216,932, respectively.

Schedule P-3
Preferred Ship Mortgages

1.   FIRST PREFERRED SHIP MORTGAGE ON THE WHOLE OF THE TAXICAT
     (Official Number 946906) VESSEL CASINOS, INC., 3408 Dover Road, Pompano
     Beach, Florida 33062, Attention: Robert Weisberg, In Favor of ORCHARD DRIVE,
     LLC in its capacity as Trustee for itself and the other Lenders under that certain Loan and
     Security Agreement dated as of April 8, 2004 between Oceans Casino Cruises, Inc.,
     Vessel Casinos, Inc., and Ventures South Carolina, L.L.C., as Borrowers and Orchard
     Drive, LLC and the other Lenders party thereto Dated as of April 8, 2004, Discharge
     Amount: $39,658,763 Together With Interest, Expenses, Fees and Performance of
     Mortgage Covenants

2.   FIRST PREFERRED SHIP MORTGAGE ON THE WHOLE OF THE SUNCRUZ I
     (Official Number 979342) VESSEL CASINOS, INC., 3408 Dover Road, Pompano
     Beach, Florida 33062, Attention: Robert Weisberg, In Favor of ORCHARD DRIVE,
     LLC in its capacity as Trustee for itself and the other Lenders under that certain Loan and
     Security Agreement dated as of April 8, 2004 between Oceans Casino Cruises, Inc.,
     Vessel Casinos, Inc., and Ventures South Carolina, L.L.C., as Borrowers and Orchard
     Drive, LLC and the other Lenders party thereto Dated as of April 8, 2004, Discharge
     Amount: $39,658,763 Together With Interest, Expenses, Fees and Performance of
     Mortgage Covenants

3.   FIRST PREFERRED SHIP MORTGAGE ON THE WHOLE OF THE SUNCRUZ II
     (Official Number 1030687) VESSEL CASINOS, INC., 3408 Dover Road, Pompano
     Beach, Florida 33062, Attention: Robert Weisberg, In Favor of ORCHARD DRIVE,
     LLC in its capacity as Trustee for itself and the other Lenders under that certain Loan and
     Security Agreement dated as of April 8, 2004 between Oceans Casino Cruises, Inc.,
     Vessel Casinos, Inc., and Ventures South Carolina, L.L.C., as Borrowers and Orchard
     Drive, LLC and the other Lenders party thereto Dated as of April 8, 2004, Discharge
     Amount: $39,658,763 Together With Interest, Expenses, Fees and Performance of
     Mortgage Covenants

4.   FIRST PREFERRED SHIP MORTGAGE ON THE WHOLE OF THE SUNCRUZ III
     (Official Number 916646) VESSEL CASINOS, INC., 3408 Dover Road, Pompano
     Beach, Florida 33062, Attention: Robert Weisberg, In Favor of ORCHARD DRIVE,
     LLC in its capacity as Trustee for itself and the other Lenders under that certain Loan and
     Security Agreement dated as of April 8, 2004 between Oceans Casino Cruises, Inc.,
     Vessel Casinos, Inc., and Ventures South Carolina, L.L.C., as Borrowers and Orchard
     Drive, LLC and the other Lenders party thereto Dated as of April 8, 2004, Discharge
     Amount: $39,658,763 Together With Interest, Expenses, Fees and Performance of
     Mortgage Covenants

5.   FIRST PREFERRED SHIP MORTGAGE ON THE WHOLE OF THE SUNCRUZ IV
     (Official Number 1026508) VESSEL CASINOS, INC., 3408 Dover Road, Pompano
     Beach, Florida 33062, Attention: Robert Weisberg, In Favor of ORCHARD DRIVE,

LLC in its capacity as Trustee for itself and the other Lenders under that certain Loan and Security Agreement dated as of April 8, 2004 between Oceans Casino Cruises, Inc., Vessel Casinos, Inc., and Ventures South Carolina, L.L.C., as Borrowers and Orchard Drive, LLC and the other Lenders party thereto Dated as of April 8, 2004, Discharge Amount: $39,658,763 Together With Interest, Expenses, Fees and Performance of Mortgage Covenants

6.   FIRST PREFERRED SHIP MORTGAGE ON THE WHOLE OF THE SUNCRUZ V (Official Number 1039137) VESSEL CASINOS, INC., 3408 Dover Road, Pompano Beach, Florida 33062, Attention: Robert Weisberg, In Favor of ORCHARD DRIVE, LLC in its capacity as Trustee for itself and the other Lenders under that certain Loan and Security Agreement dated as of April 8, 2004 between Oceans Casino Cruises, Inc., Vessel Casinos, Inc., and Ventures South Carolina, L.L.C., as Borrowers and Orchard Drive, LLC and the other Lenders party thereto Dated as of April 8, 2004, Discharge Amount: $39,658,763 Together With Interest, Expenses, Fees and Performance of Mortgage Covenants

7.   FIRST PREFERRED SHIP MORTGAGE ON THE WHOLE OF THE SUNCRUZ VI (Official Number 1060045) VESSEL CASINOS, INC., 3408 Dover Road, Pompano Beach, Florida 33062, Attention: Robert Weisberg, In Favor of ORCHARD DRIVE, LLC in its capacity as Trustee for itself and the other Lenders under that certain Loan and Security Agreement dated as of April 8, 2004 between Oceans Casino Cruises, Inc., Vessel Casinos, Inc., and Ventures South Carolina, L.L.C., as Borrowers and Orchard Drive, LLC and the other Lenders party thereto Dated as of April 8, 2004, Discharge Amount: $39,658,763 Together With Interest, Expenses, Fees and Performance of Mortgage Covenants

8.   FIRST PREFERRED SHIP MORTGAGE ON THE WHOLE OF THE SUNCRUZ VII (Official Number 686316) VESSEL CASINOS, INC., 3408 Dover Road, Pompano Beach, Florida 33062, Attention: Robert Weisberg, In Favor of ORCHARD DRIVE, LLC in its capacity as Trustee for itself and the other Lenders under that certain Loan and Security Agreement dated as of April 8, 2004 between Oceans Casino Cruises, Inc., Vessel Casinos, Inc., and Ventures South Carolina, L.L.C., as Borrowers and Orchard Drive, LLC and the other Lenders party thereto Dated as of April 8, 2004, Discharge Amount: $39,658,763 Together With Interest, Expenses, Fees and Performance of Mortgage Covenants

9.   FIRST PREFERRED SHIP MORTGAGE ON THE WHOLE OF THE SUNCRUZ VIII (Official Number 977138) VESSEL CASINOS, INC., 3408 Dover Road, Pompano Beach, Florida 33062, Attention: Robert Weisberg, In Favor of ORCHARD DRIVE, LLC in its capacity as Trustee for itself and the other Lenders under that certain Loan and Security Agreement dated as of April 8, 2004 between Oceans Casino Cruises, Inc., Vessel Casinos, Inc., and Ventures South Carolina, L.L.C., as Borrowers and Orchard Drive, LLC and the other Lenders party thereto Dated as of April 8, 2004, Discharge Amount: $39,658,763 Together With Interest, Expenses, Fees and Performance of Mortgage Covenants

Schedule P-3

10.  FIRST PREFERRED SHIP MORTGAGE ON THE WHOLE OF THE SUNCRUZ IX (Official Number 1037815) VESSEL CASINOS, INC., 3408 Dover Road, Pompano Beach, Florida 33062, Attention: Robert Weisberg, In Favor of ORCHARD DRIVE, LLC in its capacity as Trustee for itself and the other Lenders under that certain Loan and Security Agreement dated as of April 8, 2004 between Oceans Casino Cruises, Inc., Vessel Casinos, Inc., and Ventures South Carolina, L.L.C., as Borrowers and Orchard Drive, LLC and the other Lenders party thereto Dated as of April 8, 2004, Discharge Amount: $39,658,763 Together With Interest, Expenses, Fees and Performance of Mortgage Covenants

11.  FIRST PREFERRED SHIP MORTGAGE ON THE WHOLE OF THE SUNCRUZ X (Official Number 960291) VESSEL CASINOS, INC., 3408 Dover Road, Pompano Beach, Florida 33062, Attention: Robert Weisberg, In Favor of ORCHARD DRIVE, LLC in its capacity as Trustee for itself and the other Lenders under that certain Loan and Security Agreement dated as of April 8, 2004 between Oceans Casino Cruises, Inc., Vessel Casinos, Inc., and Ventures South Carolina, L.L.C., as Borrowers and Orchard Drive, LLC and the other Lenders party thereto Dated as of April 8, 2004, Discharge Amount: $39,658,763 Together With Interest, Expenses, Fees and Performance of Mortgage Covenants

12.  FIRST PREFERRED SHIP MORTGAGE ON THE WHOLE OF THE SUNCRUZ XI (Official Number 901026) VESSEL CASINOS, INC., 3408 Dover Road, Pompano Beach, Florida 33062, Attention: Robert Weisberg, In Favor of ORCHARD DRIVE, LLC in its capacity as Trustee for itself and the other Lenders under that certain Loan and Security Agreement dated as of April 8, 2004 between Oceans Casino Cruises, Inc., Vessel Casinos, Inc., and Ventures South Carolina, L.L.C., as Borrowers and Orchard Drive, LLC and the other Lenders party thereto Dated as of April 8, 2004, Discharge Amount: $39,658,763 Together With Interest, Expenses, Fees and Performance of Mortgage Covenants

13.  SECOND PREFERRED SHIP MORTGAGE ON THE WHOLE OF THE SUNCRUZ XII (Official Number 538911) SURFSIDE PRINCESS LLC, 3408 Dover Road, Pompano Beach, Florida 33062, Attention: Robert Weisberg, In Favor of ORCHARD DRIVE, LLC in its capacity as Trustee for itself and the other Lenders under that certain Loan and Security Agreement dated as of April 8, 2004 between Oceans Casino Cruises, Inc., Vessel Casinos, Inc., and Ventures South Carolina, L.L.C., as Borrowers and Orchard Drive, LLC and the other Lenders party thereto Dated as of April 8, 2004, Discharge Amount: $39,658,763 Together With Interest, Expenses, Fees and Performance of Mortgage Covenants

<u>Schedule V-1</u>
Vessels

1.   SunCruz I, 99701 Overseas Highway, Key Largo, FL 33937

2.   SunCruz II, 12788 Kingfish Drive, Treasure Island, FL 33706

3.   SunCruz III, 4877 Front Street, Ponce Inlet, FL 32127

4.   SunCruz IV, c/o Jones Boat Yard, 3399 NW South River Dr., Miami, FL 33142

5.   SunCruz V, 6024 N. Ocean Drive, Hollywood, FL 33019

6.   SunCruz VI, 4378 Ocean Street, Mayport, FL 32233

7.   SunCruz VII, 4495 Mineola Avenue, Little River, S.C. 29566

8.   SunCruz VIII, 12788 Kingfish Drive, Treasure Island, FL 33706

9.   SunCruz IX, 101 N. Riverside Drive, Pompano Beach, FL 33062

10.  SunCruz X, c/o Atlantic Marine, 8500 Heckscher Dr., Jacksonville, FL 32226

11.  SunCruz XI, c/o Atlantic Marine, 8500 Heckscher Dr., Jacksonville, FL 32226

12.  Taxicat, 99701 Overseas Highway, Key Largo, FL 33937

13.  Surfside Princess, a/k/a SunCruz XII, 620 Glen Cheek Drive, Cape Canaveral, FL 3292

<u>Schedule P-3</u>

Schedule 2.6(a)
Cash Management Banks

1.  Bank of America, N.A., 401 East Los Olas Boulevard, Ft. Lauderdale, FL 33301

<u>Schedule 3.1(i)</u>
Location Requiring Collateral Access Agreements

1.      Foreign Trade Zone
        405 Atlantis Rd., #B
        Cape Canaveral, FL  32904

<u>Schedule 3.1(i)</u>

**Schedule 3.2(e)**
**Location Requiring Collateral Access Agreements**

1.  12601 Gulf Boulevard, Treasure Island, Florida, Landlord: Paul Tauber

2.  The Dock on Glen Cheek Drive, Port Canaveral, Florida, Landlord:  D&L Port Canaveral, Inc.

3.  637, 639, 647, and 633 East Dania Beach Boulevard, Dania, Florida, Landlord: Danians Corporation

4.  99701 Overseas Highway, Key Largo, Florida, Landlord:  Resort Hotels of Key Largo, Inc.

5.  100 N. Ocean Drive, Key Largo, Florida, Landlord:  The Marina at Key Largo, Inc.

6.  4495 Mineola Ave., Little River, South Carolina, Landlord: RE Palm Beach Partners, LLC

7.  4378 Ocean Street, Mayport, Florida, Landlord:  Miss Beck Seafood, Inc.

8.  4884 Front Street, Ponce Inlet, Florida, Landlord:  Mar-Trim, Inc.

9.  The Restaurant at 610 Glen Cheek Drive, Port Canaveral, Florida, Landlord:  The Port Canaveral Seafood House, Inc.

Schedule 3.1(i)

Schedule 5.5
Locations of Inventory and Equipment

1.  SunCruz I, 99701 Overseas Highway, Key Largo, FL 33937

2.  SunCruz II, 12788 Kingfish Drive, Treasure Island, FL 33706

3.  SunCruz III, 4877 Front Street, Ponce Inlet, FL 32127

4.  SunCruz IV, c/o Jones Boat Yard, 3399 NW South River Dr., Miami, FL 33142

5.  SunCruz V, 6024 N. Ocean Drive, Hollywood, FL 33019

6.  SunCruz VI, 4378 Ocean Street, Mayport, FL 32233

7.  SunCruz VII, 4495 Mineola Avenue, Little River, S.C. 29566

8.  SunCruz VIII, 12788 Kingfish Drive, Treasure Island, FL 33706

9.  SunCruz IX, 101 N. Riverside Drive, Pompano Beach, FL 33062

10. SunCruz X, c/o Atlantic Marine, 8500 Heckscher Dr., Jacksonville, FL 32226

11. SunCruz XI, c/o Atlantic Marine, 8500 Heckscher Dr., Jacksonville, FL 32226

12  Surfside Princess, a/k/a SunCruz XII, 620 Glen Cheek Drive, Cape Canaveral, FL 32920

13. Taxicat, 99701 Overseas Highway, Key Largo, FL 33937

14  Storage, 40 E. Hallandale Beach Blvd., Suite B, Hallandale, FL 33009

15. Foreign Trade Zone, 405 Atlantis Rd., #B, Cape Canaveral, FL 32904

16. Executive Office, 647 East Dania Beach Blvd., Dania Beach, FL 33004

Schedule 5.5

Schedule 5.7(a).
States of Organization

| | | |
|---|---|---|
| 1. | Oceans Casino Cruises, Inc. | Delaware |
| 2. | Vessel Casinos, Inc. | Delaware |
| 3. | Ventures South Carolina, L.L.C. | Florida |
| 4. | Surfside Princess LLC | Delaware |

Schedule 5.7(b)

Schedule 5.7(b)
Chief Executive Offices

1.   Oceans Casino Cruises, Inc., 647 East Dania Beach Blvd., Dania Beach, FL 33004

2.   Vessel Casinos, Inc., 647 East Dania Beach Blvd., Dania Beach, FL 33004

3.   Ventures South Carolina, L.L.C., 647 East Dania Beach Blvd., Dania Beach, FL 33004

4.   Surfside Princess LLC, 647 East Dania Beach Blvd., Dania Beach, FL 33004

Schedule 3.1(i)

Schedule 5.7(c)
FEINs and Organizational Identification Numbers

| | | | |
|---|---|---|---|
| 1. | Oceans Casino Cruises, Inc. | 20-0615257 | 3726211 |
| 2. | Vessel Casinos, Inc. | 20-0614608 | 3725061 |
| 3. | Ventures South Carolina, L.L.C. | 52-2266250 | L00000010711 |
| 4. | Surfside Princess LLC | 20-0968069 | 3786695 |

Schedule 5.7(c)

Schedule 5.7(d)
Commercial Tort Claims

None

Schedule 5.7(d)

Schedule 5.8(b)
Capitalization of Each Obligor

1.   Oceans Casino Cruises, Inc., 10,000 common shares authorized, 10,000 shares outstanding

2.   Vessel Casinos, Inc., 1,000 common shares authorized, 100 shares outstanding

3.   Ventures South Carolina, L.L.C., single member limited liability company

4.   Surfside Princess LLC, multi-member limited liability company with Robert Weisberg as the initial member

Schedule 5.8(c)
Capitalization of Each Borrower's Subsidiaries

1.    Vessel Casinos, Inc., 1,000 common shares authorized, 100 shares outstanding and wholly owned by Oceans Casino Cruises, Inc.

2.    Ventures South Carolina, L.L.C., single member limited liability company wholly owned by Oceans Casino Cruises, Inc.

Schedule 5.8(c)

**Schedule 5.8(d)**
**Options, Warrants and Calls Related to each Obligor's Subsidiaries**

None

**Schedule 5.10**
Litigation

None

Schedule 5.10

Schedule 5.14
Environmental Matters


None

**Schedule 5.16**
**Intellectual Property**

1.    Trademarks:   SunCruz Casino        Serial # (Not Official) 75468546

                    SunCruz Casino        Serial # (Not Official) 75468545

Schedule 5.16

<u>Schedule 5.18</u>
Deposit Accounts and Securities Accounts

1.    Oceans Casino Cruises, Inc.

      Bank of America, N.A., 401 East Los Olas Boulevard, Ft. Lauderdale, FL 33301
              Master Operating Account 005498556831
              Accounts Payable Account 005498556860
              Payroll Disbursement Account 005498556873
              Cage Account 005498556844
              Depository Account 005498556857
              Lender Blocked Account 005498559621

2.    Vessel Casinos, Inc.

      Bank of America, N.A., 401 East Los Olas Boulevard, Ft. Lauderdale, FL 33301
              Disbursement Account 005498556886

3.    Ventures South Carolina, L.L.C.

      Bank of America, N.A., 401 East Los Olas Boulevard, Ft. Lauderdale, FL 33301
              Master Operating Account 005498556789
              Accounts Payable Account 005498556815
              Payroll Disbursement Account 005498556828
              Cage Account 005498556792
              Depository Account 005498556802
              Lender Blocked Account 005498559621

<u>Schedule 5.18</u>

<u>Schedule 5.20</u>
Permitted Indebtedness

1.      Indebtedness to International Game Technology for purchases of slot machines evidenced
by promissory notes dated September 5, 2002 and July 9, 2003 in the original principal amounts
of $303,500 and $216,932, respectively.

**Schedule 5.27**
**Credit Card Processors**

National Processing Company
Electronic Data Resources
1231 Durrett Lane
Louisville, Kentucky 40213

| | |
|---|---|
| 4164069361051930 | Sun Cruz |
| 4164069361051948 | Sun Cruz Hollywood |
| 4164069361051955 | Sun Cruz South Carolina |
| 4164069361051963 | Sun Cruz Johns Pass |
| 4164069361051989 | Sun Cruz Jacksonville |
| 4164069361052003 | Sun Cruz Daytona |
| 4164069361052011 | Sun Cruz Port Canaveral |
| 4164069361052045 | Sun Cruz Key Largo |
| 4164069361052052 | Sun Cruz Group Sales |

Schedule 5.20

Schedule 7.17
Bailees and Warehousemen

1.     Foreign Trade Zone, 405 Atlantis Rd., #B, Cape Canaveral, FL  32904

Schedule 7.17

## CONTINUING GUARANTY

This **CONTINUING GUARANTY** (this "Guaranty"), dated as of April 8, 2004 is executed and delivered by **SURFSIDE PRINCESS LLC**, a Delaware limited liability company ("Guarantor") in favor of Agent, for the benefit of the Lender Group (as such terms are defined herein), in light of the following:

        A.      Oceans Casino Cruises, Inc., a Delaware corporation ("OCC"), Vessel Casinos, Inc., a Delaware corporation ("VCI"), Ventures South Carolina, L.L.C., a Florida limited liability company ("VSC" and together with OCC and VCI, the "Borrowers"), the financial institutions party thereto (the "Lenders") and Orchard Drive, LLC, a Delaware limited liability company ("Orchard"), as the arranger and administrative agent for the Lenders (in such capacity, the "Agent") are contemporaneously herewith entering into that certain Loan and Security Agreement (as may be amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement") and other instruments, documents and agreements contemplated thereby and related thereto (collectively, together with the Loan Agreement, the "Loan Documents");

        B.      As an Affiliate of the Borrowers, Guarantor acknowledges it will derive substantial benefit from the making of the loans and other financial accommodations under the Loan Agreement; and

        C.      In order to induce Agent and the Lender Group to extend loans and other financial accommodations to Borrowers pursuant to the Loan Agreement, and in consideration thereof, and in consideration of any loans or other financial accommodations heretofore or hereafter extended by the Lenders to Borrowers, whether pursuant to the Loan Agreement or otherwise, Guarantor has agreed to guarantee the Guaranteed Obligations.

        NOW, THEREFORE, in consideration of the foregoing, Guarantor hereby agrees, in favor of Agent, for the benefit of the Lender Group, as follows:

        **1.**      **Definitions and Construction.**

        (a)      **Definitions.**  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Loan Agreement. The following terms, as used in this Guaranty, shall have the following meanings:

        "**Guaranteed Obligations**" means the Obligations (as such term is defined in the Loan Agreement) and the obligations of Guarantor hereunder.

        "**Lender Group**" has the meaning set forth in the Loan Agreement.

        (b)      **Construction.**  Unless the context of this Guaranty clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, and the term "including" is not limiting. The words "hereof," "herein," "hereby,"

"hereunder," and other similar terms refer to this Guaranty as a whole and not to any particular provision of this Guaranty.  Any reference herein to any of the Loan Documents includes any and all alterations, amendments, extensions, modifications, renewals, or supplements thereto or thereof, as applicable.  Neither this Guaranty nor any uncertainty or ambiguity herein shall be construed or resolved against Agent or Guarantor, whether under any rule of construction or otherwise.  On the contrary, this Guaranty has been reviewed by Guarantor, Agent, the Lenders, and their respective counsel, and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of Agent, the Lenders, and Guarantor.

2.   **Guaranteed Obligations.**   Guarantor hereby irrevocably and unconditionally guarantees to Agent, for the benefit of the Lender Group, as and for its own debt, until final and indefeasible payment thereof has been made, (a) payment of the Guaranteed Obligations, in each case when and as the same shall become due and payable, whether at maturity, pursuant to a mandatory prepayment requirement, by acceleration, or otherwise; it being the intent of Guarantor that the guaranty set forth herein shall be a guaranty of payment and not a guaranty of collection; and (b) the punctual and faithful performance, keeping, observance, and fulfillment by Borrowers of all of the agreements, conditions, covenants, and obligations of Borrowers contained in the Loan Agreement and in each of the Loan Documents.

3.   **Irrevocable Guaranty.**  This Guaranty is of Guaranteed Obligations and is irrevocable.

4.   **Performance Under This Guaranty.**  In the event that any Borrower fails to make any payment of any Guaranteed Obligations on or before the due date thereof, or if any Borrower shall fail to perform, keep, observe, or fulfill any other obligation referred to in clause (b) of Section 2 hereof in the manner provided in the Loan Documents Guarantor immediately shall cause such payment to be made or each of such obligations to be performed, kept, observed, or fulfilled.

5.   **Primary Obligations.**  This Guaranty is a primary and original obligation of Guarantor and is an absolute, unconditional, and continuing guaranty of payment and performance which shall remain in full force and effect without respect to future changes in conditions, including any change of law.  Guarantor agrees that it is directly, and jointly and severally with any other guarantor of the Guaranteed Obligations, liable to Agent, for the benefit of the Lenders, that the obligations of Guarantor hereunder are independent of the obligations of Borrowers or any other guarantor, and that a separate action may be brought against Guarantor whether such action is brought against Borrowers or any other guarantor or whether Borrowers or any such other guarantor is joined in such action.  Guarantor agrees that its liability hereunder shall be immediate and shall not be contingent upon the exercise or enforcement by Agent or the Lenders of whatever remedies it may have against Borrowers or any other guarantor, or the enforcement of any lien or realization upon any security Agent or the Lenders may at any time possess.  Guarantor agrees that any release which may be given by Agent to any Borrower or any other guarantor shall not release Guarantor.  Guarantor consents and agrees that Agent or the Lenders shall be under no obligation to marshal any assets of any Borrower or any other

guarantor in favor of Guarantor, or against or in payment of any or all of the Guaranteed Obligations.

6.    **Waivers**.

(a)    Guarantor absolutely, unconditionally, knowingly, and expressly waives:

(i)    (1) notice of acceptance hereof; (2) notice of any loans or other financial accommodations made or extended under the Loan Documents or the creation or existence of any Guaranteed Obligations; (3) notice of the amount of the Guaranteed Obligations, subject, however, to Guarantor's right to make inquiry of Agent to ascertain the amount of the Guaranteed Obligations at any reasonable time; (4) notice of any adverse change in the financial condition of Borrowers or of any other fact that might increase Guarantor's risk hereunder; (5) notice of presentment for payment, demand, protest, and notice thereof as to any instruments among the Loan Documents; (6) notice of any unmatured event of default or event of default under the Loan Documents; and (7) all other notices (except if such notice is specifically required to be given to Guarantor hereunder or under any Loan Document to which Guarantor is a party) and demands to which Guarantor might otherwise be entitled.

(ii)    its right to require Agent or the Lenders to institute suit against, or to exhaust any rights and remedies which Agent or the Lenders have or may have against, Borrowers or any third party, or against any collateral for the Guaranteed Obligations provided by Borrowers, Guarantor, or any third party.    In this regard, Guarantor agrees that it is bound to the payment of all Guaranteed Obligations, whether now existing or hereafter accruing, as fully as if such Guaranteed Obligations were directly owing to Agent, for the benefit of the Lender Group, by Guarantor.  Guarantor further waives any defense arising by reason of any disability or other defense (other than the defense that the Guaranteed Obligations shall have been fully and finally performed and indefeasibly paid) of Borrowers or by reason of the cessation from any cause whatsoever of the liability of Borrowers in respect thereof.

(iii)    (1) any rights to assert against Agent or the Lenders any defense (legal or equitable), set-off, counterclaim, or claim which Guarantor may now or at any time hereafter have against Borrowers or any other party liable to Agent or the Lenders; (2) any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Guaranteed Obligations or any security therefor; (3) any defense Guarantor has to performance hereunder, and any right Guarantor has to be exonerated, arising by reason of:  the impairment or suspension of Agent's or the Lenders' rights or remedies against Borrowers; the alteration by Agent or the Lenders of the Guaranteed Obligations; any discharge of Borrowers' obligations to Agent and the Lenders by operation of law as a result of Agent's or the Lenders' intervention or omission; or the acceptance by Agent or the Lenders of anything in partial satisfaction of the Guaranteed Obligations; (4) the benefit of any statute of limitations affecting Guarantor's liability

hereunder or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Guaranteed Obligations shall similarly operate to defer or delay the operation of such statute of limitations applicable to Guarantor's liability hereunder.

Guarantor absolutely, unconditionally, knowingly, and expressly waives any defense arising by reason of or deriving from (i) any claim or defense based upon an election of remedies by Agent or the Lenders; or (ii) any election by Agent or the Lenders under Bankruptcy Code Section 1111(b) to limit the amount of, or any collateral securing, its claim against Borrowers.

(b)     Until such time as all of the Guaranteed Obligations have been fully, finally, and indefeasibly paid in full in cash: (i) Guarantor hereby postpones any right of subrogation Guarantor has or may have as against Borrowers with respect to the Guaranteed Obligations; (ii) Guarantor hereby postpones any right to proceed against Borrowers or any other Person, now or hereafter, for contribution, indemnity, reimbursement, or any other suretyship rights and claims, whether direct or indirect, liquidated or contingent, whether arising under express or implied contract or by operation of law, which Guarantor may now have or hereafter have as against Borrowers with respect to the Guaranteed Obligations; and (iii) Guarantor also hereby postpones any right to proceed or seek recourse against or with respect to any property or asset of Borrowers.

7.     **Releases.**  Guarantor consents and agrees that, without notice to or by Guarantor and without affecting or impairing the obligations of Guarantor hereunder, Agent or the Lenders may, by action or inaction:

(a)     compromise, settle, extend the duration or the time for the payment of, or discharge the performance of, or may refuse to or otherwise not enforce the Loan Documents;

(b)     release all or any one or more parties to any one or more of the Loan Documents or grant other indulgences to Borrowers in respect thereof;

(c)     amend or modify in any manner and at any time (or from time to time) any of the Loan Documents; or

(d)     release or substitute any other guarantor, if any, of the Guaranteed Obligations, or enforce, exchange, release (by action or inaction), or waive any security for the Guaranteed Obligations (including, the collateral referred to in Section 19 hereof) or any other guaranty of the Guaranteed Obligations, or any portion thereof.

8.     **No Election.**  Agent and the Lenders shall have the right to seek recourse against Guarantor to the fullest extent provided for herein, and no election by Agent or the Lenders to proceed in one form of action or proceeding, or against any party, or on any obligation, shall constitute a waiver of Agent's or the Lenders' right to proceed in any other form of action or proceeding or against other parties unless Agent or the Lenders have expressly waived such right in writing.  Specifically, but without limiting the generality of the foregoing,

no action or proceeding by Agent or the Lenders under any document or instrument evidencing the Guaranteed Obligations shall serve to diminish the liability of Guarantor under this Guaranty except to the extent that Agent, for the benefit of the Lender Group, finally and unconditionally shall have realized indefeasible payment by such action or proceeding.

**9.    Indefeasible Payment.**   The Guaranteed Obligations shall not be considered indefeasibly paid for purposes of this Guaranty unless and until all payments to Agent are no longer subject to any right on the part of any person, including any Borrower, any Borrower as a debtor in possession, or any trustee (whether appointed under the Bankruptcy Code or otherwise) of such Borrower's assets to invalidate or set aside such payments or to seek to recoup the amount of such payments or any portion thereof, or to declare same to be fraudulent or preferential. Upon such full and final performance and indefeasible payment of the Guaranteed Obligations whether by Guarantor or any Borrower, Agent and the Lenders shall have no obligation whatsoever to transfer or assign its interest in the Loan Documents to Guarantor. In the event that, for any reason, any portion of such payments to Agent or the Lenders are set aside or restored, whether voluntarily or involuntarily, after the making thereof, then the obligation intended to be satisfied thereby shall be revived and continued in full force and effect as if said payment or payments had not been made, and Guarantor shall be liable for the full amount Agent or the Lenders are required to repay plus any and all costs and expenses (including attorneys' fees) paid by Agent and the Lenders in connection therewith.

**10.    Financial Condition of Borrowers.**   Guarantor represents and warrants to Agent and the Lenders that Guarantor is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Guaranteed Obligations. Guarantor further represents and warrants to Agent and the Lenders that Guarantor has read and understands the terms and conditions of the Loan Agreement and the other Loan Documents. Guarantor hereby covenants that Guarantor will continue to keep informed of Borrowers' financial condition, the financial condition of other guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Guaranteed Obligations.

**11.    Subordination.**   Guarantor hereby agrees that any and all present and future indebtedness of Borrowers owing to Guarantor is subordinated to the Guaranteed Obligations pursuant to the terms of that certain Subordination Agreement, of even date herewith, between Borrowers, Guarantor and Agent.

**12.    Payments; Application.**   All payments to be made hereunder by Guarantor shall be made in lawful money of the United States of America at the time of payment, shall be made in immediately available funds, and shall be made without deduction (whether for taxes or otherwise) or offset. All payments made by Guarantor hereunder shall be applied as follows: first, to all costs and expenses (including attorneys' fees) incurred by Agent in enforcing this Guaranty or in collecting the Guaranteed Obligations; second, to all accrued and unpaid interest, premium, if any, and fees owing to Agent constituting Guaranteed Obligations; and third, to the balance of the Guaranteed Obligations.

13. **Attorneys' Fees and Costs**. Guarantor agrees to pay, on demand, all reasonable attorneys' fees and all other costs and expenses which may be incurred by Agent and the Lenders in the enforcement of this Guaranty (including those brought relating to proceedings pursuant to 11 U.S.C.) or in any way arising out of, or consequential to the protection, assertion, or enforcement of the Guaranteed Obligations (or any security therefor), whether or not suit is brought.

14. **Indemnification**. Guarantor agrees to indemnify Agent and hold Agent harmless against all obligations, demands, or liabilities asserted by any party and against all losses in any way suffered, incurred, or paid by Agent as a result of or in any way arising out of, following, or consequential to Agent's transactions with Borrowers.

15. **Notices**. All notices or demands by Guarantor or Agent to the other relating to this Guaranty shall be in writing and either personally served or sent by registered or certified mail, postage prepaid, return receipt requested, overnight delivery service, or by telefacsimile, and shall be deemed to be given for purposes of this Guaranty on the earlier of the date of actual receipt or three days after the deposit thereof in the mail. Unless otherwise specified in a notice sent or delivered in accordance with the provisions of this section, such writing shall be sent, if to Guarantor, at Guarantor's address set forth on the signature page hereof, and if to Agent, then as follows:

> Orchard Drive, LLC
> Schulte Roth & Zabel LLP
> 919 Third Avenue
> New York, New York 10022
> Attention: Yehuda M. Braunstein, Esq.
> Telefacsimile No.: 212.593.5955

16. **Cumulative Remedies**. No remedy under this Guaranty or under any Loan Document is intended to be exclusive of any other remedy, but each and every remedy shall be cumulative and in addition to any and every other remedy given hereunder or under any Loan Document, and those provided by law or in equity. No delay or omission by Agent or the Lenders to exercise any right under this Guaranty shall impair any such right nor be construed to be a waiver thereof. No failure on the part of Agent or the Lenders to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

17. **Books and Records**. Guarantor agrees that Agent's and the Lenders' books and records showing the account between the Lenders and Borrowers shall be admissible in any action or proceeding and shall be binding upon Guarantor for the purpose of establishing the items therein set forth and shall constitute prima facie proof thereof.

18. **Collateral**. The obligations of Guarantor hereunder are secured by among other things that certain (i) Security Agreement, dated of even date herewith, (ii) Second

Preferred Ship Mortgage, dated as of even date, and (iii) Charter Assignment, dated as of even date.

19.    **Severability of Provisions**. Any provision of this Guaranty which is prohibited or unenforceable under applicable law, shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

20.    **Entire Agreement; Amendments**. This Guaranty and the other Loan Documents to which Guarantor is a party constitutes the entire agreement between Guarantor and Agent pertaining to the subject matter contained herein. This Guaranty may not be altered, amended, or modified, nor may any provision hereof be waived or noncompliance therewith consented to, except by means of a writing executed by both Guarantor and Agent. Any such alteration, amendment, modification, waiver, or consent shall be effective only to the extent specified therein and for the specific purpose for which given. No course of dealing and no delay or waiver of any right or default under this Guaranty shall be deemed a waiver of any other, similar or dissimilar right or default or otherwise prejudice the rights and remedies hereunder.

21.    **Successors and Assigns**. This Guaranty shall be binding upon Guarantor's successors and assigns and shall inure to the benefit of the permitted successors and assigns of Agent and the Lenders; provided, however, Guarantor shall not assign this Guaranty or delegate any of its duties hereunder without Agent's prior written consent. Any assignment without the consent of Agent shall be absolutely void. In the event of any permitted assignment or other transfer of rights by Agent or any Lender to an Assignee under Section 14.1 of the Loan Agreement, the rights and benefits herein conferred upon Agent and the Lenders shall automatically extend to and be vested in such Assignee or other transferee.

22.    **Choice of Law and Venue**. THE VALIDITY OF THIS GUARANTY, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF GUARANTOR AND AGENT, SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK. GUARANTOR HEREBY AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS GUARANTY SHALL BE TRIED AND DETERMINED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE BOROUGH OF MANHATTAN, STATE OF NEW YORK, OR, AT THE SOLE OPTION OF AGENT, IN ANY OTHER COURT IN WHICH AGENT SHALL INITIATE LEGAL OR EQUITABLE PROCEEDINGS AND WHICH HAS SUBJECT MATTER JURISDICTION OVER THE MATTER IN CONTROVERSY. GUARANTOR HEREBY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION.

23.    **Waiver of Jury Trial**. GUARANTOR HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY ACTION, CAUSE OF ACTION, CLAIM, DEMAND, OR PROCEEDING ARISING UNDER OR WITH RESPECT TO

THIS GUARANTY, OR IN ANY WAY CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE DEALINGS OF GUARANTOR AND AGENT WITH RESPECT TO THIS GUARANTY, OR THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE. GUARANTOR HEREBY AGREES THAT ANY SUCH ACTION, CAUSE OF ACTION, CLAIM, DEMAND, OR PROCEEDING SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY AND THAT AGENT MAY FILE AN ORIGINAL COUNTERPART OF THIS SECTION WITH ANY COURT OR OTHER TRIBUNAL AS WRITTEN EVIDENCE OF THE CONSENT OF GUARANTOR TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

24.   Waivers, Consents.   Guarantor warrants and agrees that each of the waivers and consents set forth herein is made after consultation with legal counsel and with full knowledge of its significance and consequence, with the understanding that events giving rise to any defense or right waived may diminish, destroy, or otherwise adversely affect rights which Guarantor otherwise may have against Borrowers, Agent, the Lenders or others, or against any collateral, and that, under the circumstances, the waivers and consents herein given are reasonable and not contrary to public policy or law. If any of the waivers or consents herein are determined to be unenforceable under applicable law, such waivers and consents shall be effective to the maximum extent permitted by law.

IN WITNESS WHEREOF, Guarantor has executed and delivered this Guaranty as of the date set forth in the first paragraph hereof.

SURFSIDE PRINCESS LLC,
a Delaware limited liability company

By: _____
Name:
Title:

Guarantor's Address: _____
_____
Telephone: (___) _____
Telefacsimile: (___) _____

S-1
Continuing Guaranty



b